Brooke E. Pietrzak (BP-7314)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant*
*Silver Dragon Resources, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALPHA CAPITAL ANSTALT, | Case No. 07 CV 11430 (CM) |
| Plaintiff, | ECF CASE |
| vs. | |
| SILVER DRAGON RESOURCES, INC. | |
| Defendant | |

**MEMORANDUM OF LAW OF SILVER DRAGON RESOURCES, INC. IN
SUPPORT OF MOTION TO SET ASIDE DEFAULT JUDGMENTS**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..........................................................................................................1

STATEMENT OF FACTS ..................................................................................................................1

ARGUMENT ........................................................................................................................................6

    THE DEFAULT JUDGMENTS ENTERED AGAINST SILVER DRAGON
    SHOULD BE SET ASIDE PURSUANT TO FRCP 60(B)(1) .................................................6

        A.    Silver Dragon's Defaults Were Not Willful ..................................................7

        B.    Silver Dragon Has A Meritorious Defense ...................................................9

        C.    Alpha Capital Will Not Be Prejudiced If the Default Judgments Are Set Aside ........11

CONCLUSION...................................................................................................................................13

# **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57 (2d Cir. 1996) .............................................. 8

*Davis v. Musler*, 713 F.2d 907 (2d Cir. 1983) ..................................................................... 7, 9, 11

*Dengel v. Dearden*, No. 06-CV-6279, 2007 WL 475317 (W.D.N.Y. Feb. 9, 2007) ...................... 8

*Enron Oil Corp. v. Diakuhara*, 10 F.3d 90 (2d Cir. 1993) ...................................................... 7, 9, 12

*Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623 (2d Cir. 1962) ............................................... 7

*Lichtenstein v. Jewelart, Inc.*, 95 F.R.D. 511 (E.D.N.Y. 1982) ..................................................... 9

*Meehan v. Snow*, 652 F.2d 274 (2d Cir. 1981) ....................................................................... 7, 11

*Robert L. Haag v. Shasta Beverages, Inc.*, No. 85 Civ. 2985 (CSH),
   1987 WL 12408 (S.D.N.Y. June 5, 1987) ............................................................................ 10-11

*S.E.C. v. McNulty*, 137 F.3d 732 (2d Cir. 1998) ......................................................................... 7-8

*Standard Enters., Inc. v. Bag-It, Inc.*, 115 F.R.D. 38 (S.D.N.Y. 1987) ........................................ 9

*Tripmasters, Inc. v. Hyatt Int'l Corp.*, No. 82 Civ. 6792 (JFK),
   1984 WL 1057 (S.D.N.Y. Oct. 23, 1984) ................................................................................ 9

### **Statutes**

Fed R. Civ. P. 60(b)(1) ............................................................................................................ 1, 6, 7

Fed. R. Civ. P. 55(c) ................................................................................................................ 1, 6, 7

### **Other Authorities**

10 James Wm. Moore et al., Moore's Federal Practice § 55.60[1] (3d ed. 2007) ......................... 6

**PRELIMINARY STATEMENT**

Silver Dragon Resources, Inc. ("Silver Dragon") respectfully submits this Memorandum of Law in support of its motion to set aside (i) the Order Granting A Preliminary Injunction By Default that was entered against Silver Dragon on January 14, 2008 and (ii) the Order that was also entered against Silver Dragon on or about January 25, 2008 by default pursuant to Fed. R. Civ. P. 55(c) and 60(b)(1).

**STATEMENT OF FACTS**

On or about November 8, 2006, Silver Dragon and Alpha Capital Anstalt ("Alpha Capital") entered into a Subscription Agreement, whereby Alpha Capital purchased 500,000 shares of common stock and 250,000 Class A Warrants, 250,000 Class B Warrants and one million Class C Warrants from Silver Dragon. *See* Affidavit of Marc Hazout, dated February 5, 2008 ("Hazout Aff.") ¶ 3. The Class A and Class B Warrants could be exercised for five years after the closing and the Class C Warrants could be exercised for one year after the closing (collectively the "Warrants"). *Id.* Alpha Capital paid $500,000 for its investment, and since the Warrants had no value on the date of issuance, the $500,000 therefore reflected a purchase price of $1 per share of common stock. *Id.* The Subscription Agreement contained a "Favored Nations Provision" that provided, in relevant part, that except for certain "Excepted Issuances," if Silver Dragon issued common stock (or securities that were convertible or exercisable for shares of common stock) at a price that was less than the purchase price paid by Alpha Capital (i.e., $1/share), Silver Dragon was to (i) issue additional shares of stock to Alpha Capital so that Alpha Capital's average price per share would equal that lower price per share and (ii) adjust the exercise price on the Warrants to the lower price per share. *Id.* ¶ 4.

It was the understanding and intention of the parties throughout the negotiation and drafting of the Subscription Agreement that the issuance of employee stock options and warrants would be an "Excepted Issuance" for purposes of the Favored Nations Provision. Hazout Aff. ¶ 5. This topic was discussed on numerous occasions during the process and Silver Dragon would not have entered into the Subscription Agreement unless it was able to issue warrants to its employees below $1.00 without triggering the ratchet right in the Favored Nations Provision. *Id.* The fact that stock options and warrants issued to employees were intended by the parties to be considered "Excepted Issuances" is also supported by the "Summary of Terms and Conditions" (the "Term Sheet") that Mr. Hazout signed at the beginning of the negotiations. Under the heading "Ratchet Rights" it expressly states that employee stock options and/or warrants . . . will be excluded from this provision." *Id.* ¶ 6 & Ex. B. Although Silver Dragon did not have an employee stock option plan in 2005 or 2006, it intended to start one in the future and it intended for such a plan to be excepted from the "Ratchet Rights." *Id.* ¶ 6.

The Subscription Agreement itself also reflects the intention of the parties to exclude employee stock options or warrants. Paragraph 11(a)(iii) states, in relevant part, that Silver Dragon's "issuance of Common Stock or the issuances or grants of options to purchase Common Stock pursuant to stock option plans and employee stock purchase plans described on Schedule 5(d)" are "Excepted Issuances." *Id.* ¶ 7. According to the clear language of this provision, employee stock option plans and the like were to be listed on Schedule 5(d), which was being prepared by Alpha Capital. *Id.*

Neither Silver Dragon, nor its counsel, Stephen Cohen, received a copy of Schedule 5(d) during the negotiation of the Subscription Agreement. Hazout Aff. ¶ 8. In fact, the copy of the Subscription Agreement signed by Mr. Hazout on November 2, 2006, had only Exhibit E and

- 2 -

Schedule 7 attached to it.  *See id.*  While it is unclear as of now (without further discovery) how the employee stock option plans and repurchase plans failed to be listed on Schedule 5(d) to the Subscription Agreement, there was at least an oversight on the part of Alpha Capital, which was preparing the document.  *Id.*  On December 18, 2006, Barbara Mittman, counsel for Alpha Capital, forwarded what was represented to be the "correct" version of Schedule 5(d) to Mr. Cohen and Mr. Hazout and indicated that an earlier version of Schedule 5(d) had been attached to the closing documents.  *Id.* ¶ 9 & Ex. C.

From November 7, 2006 through November 7, 2007, Silver Dragon issued more than $5 million worth of common stock in 54 financings.  Hazout Aff. ¶ 10 & Ex. D..  Not one of these 54 financings was conducted below $1.00 because Silver Dragon expressly did not wish to trigger the ratchet provision set forth in the Subscription Agreement.  *See id*.  In fact, on October 17, 2007, Silver Dragon issued common stock in connection with a financing at $1.00, even though the stock had been trading below $1.00 that day because it did not want to trigger the ratchet provision.  *Id.*  During that same time period, Silver Dragon issued warrants to its directors on three separate occasions.  *Id.* ¶ 11.  These three issuances are the only instances during that time frame where Silver Dragon issued warrants below $1.00.  *Id*.  Silver Dragon did so because the parties had agreed that employee stock options and/or warrants were to be "Excepted Issuances."  *Id.*  The first such issuance occurred on August 16, 2007, the second occurred on August 29, 2007 and the third took place on November 2, 2007.  Each issuance was reported shortly thereafter in a press release and/or a publicly filed 8K.  *Id.*  Alpha Capital did not seek a preliminary injunction based on the application of the "ratchet provision" to warrants issued to directors, though, until four months after the first such issuance.  *Id*.

The one million Class C Warrants issued to Alpha Capital expired on November 8, 2007. Hazout Aff. ¶ 12. On November 4, 5, and 6, 2007, Asher Brand of LH Financial Services Corp. ("LH Financial") contacted Mr. Hazout to request an extension of the time to exercise these warrants. *Id.* Alpha Capital is a fund owned by LH Financial and Mr. Brand has indicated that he is authorized to act on behalf of his client, Alpha Capital. *Id.* Mr. Hazout discussed Mr. Brand's request with Colin Sutherland, Silver Dragon's Chief Financial Officer, but it was determined that it was not in Silver Dragon's best interest to extend Alpha Capital's time to exercise the Class C Warrants. *Id.* ¶ 13. As a result, Silver Dragon did not agree to Mr. Brand's request. *Id.* Shortly thereafter, on November 20, 2007, Silver Dragon received a letter from counsel for Alpha Capital, Grushko & Mittman, P.C., seeking to effectuate the ratchet rights set forth in the Subscription Agreement based upon the issuance of options to one of Silver Dragon's directors at $.60 share on November 2, 2007. *Id*. Silver Dragon was surprised by Alpha Capital's demand, since employee stock options and/or warrants were understood to be excluded from the Favored Nations Provision throughout the negotiation and execution of the Subscription Agreement. *Id*. ¶ 14. Moreover, Silver Dragon had issued warrants to directors below $1.00 on two prior occasions and had publicly disclosed such issuances, yet Alpha Capital had not claimed that the Favored Nations Provision had been breached by those issuances. *Id*.

On or about December 21, 2007, Alpha Capital filed an Order to Show Cause seeking (i) the issuance of 333,333 shares of Silver Dragon's common stock to Alpha Capital and (ii) a declaration that the exercise price of Alpha Capital's Class A and B Warrants was reduced to $0.60. The Court stated in the Order to Show Cause, though, that "nothing in the papers suggests that this motion needed to be filed on the last business day before Christmas" and

warned that if the Order to Show Cause was given to Federal Express before Christmas, the Court "will not hear the matter until March."

Silver Dragon's office, which is located in Toronto, was officially closed from December 24, 2007 until January 7, 2008 for the Christmas and New Year holidays. Hazout Aff. ¶ 15. On December 28, 2007, Mr. Hazout happened to be in the offices to meet with Silver Dragon's Controller when Federal Express delivered Alpha Capital's Order to Show Cause papers. *Id.* It was only by happenstance therefore, that Mr. Hazout received and opened the papers before the office re-opened on January 7, 2008. *Id.* Mr. Hazout needed to consult with Mr. Sutherland, the CFO, though, before determining how the corporation should respond (including whether the company should retain legal counsel for the matter). *Id.* ¶ 16. Mr. Sutherland, however, was on vacation in Halifax while Silver Dragon's offices were closed for the holidays. *Id.* The papers were forwarded to Mr. Sutherland while he was away so that he could discuss the matter promptly upon his return and devise a strategy to address Alpha Capital's claims. *Id.*

On January 7, 2008, the first day that Silver Dragon re-opened after the holiday closure, Mr. Hazout and Mr. Sutherland spoke regarding the Order to Show Cause papers and decided that the corporation should try to negotiate with Alpha Capital and resolve this matter. Hazout Aff. ¶ 17. Silver Dragon believed that the parties could work this issue out without involving the Court, especially since it was clear that employee stock options and/or warrants were clearly meant to be "Excepted Issuances" under the terms of the Subscription Agreement, the Term Sheet and the agreement between the parties. *Id.* Mr. Hazout therefore contacted Asher Brand at LH Financial Services Corporation on January 7, 2008 to begin settlement negotiations. *Id.* ¶ 18. Mr. Brand was receptive to the discussion and over the next two days, he and Mr. Hazout spoke and exchanged emails regarding the parties' offers and counter-offers. *Id.*

Settlement negotiations continued via electronic mail during the afternoon and early evening of January 8, 2007 between Mr. Hazout and Mr. Brand; however they were unable to reach a resolution. Hazout Aff. ¶ 19. At this point in time, Mr. Hazout sent a letter to the Court respectfully requesting an adjournment of the January 9th Hearing until January 15, 2008, to complete the settlement negotiations. *Id.* Silver Dragon was not in a position to make this request in person since its officers and directors are located in Canada and it had not retained counsel in New York (Mr. Cohen is licensed to practice in Canada, not in the United States). *Id.* Silver Dragon's request for an extension was not granted, the January 9th Hearing proceeded as scheduled with only counsel for Alpha Capital in attendance and Alpha Capital's request for a preliminary injunction was granted by default on or about January 14, 2008. *Id.* ¶ 20. Silver Dragon subsequently retained counsel in New York to represent it in connection with the instant matter. The motion to set aside the default judgment was promptly prepared, along with an Answer to the Complaint. Before this process was complete, however, a second Order was entered against Silver Dragon on default on January 25, 2008.

## ARGUMENT

### THE DEFAULT JUDGMENTS ENTERED AGAINST SILVER DRAGON SHOULD BE SET ASIDE PURSUANT TO FRCP 60(b)(1)

Pursuant to FRCP 55(c) "[t]he court . . . may set aside a default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). FRCP 60(b) provides, in turn, that the court may relieve a party from a final order for "mistake, inadvertence, surprise, or excusable neglect." Fed R. Civ. P. 60(b)(1).[1]

---

[1] Silver Dragon is effectively unable to appeal the preliminary inunctions herein because they were granted by default. *See* 10 James Wm. Moore et al., Moore's Federal Practice § 55.60[1] (3d ed. 2007) ("[O]ne effect of a default judgment is that the factual allegations of

- 6 -

The Second Circuit has long held that the following three criteria should be applied when applying Rule 60(b)(1) in the context of a default judgment: (i) was the default willful; (ii) does the defendant have a meritorious defense; and (iii) what level of prejudice may the non-defaulting party face if the judgment is vacated. *See Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983) (citations omitted). While the burden of proof is on the party seeking to establish that a default judgment should be set aside, "when doubt exists as to whether a default judgment should be granted or vacated, the doubt should be resolved in favor of the defaulting party. In other words, 'good cause' and the criteria of the Rule 60(b) set aside should be construed generously." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993); *see also Davis,* 713 F.2d at 915 ("Given that all doubts should be resolved in favor of those seeking relief under Rules 55(c) and 60(b), we believe defendants should be given a chance to prove it.") (citations omitted).

Silver Dragon can more than satisfy this standard, as its default was not willful, it has a meritorious defense to the motion for a preliminary injunction (and the Complaint), and Alpha Capital will not be prejudiced by the brief delay that will result if the judgments are vacated.

### A.  Silver Dragon's Defaults Were Not Willful

As the Second Circuit has observed, "the extreme sanction of a default judgment must remain a weapon of last, rather than first, resort." *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981). The courts have therefore "interpreted 'willfulness,' in the context of a default, to refer to conduct that is more than merely negligent or careless." *S.E.C. v. McNulty*, 137 F.3d 732, 738

---

the claim . . . are deemed to be admitted by the defaulting party. Therefore on appeal, the defaulting party may not contest those facts."). Silver Dragon therefore respectfully submits that the proper procedure to seek reconsideration of the default judgments herein is pursuant to FRCP 55(c) and 60(b)(1). In any event, Silver Dragon respectfully submits that the Court should apply the same equitable principles set forth in this brief if it instead entertains this motion pursuant to its continuing power over the preliminary injunctions. *See Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962).

(2d Cir. 1998). In other words, a finding of willfulness is properly based on "egregious or deliberate conduct." *See Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996). As has been demonstrated above, and in the accompanying Affidavit of Marc Hazout, Silver Dragon's conduct herein does not rise to this extreme level.

The Order to Show Cause papers were served on December 28, 2007 when Silver Dragon's offices were closed for the holidays. *See* Hazout Aff. ¶ 15. The fact that Mr. Hazout received them before January 7, 2008, when the office re-opened, was mere happenstance, as he had briefly come in to the office to meet with the corporation's Controller when Federal Express delivered the package. *Id.* Mr. Hazout, who is not an attorney, was not in a position to retain counsel or to determine how to respond without first consulting with his CFO, Mr. Sutherland. *Id.* ¶ 16. Mr. Sutherland, however, was on vacation in Halifax during Silver Dragon's winter break. Mr. Hazout and Mr. Sutherland spoke immediately upon the latter's return to the office on January 7th and decided that given the short time frame, the best approach would be to negotiate with Alpha Capital, which it did over the course of the next two days. *Id.* ¶ 17.

When it became apparent that a settlement could not be reached before the January 9th Hearing, Silver Dragon wrote to the Court to request an extension. Hazout Aff. ¶ 19. Silver Dragon's conduct, therefore, was not "indicative of [a] willful evasion of a duty to respond," *see Dengel v. Dearden*, No. 06-CV-6279, 2007 WL 475317, at *3 (W.D.N.Y. Feb. 9, 2007), as the corporation did intend to respond and simply wanted one additional week to pursue settlement negotiations. Silver Dragon was not in a position to make this request for an extension in person since its officers and directors are located in Canada and it had not retained counsel in New York (Mr. Cohen is licensed to practice in Canada, not the United States). Hazout Aff. ¶ 19.

In the short time that has passed since the default judgments were entered, Silver Dragon has retained counsel for this matter, brought counsel up to speed, prepared the instant motion and drafted an Answer to the Complaint. Hazout Aff. ¶ 21. Silver Dragon's quick action to address the default also weighs against a finding of willfulness. *See e.g. Standard Enters., Inc. v. Bag-It, Inc.*, 115 F.R.D. 38, 39 (S.D.N.Y. 1987) (finding "it would be going too far to call the default 'willful,' particularly given the dispatch with which [defendant] and counsel acted once they finally learned that [defendant] was being sued.") Silver Dragon's failure to appear was not strategic, nor was it done in bad faith – at worst its initial efforts to respond to the Order to Show Cause can be classified as misdirected, since it focused its efforts on trying to settle the matter first. Such conduct does not rise, however, to the required level of willfulness. *See Lichtenstein v. Jewelart, Inc.*, 95 F.R.D. 511, 513 n. 3 (E.D.N.Y. 1982) (finding defendant's "failure to file an answer was not willful because it was based on the good faith belief that settlement negotiations obviated judicial action").

### B. Silver Dragon Has A Meritorious Defense

"[A] defendant seeking to vacate a default judgment need not conclusively establish the validity of the defense(s) asserted . . . ." *Davis*, 713 F.2d at 916 (citations omitted). "The test of such a defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, *if proven at trial*, would constitute a complete defense." *Enron Oil*, 10 F.3d at 98 (emphasis added). "Actual proof of the defense is not required at this stage." *Tripmasters, Inc. v. Hyatt Int'l Corp.*, No. 82 Civ. 6792 (JFK), 1984 WL 1057, at *3 (S.D.N.Y. Oct. 23, 1984).

Silver Dragon clearly has a meritorious defense, as the Subscription Agreement, the Term Sheet and the negotiations between the parties clearly show that employee stock options and/or warrants were to be considered "Excepted Issuances." The Term Sheet, which was executed by

- 9 -

Mr. Hazout at the beginning of the negotiations expressly states under the heading "Ratchet Rights" that employee stock options and/or warrants . . . will be excluded from this provision." Hazout Aff. ¶ 6 & Ex. B.  Similarly, ¶ 11(a)(iii) of the Subscription Agreement references "stock option plans and employee stock repurchase plans" and directs the parties to the descriptions of these plans listed on Schedule 5(d).  *Id.* ¶ 7 & Ex. A.  The fact that the descriptions were omitted from Schedule 5(d) when it was being prepared by Alpha Capital (apparently as an oversight, but further discovery is needed), does not undo the intention of the parties to exclude such issuances from the ratchet provision.

Moreover, Silver Dragon's course of conduct with respect to the pricing of its issuances after the Subscription Agreement was executed further supports this defense.  Fifty-four financings were done from November 7, 2006, through November 7, 2007, totaling nearly $5 million.  Hazout Aff. ¶ 10 & Ex. D.  Not one of these financings was priced below $1.00, though, since Silver Dragon did not want to trigger the ratchet provision set forth in the Subscription Agreement".  *Id.*  In fact, on October 17, 2007, Silver Dragon issued common stock for a financing at $1.00 per share despite the fact that the stock had been trading well below that threshold, because it did not want to trigger the ratchet provision.  *Id.*  In contrast, warrants were issued below $1.00 on only three occasions during this time frame – two issuances in August of 2007 and one on November 2, 2007.  *Id.* ¶ 11.  In each of these three cases, the warrants were issued to directors who were clearly understood to be exempt from the ratchet provision.  *Id.*

In *Robert L. Haag v. Shasta Beverages, Inc.*, No. 85 Civ. 2985 (CSH), 1987 WL 12408, at *2 (S.D.N.Y. June 5, 1987), a case involving the oral modification of a contract, the court noted that the defendant's proffer was "weak" and "[t]he most that can be said in its favor on the present papers is that [defendant's vice president] cannot remember whether he did or did not

agree to the changes." Even on that tenuous basis, though, the court held that a meritorious defense had been presented and the default judgment was set aside. Silver Dragon's showing far exceeds the proffer made in *Robert L. Haag,* as its defense is solidly based upon documents and testimony and rises far above "general denials, mere legal conclusions, or simple assertions that [it] has a meritorious defense." *Id.* Given that "[d]efaults are not favored, particularly when the case presents issues of fact, and doubts are to be resolved in favor of a trial on the merits," *Meehan*, 652 F.2d at 277, Silver Dragon should be permitted the opportunity to defend against the request for a preliminary injunction.

### C. Alpha Capital Will Not Be Prejudiced If the Default Judgments Are Set Aside

"[D]elay alone is not a sufficient basis for establishing prejudice. Rather, it must be shown that delay will 'result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'" *Davis*, 713 F.2d. at 916 (citations omitted). In the instant matter, approximately three weeks have passed since the first preliminary injunction was granted on default. During this very brief period of time, evidence has not been lost, discovery has not become more difficult to conduct, nor has any fraud or collusion taken place. Silver Dragon has instead spent this short window of time hiring and conferring with counsel, preparing these motion papers and preparing an Answer to the Complaint. Hazout Aff. ¶ 21. Silver Dragon has also stated that it is prepared to move forward quickly and expeditiously with this matter and it has simultaneously filed its Answer with the instant papers as further evidence of this commitment. *Id.* ¶¶ 21, 26.

While permitting Silver Dragon the opportunity to raise its defenses to the preliminary injunction will obviously result in a brief delay, it should be noted that Alpha Capital waited more than four months to file its Order to Show Cause papers. Silver Dragon first issued

warrants with an exercise price below $1.00 to a director on August 16, 2007, and such issuance was reported shortly thereafter in a press release and/or a publicly filed 8K. A second issuance to a director, again below $1.00, occurred on August 29, 2007, and was promptly reported in a press release and/or a publicly filed 8K. Alpha Capital did not file the instant preliminary injunction motion, however, until after warrants were issued a third time below $1.00 to a director and only after Alpha Capital had been denied an extension on the time to exercise its expiring Class C Warrants. Even then, Alpha Capital did not file its Order to Show Cause papers until more than one month later on December 21, 2007 - the last business day before Christmas and right before many businesses (including Silver Dragon) closed over the Christmas and New Year's holidays.

Silver Dragon's CEO has stated that the company is pursuing more than one large financing and that the corporation is not in imminent financial danger, contrary to the assertions in Alpha Capital's papers.[2] However, if Silver Dragon continues to be restrained from issuing any shares of its stock, as is set forth in the January 25th Order, these financings will be put in jeopardy. The prejudice facing Silver Dragon, therefore, is much greater than any prejudice Alpha Capital could assert, an equitable factor that should also weigh in favor of setting aside the default judgments. *See Enron Oil*, 10 F.3d at 96 (holding that "[o]ther relevant equitable factors may also be considered, for instance … whether the entry of default would bring about a harsh or unfair result."). Silver Dragon has essentially been prohibited from doing business by the two default judgments, which is an unfair result given that Silver Dragon has a meritorious defense.

---

[2] The fact that Alpha Capital wanted to extend its time to exercise its Class C Warrants for an additional year belies the assertion in its papers that it fears Silver Dragon may soon cease to exist.

The fact that Alpha Capital has been granted a mandatory injunction without having to post a bond to preserve the status quo is also a harsh result given the strength of Silver Dragon's case.

## CONCLUSION

For the foregoing reasons, Silver Dragon respectfully requests that the Court set aside the default judgments entered on January 14, 2008 and January 25, 2008.

Dated: New York, New York
February 5, 2008

Respectfully submitted,

**DORSEY & WHITNEY LLP**

By:  /s/Brooke E. Pietrzak
_____
Brooke E. Pietrzak (BP-7314)
Stephen M. Raab (SR-0742)

250 Park Avenue
New York, New York  10177
(212) 415-9200

Attorneys for Defendant
Silver Dragon Resources, Inc.

- 13 -