Brooke E. Pietrzak (BP-7314)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant*
*Silver Dragon Resources, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALPHA CAPITAL ANSTALT, | Case No. 07 CV 11430 (CM) |
| Plaintiff, | ECF CASE |
| vs. | **AFFIDAVIT OF MARC HAZOUT** |
| SILVER DRAGON RESOURCES, INC. | |
| Defendant | |

COUNTRY OF CANADA     )

                                    )  s.s.:

CITY OF TORONTO          )

        Marc Hazout being duly sworn, deposes and says:

        1.        I am the President and CEO of Silver Dragon Resources, Inc. ("Silver Dragon"),

the defendant in the above-captioned action.  I make this statement in support of Silver Dragon's

motion seeking to set aside (i) the Order Granting A Preliminary Injunction By Default that was

entered against Silver Dragon on January 14, 2008 and (ii) the Order that was also entered

against Silver Dragon by default on or about January 25, 2008.

**Background**

2.      Silver Dragon's principal place of business is located at 5160 Yonge Street, Suite 803, Toronto, Ontario, Canada.  All of Silver Dragon's officers and directors reside in Canada.

3.      On or about November 8, 2006, Silver Dragon and Alpha Capital Anstalt ("Alpha Capital") entered into a Subscription Agreement, whereby Alpha Capital purchased 500,000 shares of common stock and 250,000 Class A Warrants, 250,000 Class B Warrants and one million Class C Warrants from Silver Dragon.  The Class A and Class B Warrants could be exercised for five years after the closing and the Class C Warrants could be exercised for one year after the closing (collectively the "Warrants").  A true and correct copy of the Subscription Agreement, as it was signed by me on November 2, 2006, is attached hereto as Exhibit A.  Alpha Capital paid $500,000 for its investment, and since the Warrants had no value on the date of issuance, the $500,000 therefore reflected a purchase price of $1 per share of common stock.

4.      The Subscription Agreement contained a "Favored Nations Provision" that provided, in relevant part, that except for certain "Excepted Issuances," if Silver Dragon issued common stock (or securities convertible or exercisable for shares of common stock) at a price that was less than the purchase price paid by Alpha Capital (i.e., $1/share), Silver Dragon was to (i) issue additional shares of stock to Alpha Capital so that Alpha Capital's average price per share would equal that lower price per share and (ii) adjust the exercise price on the Warrants to the lower price per share.  *See* Exhibit A at ¶ 11(b).

5.      It was the understanding and intention of the parties throughout the negotiation and drafting of the Subscription Agreement that the issuance of employee stock options and warrants would be considered "Excepted Issuances" for purposes of the Favored Nations

-2-

Provision.  This topic was discussed on numerous occasions during the process and I would not have entered into the Subscription Agreement unless Silver Dragon was in a position to issue warrants to its employees below $1.00 without triggering the "ratchet right" set forth in the Favored Nation Provision.

6.     The fact that stock options and warrants issued to employees were intended by the parties to be considered "Excepted Issuances" is supported by the "Summary of Terms and Conditions" (the "Term Sheet") that I signed at the beginning of the negotiations.  Under the heading "Ratchet Rights" it expressly states that employee stock options and/or warrants . . . will be excluded from this provision."  A true and correct copy of the Term Sheet is attached hereto as Exhibit B.  Although Silver Dragon did not have an employee stock option plan in 2005 or 2006, it intended to start one in the future and it intended for such a plan to be excepted from the "Ratchet Rights" once it was implemented.

7.     The Subscription Agreement itself also reflects the intention of the parties to exclude employee stock options or warrants.  Paragraph 11(a)(iii) states, in relevant part, that Silver Dragon's "issuance of Common Stock or the issuances or grants of options to purchase Common Stock pursuant to stock option plans and employee stock purchase plans described on Schedule 5(d)" are "Excepted Issuances."  According to the clear language of this provision, employee stock option plans and the like were to be listed on Schedule 5(d), which was being prepared by Alpha Capital.  The fact that by Alpha Capital's apparent omission no such plans were described on Schedule 5(d), does not undo the intention of the parties.

8.     Neither Silver Dragon, nor its counsel, Stephen Cohen, received a copy of Schedule 5(d) during the negotiation of the Subscription Agreement.  In fact, as is evident from

Exhibit A to this Affidavit, the copy of the Subscription Agreement signed by me on November 2, 2006 only had Exhibit E and Schedule 7 attached to it. It is therefore unclear how the employee stock option plans and repurchase plans failed to be listed on Schedule 5(d) of the Subscription Agreement, but there was at least an oversight on the part of Alpha Capital.

9.    On December 18, 2006, more than one month after the closing, Barbara Mittman, counsel for Alpha Capital, forwarded what was represented to be the "correct" version of Schedule 5(d) to Mr. Cohen and myself and indicated that an earlier version of Schedule 5(d) had been attached to the closing documents. A true and correct copy of the email from Barbara Mittman to Stephen Cohen dated December 18, 2006 is attached hereto as Exhibit C.

10.    From November 7, 2006 through November 7, 2007, Silver Dragon issued more than $5 million worth of common stock in 54 financings. Not one of these 54 financings was conducted below $1.00, though, because Silver Dragon expressly did not wish to trigger the ratchet provision set forth in the Subscription Agreement. *See* excerpt from "Silver Dragon Resources, Inc. (Stock Ledger) Activity Report – Detailed" (the "Activity Report") attached hereto as Exhibit D. In fact, on October 17, 2007, Silver Dragon issued common stock in connection with a financing at $1.00, even though the stock had been trading below $1.00 that day because it did not want to trigger the ratchet provision.

11.    During that same time period, Silver Dragon issued warrants to its directors on three separate occasions. These three issuances are the only instances where Silver Dragon issued warrants below $1.00. Silver Dragon did so because the parties had agreed that employee stock options and/or warrants (unlike the 54 financings discussed in the preceding paragraph) were to be "Excepted Issuances." The first such issuance occurred on August 16, 2007, the

second issuance occurred on August 29, 2007 and the third issuance occurred on November 2, 2007. Each of the three issuances was promptly reported in a press release and/or a publicly filed 8K filed by Silver Dragon. Alpha Capital did not seek a preliminary injunction based on the application of the "ratchet provision" to warrants issued to directors, though, until four months after the first such issuance.

12.    The one million Class C Warrants issued to Alpha Capital expired on November 8, 2007. On November 4, 5 and 6, 2007, Asher Brand of LH Financial Services Corp. contacted me to request an extension of the time to exercise the warrants. Alpha Capital is a fund owned by LH Financial and it has been represented to me on several occasions that Mr. Brand is authorized to act on behalf of his client, Alpha Capital.

13.    I discussed Mr. Brand's request with Colin Sutherland, Silver Dragon's Chief Financial Officer, but we determined that it was not in Silver Dragon's best interest to extend Alpha Capital's time to exercise the Class C Warrants. As a result, we did not agree to Mr. Brand's request. Shortly thereafter, on November 20, 2007, Silver Dragon received a letter from counsel for Alpha Capital, Grushko & Mittman, P.C., seeking to effectuate the ratchet rights set forth in the Subscription Agreement based upon the issuance of warrants to one of Silver Dragon's directors at $.60 share on November 2, 2007.

14.    Silver Dragon was surprised by Alpha Capital's demand, since employee stock options and/or warrants were understood to be excluded from the Favored Nations Provision throughout the negotiation and execution of the Subscription Agreement. Moreover, Silver Dragon had issued warrants to directors below $1.00 on two prior occasions and had publicly

disclosed such issuances, yet Alpha Capital had not claimed that the Favored Nations Provision

had been breached by these issuances.

**Default Was Not Willful**

15.     Silver Dragon's office in Toronto was officially closed from December 24, 2007

until January 7, 2008 for the Christmas and New Year holidays.  On December 28, 2007, I came

into the office for a few hours to meet with Silver Dragon's Controller to address some year-end

items.  While I happened to be in the office, a package of legal papers was delivered by Federal

Express, which I then opened.  I did not know what these papers were as I was not expecting a

delivery and it was only a coincidence that I received them before the office re-opened on

January 7, 2008.

16.     In order to determine how Silver Dragon would respond to these legal papers

(including whether the company should retain legal counsel for the matter), I first had to consult

with Colin Sutherland.  Mr. Sutherland, however, was on vacation in Halifax while Silver

Dragon's offices were closed for the holidays.  The papers were forwarded to Mr. Sutherland

while he was away so that we could discuss the matter promptly upon his return and devise a

strategy for addressing the claims made by Alpha Capital.

17.     On January 7, 2008, the first day that Silver Dragon re-opened after the holiday

closure, I spoke with Mr. Sutherland regarding the legal papers that had been received and we

decided that we should negotiate with Alpha Capital and resolve this matter.  Silver Dragon

believed that the parties could work this issue out without involving the Court, especially since it

was clear that employee stock options and/or warrants were clearly meant to be "Excepted

Issuances" under the terms of the Subscription Agreement, the Term Sheet and the agreement

between the parties. It seemed like a simple misunderstanding that the parties should have been able to resolve among themselves.

18.     I therefore contacted Asher Brand at LH Financial on January 7, 2008 to begin settlement negotiations. Mr. Brand was receptive to the discussion and invited Silver Dragon to make an offer. Over the next two days, we spoke and exchanged emails regarding the parties' offers and counter-offers.

19.     Settlement negotiations continued via electronic mail during the afternoon and early evening of January 8, 2007 between myself and Mr. Brand; however we were unable to reach a resolution. At this point in time, I sent a letter to the Court respectfully requesting an adjournment of the January 9th Hearing until January 15, 2008 to complete the settlement negotiations. Silver Dragon was not in a position to make this request in person since its officers and directors are located in Canada and it had not retained counsel in New York (Mr. Cohen is licensed to practice in Canada, not in the United States).

20.     Silver Dragon's request for an extension was not granted, the January 9th Hearing proceeded as scheduled with only counsel for Alpha Capital in attendance and Alpha Capital's request for a preliminary injunction was granted by default. Silver Dragon's default was not willful, however, as it had only reopened for business two days before the January 9th Hearing and it had focused its efforts during that short time frame, in good faith, on negotiating a resolution of the matter. Silver Dragon did not intend to evade Alpha Capital's motion for a preliminary injunction, but simply wanted an additional week to try and settle the matter.

21.     Silver Dragon subsequently retained counsel in New York to represent it in connection with the instant matter.  The instant motion to set aside the default judgment was promptly prepared, along with an Answer to the Complaint.

**Meritorious Defense**

22.     Silver Dragon's failure to appear at the January 9th Hearing was not strategic, nor was it based on the belief that it did not have a viable defense to Alpha Capital's allegations. Rather, Silver Dragon was focused on resolving this matter with Alpha Capital during the brief time it had after the holiday closure and before the January 9th Hearing.  Silver Dragon firmly believes that it has a meritorious defense to the Complaint and to Alpha Capital's request for a preliminary injunction.

23.     As is set forth above, it was the understanding of the parties throughout the negotiation of the Subscription Agreement that issuances of employee stock options and/or warrants would be considered "Excepted Issuances."  The language of the Term Sheet, which was executed at the start of the process, as well as ¶ 11(a)(iii) of the signed Subscription Agreement indicates that employee stock option plans, warrants, repurchase plans and the like should have been listed on Schedule 5(d).

24.     The manner in which Silver Dragon conducted its financings from November 7, 2006 through November 7, 2007 also shows that it understood that issuances to employees would be considered "Excepted Issuances."  Not one of the 54 financings conducted by Silver Dragon during that time period was done below $1.00.  The only instances where warrants were issued below the $1.00 threshold involved the three issuances to Silver Dragon's directors.

25.    Silver Dragon therefore thinks it has stated a meritorious defense to Alpha Capital's motion for a preliminary injunction.

**No Prejudice to Alpha Capital**

26.    If Silver Dragon's motion to set aside the default judgment is granted, it is prepared to move forward quickly and efficiently to oppose Alpha Capital's request for a preliminary injunction.  It is not Silver Dragon's intention to delay the progress of this matter in any fashion.  In fact, Silver Dragon has served and filed its Answer simultaneously with this motion to set aside the two default judgments.

27.    Contrary to the assertions made by Alpha Capital, Silver Dragon is also actively pursuing more than one large financing at this time and the corporation is not in danger of ceasing to exist.  If Silver Dragon continues to be restrained from issuing any shares of its stock, pursuant to the January 25, 2008 Order, though, these financings will be put in jeopardy.  The prejudice that Silver Dragon would suffer if it is not given a chance to present its defense to Alpha Capital's request for a preliminary injunction is therefore considerably greater than any prejudice that Alpha Capital would face.

28.    As I previously stated, Alpha Capital contacted me in November 2007 to try and extend its time to exercise the Class C warrants by one year.  This request does not seem consistent with Alpha Capital's allegations in its papers that Silver Dragon is in danger of ceasing to exist.

MARC HAZOUT

Sworn to before me this 5th
day of February 2008

Notary Public

Stephen . M. Cohen

-10-



**EXHIBIT A**

# SUBSCRIPTION AGREEMENT

THIS SUBSCRIPTION AGREEMENT (this "**Agreement**"), dated as of November 2, 2006, by and among Silver Dragon Resources, Inc., a Delaware corporation (the "**Company**"), and the subscribers identified on the signature page hereto (each a "**Subscriber**" and collectively "**Subscribers**").

WHEREAS, the Company and the Subscribers are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**Commission**") under the Securities Act of 1933, as amended (the "1933 Act").

WHEREAS, the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Subscribers, as provided herein, and the Subscribers shall purchase Five Hundred Thousand Dollars ($500,000) (the "**Purchase Price**") of the Company's Units at a per Unit Purchase Price of $1.00, subject to adjustment as described in this Agreement, each Unit consisting of one share of common stock, $.0001 par value (the "**Common Stock**" or "**Shares**"), and share purchase warrants in the form attached hereto as **Exhibit A** (the "**Warrants**"), to purchase shares of Common Stock (the "**Warrant Shares**").  The Purchase Price shall be payable to the Company on the Closing Date.  The Common Stock, the Warrants and the Warrant Shares are collectively referred to herein as the "**Securities**"; and

WHEREAS, the aggregate proceeds of the sale of the Common Stock and the Warrants contemplated hereby may be held in escrow pursuant to the terms of a Funds Escrow Agreement which may be executed by the parties substantially in the form attached hereto as **Exhibit B** (the "**Escrow Agreement**").

NOW, THEREFORE, in consideration of the mutual covenants and other agreements contained in this Agreement, the Company and the Subscribers hereby agree as follows:

1. <u>Purchase and Sale of Shares and Warrants</u>.  Subject to the satisfaction (or waiver) of the conditions to Closing set forth in this Agreement and the Escrow Agreement, each Subscriber shall purchase the Shares and Warrants for the portion of the Purchase Price indicated on the signature page hereto, and the Company shall sell such Shares and Warrants to the Subscriber.  The Purchase Price for the Shares and Warrants shall be paid in cash.  The entire Purchase Price shall be allocated to the Shares.

2. <u>Escrow Arrangements; Deliveries</u>.  Upon execution hereof by the parties and pursuant to the terms of the Escrow Agreement, each Subscriber agrees to make the deliveries required of such Subscriber as set forth in the Escrow Agreement and the Company agrees to make the deliveries required of the Company as set forth in the Escrow Agreement.

3. <u>Warrants</u>.

(a) <u>A Warrants</u>.  On the Closing Date, the Company will issue and deliver Class A Warrants to the Subscribers.  One Class A Warrant will be issued for each two Shares issued on the Closing Date.  The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class A Warrant shall be $2.00.  The Class A Warrants shall be exercisable until five (5) years after the Closing Date.

11/7/2007, 9:47 AM

(b)     B Warrants.     On the Closing Date, the Company will issue and deliver Class B Warrants to the Subscribers. One Class B Warrant will be issued for each two Shares issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class B Warrant shall be $5.00. The Class B Warrants shall be exercisable until five (5) years after the Closing Date.

(c)     C Warrants.     On the Closing Date, the Company will issue and deliver Class C Warrants to the Subscribers. Two Class C Warrants will be issued for each Share issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class C Warrant shall be $1.00. The Class C Warrants shall be exercisable until one (1) year after the Closing Date.

4.     Subscriber's Representations and Warranties. Each Subscriber hereby represents and warrants to and agrees with the Company only as to such Subscriber that:

(a)     Information on Company.     The Subscriber has been furnished with or has had access at the EDGAR Website of the Commission to the Company's Form 10-KSB for the year ended December 31, 2005 as filed with the Commission, together with all subsequently filed Forms 10-QSB, 8-K, and filings made with the Commission available at the EDGAR website (hereinafter referred to collectively as the "Reports"). In addition, the Subscriber has received in writing from the Company such other information concerning its operations, financial condition and other matters as the Subscriber has requested in writing (such other information is collectively, the "Other Written Information"), and considered all factors the Subscriber deems material in deciding on the advisability of investing in the Securities.

(b)     Information on Subscriber.     The Subscriber (and, if the Subscriber is acting on behalf of a principal, such principal) is, and will be at the time of the issuance of the Common Stock and exercise of any of the Warrants, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable the Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment. The Subscriber has the authority and is duly and legally qualified to purchase and own the Securities. The Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof. The information set forth on the signature page hereto regarding the Subscriber is accurate and complete.

(c)     Purchase of Common Stock and Warrants.     On the Closing Date, the Subscriber will have purchased the Common Stock and Warrants as principal for its own account (or, if the Subscriber is acting on behalf of a principal, such principal) for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(d)     Compliance with Securities Act.     The Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration. Until the Actual Effective Date, the

2

Subscriber will not maintain a net short position in the Common Stock contrary to applicable rules and regulations. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "**Affiliate**" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity. Affiliate when employed in connection with the Company includes each Subsidiary [as defined in Section 5(a)] of the Company. For purposes of this definition, "**control**" means the power to direct the management and policies of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

     (e)  <u>Shares Legend</u>. The Shares and the Warrant Shares shall bear the following or similar legend:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THESE SHARES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SILVER DRAGON RESOURCES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED."

     (f)  <u>Warrants Legend</u>. The Warrants shall bear the following or similar legend:

> "THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS WARRANT UNDER SAID ACT OR ANY APPLICABLE STATE SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SILVER DRAGON RESOURCES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED."

     (g)  <u>Communication of Offer</u>. The offer to sell the Securities was directly communicated to the Subscriber by the Company. At no time was the Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

     (h)  <u>Authority; Enforceability</u>. This Agreement and other agreements delivered together with this Agreement or in connection herewith have been duly authorized, executed and delivered by the Subscriber and are valid and binding agreements enforceable in accordance with their

11/7/2007, 9:47 AM

terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity; and Subscriber has full corporate power and authority necessary to enter into this Agreement and such other agreements and to perform its obligations hereunder and under all other agreements entered into by the Subscriber relating hereto.

(i)      No Governmental Review.  Each Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(j)      Correctness of Representations.  Each Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless a Subscriber otherwise notifies the Company prior to the Closing Date (as hereinafter defined), shall be true and correct as of the Closing Date.

(k)      Organization and Standing of the Subscribers.  If the Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate power to own its assets and to carry on its business.

(l)      No Conflicts.  The execution, delivery and performance of this Agreement and the consummation by such Subscriber of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber).  Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement or to purchase the Notes or acquire the Warrants in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(m)      Survival.  The foregoing representations and warranties shall survive the Closing Date for a period of three years.

5.      Company Representations and Warranties.  The Company represents and warrants to and agrees with each Subscriber that except as set forth in the Reports or the Other Written Information and as otherwise qualified in the Transaction Documents:

(a)      Due Incorporation.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power to own its properties and to carry on its business as disclosed in the Reports.  The Company is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect.  For purpose of this Agreement, a "**Material Adverse**

Effect" shall mean a material adverse effect on the financial condition, results of operations, properties or business of the Company taken individually, or in the aggregate, as a whole. For purposes of this Agreement, "**Subsidiary**" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity) of which more than 50% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity. All the Company's Subsidiaries as of the Closing Date are set forth on **Schedule 5(a)** hereto.

      (b)    <u>Outstanding Stock</u>. All issued and outstanding shares of capital stock of the Company and each of its subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable.

      (c)    <u>Authority; Enforceability</u>. This Agreement, the Common Stock, the Warrants and the Escrow Agreement and any other agreements delivered together with this Agreement or in connection herewith (collectively "**Transaction Documents**") have been duly authorized, executed and delivered by the Company and are valid and binding agreements enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

      (d)    <u>Additional Issuances</u>. There are no outstanding agreements or preemptive or similar rights affecting the Company's common stock or equity and no outstanding rights, warrants or options to acquire, or instruments convertible into or exchangeable for, or agreements or understandings with respect to the sale or issuance of any shares of common stock or equity of the Company or other equity interest in any of the subsidiaries of the Company except as described on **Schedule 5(d)**. The common stock of the Company on a fully diluted basis outstanding as of the last trading day preceding the Closing Date is set forth on **Schedule 5(d)**.

      (e)    <u>Consents</u>. No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its affiliates, the American Stock Exchange, the National Association of Securities Dealers, Inc., Nasdaq National Market, the OTC Bulletin Board ("**Bulletin Board**") nor the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities.

      (f)    <u>No Violation or Conflict</u>. Assuming the representations and warranties of the Subscribers in Section 4 are true and correct, neither the issuance and sale of the Securities nor the performance of the Company's obligations under the Transaction Documents by the Company will:

      (i)    violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having

jurisdiction over the Company or any of its subsidiaries or over the properties or assets of the Company or any of its affiliates, (C) the terms of any bond, debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its affiliates or subsidiaries is a party, by which the Company or any of its affiliates or subsidiaries is bound, or to which any of the properties of the Company or any of its affiliates or subsidiaries is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its affiliates or subsidiaries is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect on the Company; or

(ii)    result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company, its subsidiaries or any of its affiliates; or

(iii)    result in the activation of any anti-dilution rights or a reset or repricing of any debt or security instrument of any other creditor or equity holder of the Company, nor result in the acceleration of the due date of any obligation of the Company; or

(iv)    result in the activation of any piggy-back registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company; or

(v)    result in a violation of Section 5 under the 1933 Act.

(g)    The Securities.  The Securities upon issuance:

(i)    are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

(ii)    have been, or will be, duly and validly authorized and on the date of issuance of the Shares and upon exercise of the Warrants, the Shares and Warrant Shares will be duly and validly issued, fully paid and nonassessable (and if registered pursuant to the 1933 Act, and resold pursuant to an effective registration statement will be free trading and unrestricted, provided that each Subscriber complies with the prospectus delivery requirements of the 1933 Act);

(iii)    will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company;

(iv)    will not subject the holders thereof to personal liability by reason of being such holders; and

(v)    provided Subscriber's representations herein are true and accurate, will have been issued in reliance upon an exemption from the registration requirements of and will not result in a violation of Section 5 under the 1933 Act.

(h)    Litigation.  There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its affiliates that would affect the execution by the Company or the performance by the Company of its obligations under the Transaction Documents.  There is no pending or, to the best knowledge of the Company, basis for or threatened action,

11/7/2007, 9:47 AM

suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its affiliates which litigation if adversely determined would have a Material Adverse Effect on the Company.

(i)    Reporting Company.  The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "1934 Act") and has a class of common shares registered pursuant to Section 12(g) of the 1934 Act. Pursuant to the provisions of the 1934 Act, the Company has timely filed all reports and other materials required to be filed thereunder with the Commission during the twelve months preceding the Closing Date **except Form 10-KSB for the for the fiscal year ended December 31, 2005 and Form 10-QSB for the quarter ended June 30, 2006.**

(j)    No Market Manipulation.  The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the common stock of the Company to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(k)    Information Concerning Company.  The Reports contain all material information relating to the Company and its operations and financial condition as of their respective dates and all the information required to be disclosed therein.   Since the last day of the fiscal year of the most recent audited financial statements included in the Reports ("**Latest Financial Date**"), and except as modified in the Other Written Information or in the Schedules hereto, there has been no Material Adverse Event relating to the Company's business, financial condition or affairs not disclosed in the Reports. The Reports do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made.

(l)    Dilution.  The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company.  The Company specifically acknowledges that its obligation to issue the Warrant Shares upon exercise of the Warrants is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(m)    Defaults.  The Company is not in violation of its articles of incorporation or bylaws.  The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters, or (iii) to the Company's knowledge not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect.

(n)    Not an Integrated Offering.  Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of

7

any security or solicited any offers to buy any security under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. Nor will the Company or any of its Affiliates take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. The Company will not conduct any offering other than the transactions contemplated hereby that will be integrated with the offer or issuance of the Securities, which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(o)    No General Solicitation. Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities.

(p)    Listing. The Company's common stock is quoted on the Bulletin Board under the symbol SDRG.OB. The Company has not received any oral or written notice that its common stock is not eligible nor will become ineligible for quotation on the Bulletin Board nor that its common stock does not meet all requirements for the continuation of such quotation. The Company satisfies all the requirements for the continued quotation of its common stock on the Bulletin Board.

(q)    No Undisclosed Liabilities. The Company has no liabilities or obligations which are material and which are not disclosed in the Reports and Other Written Information, other than those incurred in the ordinary course of the Company's businesses since June 30, 2006 and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed on **Schedule 5(q)**.

(r)    No Undisclosed Events or Circumstances. Since June 30, 2006, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(s)    Capitalization. The authorized and outstanding capital stock of the Company and Subsidiaries as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on **Schedule 5(d)**. Except as set forth on **Schedule 5(d)**, there are no options, warrants, or rights to subscribe to, securities, rights or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock of the Company or any of its Subsidiaries. All of the outstanding shares of Common Stock of the Company have been duly and validly authorized and issued and are fully paid and nonassessable.

(t)    No Disagreements with Accountants and Lawyers. There are no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers.

(u)    Transfer Agent. The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is set forth on **Schedule 5(u)** hereto.

11/7/2007, 9:47 AM

(v)    Investment Company.  Neither the Company nor any Affiliate is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(w)    Company Predecessor.  All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 8(g) through 8(l) shall relate, apply and refer to the Company, its predecessors, and the Subsidiaries.

(x)    Subsidiary Representations.  The Company makes each of the representations contained in Sections 5(a), (b), (d), (e), (f), (h), (k), (m), (q), (r), (s), (t), (v) and (w) of this Agreement, as same relate to each Subsidiary of the Company, with the same qualifications to each such representation.

(y)    Correctness of Representations.  The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscribers prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date.

(z)    Survival.  The foregoing representations and warranties shall survive the Closing Date for a period of three years.

6.    Regulation D Offering.  The offer and issuance of the Securities to the Subscribers is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder.  On the Closing Date, the Company will provide an opinion reasonably acceptable to Subscriber from the Company's legal counsel opining on the availability of an exemption from registration under the 1933 Act as it relates to the offer and issuance of the Securities and other matters reasonably requested by Subscribers.  A form of the legal opinion is annexed hereto as **Exhibit C**.  The Company will provide, at the Company's expense, such other legal opinions in the future as are reasonably necessary for the resale of the Common Stock and exercise of the Warrants and resale of the Warrant Shares.

7.    Broker/Legal Fees.

(a)    Broker's Commission.  The Company on the one hand, and each Subscriber (for himself only) on the other hand, agrees to indemnify the other against and hold the other harmless from any and all liabilities to any persons claiming brokerage commissions or similar fees other than the entity identified on **Schedule 7** hereto ("**Broker**") on account of services purported to have been rendered on behalf of the indemnifying party in connection with this Agreement or the transactions contemplated hereby and arising out of such party's actions.  Anything in this Agreement to the contrary notwithstanding, each Subscriber is providing indemnification only for such Subscriber's own actions and not for any action of any other Subscriber.  Each Subscriber's liability hereunder is several and not joint.  The Company agrees that it will pay the Broker the fees set forth on **Schedule 7** hereto ("**Broker's Fees**").  The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the offering described in this Agreement except the Broker.

(b)    Legal Fees.  The Company shall pay to Grushko & Mittman, P.C., a cash fee of $15,000, of which $3,980 has already been paid ("**Subscriber's Legal Fees**") as reimbursement for services rendered to the Subscribers in connection with this Agreement and the purchase and sale of the Shares and Warrants (the "**Offering**").  The Subscriber's Legal Fees will be payable on the Closing Date out of funds held pursuant to the Escrow Agreement.

9

8.    Covenants of the Company.  The Company covenants and agrees with the Subscribers as follows:

(a)    Stop Orders.  The Company will advise the Subscribers, within twenty-four (24) hours after the Company receives notice of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose.

(b)    Listing.  If applicable, the Company shall promptly secure the listing of the shares of Common Stock and the Warrant Shares upon each national securities exchange, or electronic or automated quotation system upon which they are or become eligible for listing and shall maintain such listing so long as any Notes or Warrants are outstanding.  The Company will maintain the listing or quotation of its Common Stock on the American Stock Exchange, Nasdaq Capital Market, Nasdaq National Market System, Bulletin Board, or New York Stock Exchange (whichever of the foregoing is at the time the principal trading exchange or market for the Common Stock (the "**Principal Market**")), and will comply in all material respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market, as applicable. The Company will provide the Subscribers copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock from any Principal Market.  As of the date of this Agreement, the Bulletin Board is the Principal Market. The Company may list the Common Stock on the Toronto Stock Exchange ("**TSX**") provided the Shares and Warrant Shares are contemporaneously listed thereon.  Such TSX listing notwithstanding, the Company must maintain its listing on one of the above listed Principal Markets.

(c)    Market Regulations.  If applicable, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscribers and promptly provide copies thereof to Subscriber.

(d)    Filing Requirements.  From the date of this Agreement and until the earlier of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement as defined in Section 10 or pursuant to Rule 144, without regard to volume limitations, the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) timely comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement.  The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until two (2) years after the Closing Date.   Until the later of the resale of the Shares and the Warrant Shares by each Subscriber or two (2) years after the Closing Date, the Company will use its best efforts to continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market. The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

(e)    <u>Use of Proceeds</u>.  The proceeds of the Offering will be employed by the Company for the purposes set forth on **Schedule 8(e)** hereto.  Except as set forth on **Schedule 8(e)**, the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company, litigation related expenses or settlements, brokerage fees, nor non-trade obligations outstanding on a Closing Date.

(f)    <u>Reservation</u>.  Prior to the Closing Date, the Company undertakes to reserve, pro rata, on behalf of the Subscribers from its authorized but unissued Common Stock, a number of common shares equal to 100% of the amount of Shares and Warrant Shares issuable upon exercise of the Warrants.  Failure to have sufficient shares reserved pursuant to this Section 8(f) shall be a material default of the Company's obligations under this Agreement.

(g)    <u>Taxes</u>.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

(h)    <u>Insurance</u>.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will keep its assets which are of an insurable character (**it being understood that the Company's mining rights are not insurable**) insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business, in amounts sufficient to prevent the Company from becoming a co-insurer and not in any event less than one hundred percent (100%) of the insurable value of the property insured less reasonable deductible amounts; and the Company will maintain, with financially sound and reputable insurers, insurance against other hazards and risks and liability to persons and property to the extent and in the manner customary for companies in similar businesses similarly situated and to the extent available on commercially reasonable terms.

(i)    <u>Books and Records</u>.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(j)    <u>Governmental Authorities.</u>  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall duly observe and conform in all material

11

respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(k)    Intellectual Property.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.

(l)    Properties.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement (as defined in Section 10.1(ii) hereof) or pursuant to Rule 144, without regard to volume limitations, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases to which it is a party or under which it occupies property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.

(m)    Confidentiality/Public Announcement.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company agrees that except in connection with a Form 8-K or the Registration Statement or as otherwise required in any other Commission filing, it will not disclose publicly or privately the identity of the Subscribers unless expressly agreed to in writing by a Subscriber, only to the extent required by law and then only upon reasonable prior notice to Subscriber. In any event and subject to the foregoing, the Company shall file a Form 8-K or make a public announcement describing the Offering not later than the first business day after the Closing Date.  In the Form 8-K or public announcement, the Company will specifically disclose the amount of Common Stock outstanding immediately after the Closing.  A form of the proposed Form 8-K or public announcement to be employed in connection with the Closing is annexed hereto as **Exhibit D**.

(n)    Further Registration Statements.  Except for a registration statement filed on behalf of the Subscribers pursuant to Section 10 of this Agreement **and the registration statements relating to the proposed initial public offering of the Company's securities in Canada**, or as described on **Schedule 10.1**, the Company will not file any registration statement with the Commission or with state regulatory authorities without the consent of the Subscribers until the expiration of the "**Exclusion Period**", which is defined as the sooner of (i) the Registration Statement shall have been current and available for use in connection with the resale of the Registrable Securities (as defined in Section 10.1(i) for a period of 365 days, or (ii) until all the Shares and Warrant Shares have been resold or transferred by the Subscribers pursuant to the Registration Statement or Rule 144(k) under the 1933 Act, without regard to volume limitations.

(o)    Blackout.   The Company undertakes and covenants that until **December 31, 2006** the Company will not enter into any acquisition, merger, exchange or sale or other transaction that delays the effectiveness of any pending registration statement or causes an already effective registration statement to no longer be effective or current for more than 20 consecutive days or 45 days during any 365 day period, provided that the Company may enter into a definitive agreement with Hubei

Silver Mine Co., Ltd. and Cistex Global Investment Inc., relating to the acquisition by the Company of a 60% equity interest in Hubei Silver Mine Co., Ltd. provided the Company is able to timely and fully comply with Form 8-K reporting obligations in connection with such acquisition.

(p)     <u>Non-Public Information</u>.  The Company covenants and agrees that neither it nor any other person acting on its behalf will provide any Subscriber or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Subscriber shall have agreed in writing to receive such information.  The Company understands and confirms that each Subscriber shall be relying on the foregoing representations in effecting transactions in securities of the Company. In any event, the Company will offer to the Subscriber an opportunity to review and comment on the Registration Statement thereto between three and five business days prior to the proposed filing date thereof.

(q)     <u>Offering Restrictions</u>.  **Until 30 days after the expiration of the Exclusion Period**, except for the Excepted Issuances [as defined in Section 11(a)], the Company will not enter into an agreement to nor issue any convertible debt or other securities convertible into common stock or equity of the Company nor modify any of the foregoing which may be outstanding at anytime, nor enter into any equity line of credit or similar agreement, nor issue nor agree to issue any floating or variable priced equity linked instruments nor any of the foregoing or equity with price reset rights, without the prior written consent of the Subscriber, which consent may be withheld for any reason.

(r)     <u>Negative Covenants</u>.  Until the sooner of (i) two years after the Closing Date, or (ii) the date Subscribers are no longer holders of the Shares or Warrant Shares issued and issuable hereunder and when liquidated damages are accruing or are outstanding, without the consent of the Subscribers, which consent will not be unreasonably withheld, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i)     create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "**Lien**") upon any of its property, whether now owned or hereafter acquired, if such Lien is a result of a convertible note or other similar convertible equity instrument that is secured by any lockbox arrangement, except for (i) the Excepted Issuances (as defined in Section 12(a) hereof), (ii) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property, or (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "**Permitted Lien**") and (iii) indebtedness for

13

borrowed money which is not senior or pari passu in right of payment to the payment of the Notes;

(ii)     amend its certificate of incorporation, bylaws or its charter documents so as to materially adversely affect any rights of the Subscriber; or

(iii)     repay, repurchase or offer to repay, repurchase, redeem, or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities or debt other than (1) dividend or distribution of the securities held by the Company, (2) to the extent permitted or required under the Transaction Documents, and (3) any financing disclosed on **Schedule 8(r)**.

(s)     Lock Up Agreement.  The Company will deliver to the Subscribers on or before the Closing Date and enforce the provisions of the irrevocable Lock Up Agreement ("**Lock Up Agreement**") in the form annexed hereto as **Exhibit E**, with Marc Hazout.

9.     Covenants of the Company and Subscriber Regarding Indemnification.

(a)     The Company agrees to indemnify, hold harmless, reimburse and defend the Subscribers, the Subscribers' officers, directors, agents, affiliates, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any warranty by Company in any of the Transaction Documents; or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any covenant or undertaking to be performed by the Company under any Transaction Documents other than its obligations under Section 10 of this Agreement.

(b)     Each Subscriber agrees to indemnify, hold harmless, reimburse and defend the Company and each of the Company's officers, directors, agents, affiliates, control persons against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Company or any such person which results, arises out of or is based upon (i) any material misrepresentation by such Subscriber in this Agreement or in any Exhibits or Schedules attached hereto, or other agreement delivered pursuant hereto; or (ii) after any applicable notice and/or cure periods, any breach or default in performance by such Subscriber of any covenant or undertaking to be performed by such Subscriber hereunder, or any other agreement entered into by the Company and Subscribers, relating hereto.

(c)     In no event shall the liability of any Subscriber or permitted successor hereunder or under any other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber upon the sale of Registrable Securities (as defined herein), except with respect to such Subscribers fraud or willful negligence.

(d)     The procedures set forth in Section 10.5 shall apply to the indemnifications set forth in Sections 9(a) and 9(b) above.

10.1.     Registration Rights.  The Company hereby grants the following registration rights to holders of the Securities.

(i)     On one occasion, for a period commencing one hundred and twenty-six (126) days after the Closing Date, but not later than two (2) years after the Closing Date ("**Request Date**"), upon a written request therefor from any record holder or holders of more than 50% of the Shares and Warrant Shares actually issued upon exercise of the Warrants, the Company shall prepare and file with the

Commission a registration statement under the 1933 Act registering the Shares and Warrant Shares issuable upon exercise of the Warrants (collectively "**Registrable Securities**") which are the subject of such request for unrestricted public resale by the holder thereof.  For purposes of Sections 10.1(i) and 10.1(ii), Registrable Securities shall not include Securities (A) which are registered for resale in an effective registration statement, (B) included for registration in a pending registration statement, or (C) which have been issued without further transfer restrictions after a sale or transfer pursuant to an effective registration statement or Rule 144 under the 1933 Act.  Upon the receipt of such request, the Company shall promptly give written notice to all other record holders of the Registrable Securities that such registration statement is to be filed and shall include in such registration statement Registrable Securities for which it has received written requests within ten (10) days after the Company gives such written notice.  Such other requesting record holders shall be deemed to have exercised their demand registration right under this Section 10.1(i).

(ii)     If the Company at any time proposes to register any of its securities under the 1933 Act for sale to the public, whether for its own account or for the account of other security holders or both, except with respect to registration statements on Forms S-4, S-8 or another form not available for registering the Registrable Securities for sale to the public, provided the Registrable Securities are not otherwise registered for resale by the Subscribers or Holder pursuant to an effective registration statement, each such time it will give at least fifteen (15) days' prior written notice to the record holder of the Registrable Securities of its intention so to do. Upon the written request of the holder, received by the Company within ten (10) days after the giving of any such notice by the Company, to register any of the Registrable Securities not previously registered, the Company will cause such Registrable Securities as to which registration shall have been so requested to be included with the securities to be covered by the registration statement proposed to be filed by the Company, all to the extent required to permit the sale or other disposition of the Registrable Securities so registered by the holder of such Registrable Securities (the "**Seller**" or "**Sellers**").  In the event that any registration pursuant to this Section 10.1(ii) shall be, in whole or in part, an underwritten public offering of Common Stock of the Company, the number of shares of Registrable Securities to be included in such an underwriting may be reduced by the managing underwriter if and to the extent that the Company and the underwriter shall reasonably be of the opinion that such inclusion would adversely affect the marketing of the securities to be sold by the Company therein; provided, however, that the Company shall notify the Seller in writing of any such reduction. Notwithstanding the foregoing provisions, or Section 10.4 hereof, the Company may withdraw or delay or suffer a delay of any registration statement referred to in this Section 10.1(ii) without thereby incurring any liability to the Seller.

(iii)     The Company shall file with the Commission a Form SB-2 registration statement (the "**Registration Statement**") (or such other form that it is eligible to use) in order to register the Registrable Securities for resale and distribution under the 1933 Act not later than forty-five (45) days after the Closing Date (the "**Filing Date**"), and use its reasonable efforts to cause the Registration Statement to be declared effective not later than one hundred and twenty-five (125) days after the Closing Date (the "**Effective Date**").  The "**Actual Effective Date**" shall be the date the Registration is actually declared effective.  The Registration Statement will cover not less than a number of shares of Common Stock that is equal to the Shares and Warrant Shares issuable pursuant to this Agreement upon exercise of the Warrants (the "**Registrable Securities**"). The Registrable Securities shall be reserved and set aside exclusively for the benefit of each Subscriber and Warrant holder, pro rata, and not issued, employed or reserved for anyone other than each such Subscriber and Warrant holder.  The Registration Statement will promptly be amended or one or more additional registration statements will be promptly filed by the Company as necessary to register additional shares of Common Stock to allow the public resale of all Common Stock included in and issuable by virtue of the Registrable Securities.  Without the consent of a majority of the Subscribers, no securities of the Company other than the Registrable Securities will be

included in the Registration Statement, except as described on **Schedule 10.1**. The Company will promptly provide to the holders of the Registrable Securities, copies of all filings and Commission letters of comment and notify Subscribers (by telecopier and by e-mail addresses provided by Subscribers) and Grushko & Mittman, P.C. (by telecopier and by email to Counslers@aol.com) on or before the second business day following the day the Company receives notice that (i) the Commission has no comments or no further comments on the Registration Statement, and (ii) the registration statement has been declared effective.

     10.2.   <u>Registration Procedures</u>.  If and whenever the Company is required by the provisions of Section 10.1(i) to effect the registration of any Registrable Securities under the 1933 Act, the Company will, as expeditiously as practicable:

     (a)   use its reasonable efforts to prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective until such registration statement has been effective for a period of two (2) years, and comply in all material respects with the provisions of the 1933 Act with respect to the disposition of all of the Registrable Securities covered by such registration statement in accordance with the intended method of disposition for the holder of such registrable securities ("Seller') set forth in such registration statement for such period.  If the Registration Statement is withdrawn for any reason, the Company shall file replacement registration statement as expeditiously as practicable;

     (c)   furnish to the Sellers, at the Company's expense, such number of copies of the registration statement and the prospectus included therein (including each preliminary prospectus) as such persons reasonably may request in order to facilitate the public sale or their disposition of the securities covered by such registration statement;

     (d)   use its commercially reasonable efforts to register or qualify the Registrable Securities covered by such registration statement under the securities or "blue sky" laws of New York and such jurisdictions as the Sellers shall request in writing, provided, however, that the Company shall not for any such purpose be required to qualify generally to transact business as a foreign corporation in any jurisdiction where it is not so qualified, subject itself to in any such jurisdiction or to consent to general service of process in any such jurisdiction;

     (e)   if applicable, list the Registrable Securities covered by such registration statement with any securities exchange or market on which the Common Stock of the Company is then listed;

     (f)   notify the Subscribers not later than the next day after the Company becomes aware that a prospectus relating thereto is required to be delivered under the 1933 Act, of the happening of any event of which the Company has knowledge as a result of which the prospectus contained in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or which becomes subject to a Commission, state or other governmental order suspending the effectiveness of the registration statement covering any of the Shares or Warrant Shares;

     (g)   provided same would not be in violation of the provision of Regulation FD under the 1934 Act, make available for inspection by the Sellers,  and any attorney, accountant or other agent retained by the Seller or underwriter, all publicly available, non-confidential financial and other

11/7/2007, 9:47 AM

records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors and employees to supply all publicly available, non-confidential information reasonably requested by the seller, attorney, accountant or agent in connection with such registration statement; and

                (h)     provide to the Sellers copies of the Registration Statement and amendments thereto three business days prior to the filing thereof with the Commission10.3.

        <u>Provision of Documents</u>.  In connection with each registration described in this Section 10, each Seller or holder of Registrable Securities will furnish to the Company in writing such information and representation letters with respect to itself and the proposed distribution by it as the Company shall reasonably deem necessary in order to assure compliance with federal and applicable state securities laws.

              10.4.    <u>Non-Registration Events</u>.  The Company and the Subscribers agree that the Sellers will suffer damages if the Registration Statement is not filed by the Filing Date and not declared effective by the Commission by the Effective Date, and any registration statement required under Section 10.1(i) or 10.1(ii) is not filed within 60 days after written request and declared effective by the Commission within 120 days after such request, and maintained in the manner and within the time periods contemplated by Section 10 hereof, if (A) the Company does not use its best efforts in causing the Registration Statement to become effective as early as reasonably possible with all material needed within a reasonable time frame, (B) the Registration Statement is not declared effective within five (5) business days after receipt by the Company or its attorneys of a written or oral communication from the Commission that the Registration Statement will not be reviewed or that the Commission has no further comments, (C) if the registration statement described in Sections 10.1(i) or 10.1(ii) is not filed within 60 days after such written request, or is not declared effective within 125 days after such written request, or (D) any registration statement described in Sections 10.1(i), 10.1(ii) or 10.1(iv) is filed and declared effective but shall thereafter cease to be effective for a period of time which shall exceed 45 days in the aggregate per year (defined as a period of 365 days commencing on the date the Registration Statement is declared effective) or more than 20 consecutive days (each such event referred to in clauses A through E of this Section 10.4 is referred to herein as a **"Non-Registration Event"**), then the Company shall pay to the holders of Registrable Securities included in the Registration Statement, as Liquidated Damages, an aggregate amount equal to one percent (1%) of the Purchase Price of the Shares owned of record by such holder which are subject to such Non-Registration Event for each thirty (30) days of the initial aggregate sixty (60) days of the pendency of Non-Registration Events and one and one-half percent (1.5%) thereafter for each thirty (30) days of the pendency of Non-Registration Events.  A prorated portion shall be payable for any period of less than 30 days.  The Company must pay the Liquidated Damages in cash.  The Liquidated Damages must be paid within ten (10) days after the end of each thirty (30) day period or shorter part thereof for which Liquidated Damages are payable.  In the event a Registration Statement is filed by the Filing Date but is withdrawn prior to being declared effective by the Commission, then such Registration Statement will be deemed to have not been filed.  All oral or written comments received from the Commission relating to the Registration Statement must be responded to within twelve (12) business days after receipt of comments from the Commission.  Notwithstanding the foregoing, the Company shall not be liable to the Subscriber under this Section 10.4 for any events or delays occurring as a consequence of the acts or omissions of the Subscribers contrary to the obligations undertaken by Subscribers in this Agreement.  Liquidated Damages will not accrue nor be payable pursuant to this Section 10.4 nor will a Non-Registration Event be deemed to have occurred for times during which Registrable Securities are transferable by the holder of Registrable Securities pursuant to Rule 144(k) under the 1933 Act.

              10.5.    <u>Expenses</u>.  All expenses incurred by the Company in complying with Section 11, including, without limitation, all registration and filing fees, printing expenses (if required), fees and disbursements of counsel and independent public accountants for the Company, fees and expenses (including reasonable counsel fees) incurred in connection with complying with state securities or "blue

sky" laws, fees of the National Association of Securities Dealers, Inc., transfer taxes, and fees of transfer agents and registrars, are called "**Registration Expenses.**" All underwriting discounts and selling commissions applicable to the sale of Registrable Securities are called "**Selling Expenses.**" The Company will pay all Registration Expenses in connection with the registration statement under Section 11. Selling Expenses in connection with each registration statement under Section 11 shall be borne by the Seller and may be apportioned among the Sellers in proportion to the number of shares sold by the Seller relative to the number of shares sold under such registration statement or as all Sellers thereunder may agree.

      10.6.   <u>Indemnification and Contribution.</u>

      (a)   In the event of a registration of any Registrable Securities under the 1933 Act pursuant to Section 10, the Company will, to the extent permitted by law, indemnify and hold harmless the Seller, each officer of the Seller, each director of the Seller, each underwriter of such Registrable Securities thereunder and each other person, if any, who controls such Seller or underwriter within the meaning of the 1933 Act, against any losses, claims, damages or liabilities, joint or several, to which the Seller, or such underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such Registrable Securities was registered under the 1933 Act pursuant to Section 10, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made, and will, subject to the provisions of Section 10.6(c), reimburse the Seller, each such underwriter and each such controlling person for any reasonable legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable to the Seller to the extent that any such damages arise out of or are based upon an untrue statement or omission made in any preliminary prospectus if (i) the Seller failed to send or deliver a copy of the final prospectus delivered by the Company to the Seller with or prior to the delivery of written confirmation of the sale by the Seller to the person asserting the claim from which such damages arise, (ii) the final prospectus would have corrected such untrue statement or alleged untrue statement or such omission or alleged omission, (iii) to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission so made in conformity with information furnished by any such Seller, or any such controlling person, in writing specifically for use in such registration statement or prospectus, (iv) to the extent that any such loss, claim, damage or liability results from the settlement of any claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld, delayed or conditioned.

      (b)   In the event of a registration of any of the Registrable Securities under the 1933 Act pursuant to Section 10, each of the Sellers severally but not jointly will, to the extent permitted by law, indemnify and hold harmless the Company, and each person, if any, who controls the Company within the meaning of the 1933 Act, each officer of the Company who signs the registration statement, each director of the Company, each underwriter and each person who controls any underwriter within the meaning of the 1933 Act, against all losses, claims, damages or liabilities, joint or several, to which the Company or such officer, director, underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the registration statement under which such Registrable Securities were registered under the 1933 Act pursuant to Section 10, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to

state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and each such officer, director, underwriter and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action, provided, however, that the Seller will be liable hereunder in any such case if and only to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with information pertaining to such Seller, as such, furnished in writing to the Company by such Seller specifically for use in such registration statement or prospectus, and provided, further, however, that the liability of the Seller hereunder shall be limited to the net proceeds actually received by the Seller from the sale of Registrable Securities covered by such registration statement. Seller shall not be liable under this Section 10.6(b) for any such loss, claim, damage or liability that results from the settlement of any claim if such settlement is effected without the prior written consent of the Seller, which consent shall not be unreasonably withheld, delayed or conditioned.

(c)      Promptly after receipt by an indemnified party hereunder of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party hereunder, notify the indemnifying party in writing thereof, but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to such indemnified party other than under this Section 10.6(c) and shall only relieve it from any liability which it may have to such indemnified party under this Section 10.6(c), except and only if and to the extent the indemnifying party is prejudiced by such omission. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate in and, to the extent it shall wish, to assume and undertake the defense thereof with counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume and undertake the defense thereof, the indemnifying party shall not be liable to such indemnified party under this Section 10.6(c) for any legal expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation and of liaison with counsel so selected, provided, however, that, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be reasonable defenses available to it which are different from or additional to those available to the indemnifying party or if the interests of the indemnified party reasonably may be deemed to conflict with the interests of the indemnifying party, the indemnified parties, as a group, shall have the right to select one separate counsel and to assume such legal defenses and otherwise to participate in the defense of such action, with the reasonable expenses and fees of such separate counsel and other expenses related to such participation to be reimbursed by the indemnifying party as incurred.

(d)      In order to provide for just and equitable contribution in the event of joint liability under the 1933 Act in any case in which either (i) a Seller, or any controlling person of a Seller, makes a claim for indemnification pursuant to this Section 10.6 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 10.6 provides for indemnification in such case, or (ii) contribution under the 1933 Act may be required on the part of the Seller or controlling person of the Seller in circumstances for which indemnification is not provided under this Section 10.6; then, and in each such case, the Company and the Seller will contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that the Seller is responsible only for the portion represented by the percentage that the public offering price of its securities offered by the registration statement bears to the public offering price of all securities offered by such registration statement, provided, however, that, in any such case, (y) the Seller will not be required to

19

contribute any amount in excess of the public offering price of all such securities sold by it pursuant to such registration statement; and (z) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

10.7.    Delivery of Unlegended Shares.

(a)    Within five (5) business days (such fifth business day being the "**Unlegended Shares Delivery Date**") after the business day on which the Company has received (i) a notice that Shares or Warrant Shares or any other Common Stock held by a Subscriber have been sold pursuant to the Registration Statement or Rule 144 under the 1933 Act, (ii) a representation that the prospectus delivery requirements, or the requirements of Rule 144, as applicable and if required, have been satisfied, and (iii) the original share certificates representing the shares of Common Stock that have been sold, and (iv) in the case of sales under Rule 144, customary representation letters of the Subscriber and/or Subscriber's broker regarding compliance with the requirements of Rule 144, the Company at its expense, (y) shall deliver, and shall cause legal counsel selected by the Company to deliver to its transfer agent (with copies to Subscriber) an appropriate instruction and opinion of such counsel, directing the delivery of shares of Common Stock without any legends including the legend set forth in Section 4(e) above, reissuable pursuant to any effective and current Registration Statement described in Section 11 of this Agreement or pursuant to Rule 144 under the 1933 Act (the "**Unlegended Shares**"); and (z) cause the transmission of the certificates representing the Unlegended Shares together with a legended certificate representing the balance of the submitted Shares certificate, if any, to the Subscriber at the address specified in the notice of sale, via express courier, by electronic transfer or otherwise on or before the Unlegended Shares Delivery Date.

(b)    In lieu of delivering physical certificates representing the Unlegended Shares, if the Company's transfer agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer program, upon request of a Subscriber, so long as the certificates therefor do not bear a legend and the Subscriber is not obligated to return such certificate for the placement of a legend thereon, the Company shall cause its transfer agent to electronically transmit the Unlegended Shares by crediting the account of Subscriber's prime broker with DTC through its Deposit Withdrawal Agent Commission system. Such delivery must be made on or before the Unlegended Shares Delivery Date.

(c)    The Company understands that a delay in the delivery of the Unlegended Shares pursuant to Section 10 hereof later than five (5) business days after the Unlegended Shares Delivery Date could result in economic loss to a Subscriber. As compensation to a Subscriber for such loss, the Company agrees to pay late payment fees (as liquidated damages and not as a penalty) to the Subscriber for late delivery of Unlegended Shares in the amount of $100 per business day after the Delivery Date for each $10,000 of purchase price of the Unlegended Shares subject to the delivery default. If during any 360 day period, the Company fails to deliver Unlegended Shares as required by this Section 10.7 for an aggregate of thirty (30) days, then each Subscriber or assignee holding Securities subject to such default may, at its option, require the Company to redeem all or any portion of the Shares and Warrant Shares subject to such default at a price per share equal to 120% of the Purchase Price of such Common Stock and Warrant Shares ("**Unlegended Redemption Amount**"). The amount of the aforedescribed liquidated damages that have accrued or have been paid for the twenty-day period prior to the receipt by the Subscriber of the Unlegended Redemption Amount shall be credited against the Unlegended Redemption Amount. The Company shall pay any payments incurred under this Section in immediately available funds upon demand.

(d)    In addition to any other rights available to a Subscriber, if the Company

fails to deliver to a Subscriber Unlegended Shares as required pursuant to this Agreement, within five (5) business days after the Unlegended Shares Delivery Date and the Subscriber or a broker on the Subscriber's behalf, purchases (in an open market transaction or otherwise) shares of common stock to deliver in satisfaction of a sale by such Subscriber of the shares of Common Stock which the Subscriber was entitled to receive from the Company (a "**Buy-In**"), then the Company shall pay in cash to the Subscriber (in addition to any remedies available to or elected by the Subscriber) the amount by which (A) the Subscriber's total purchase price (including brokerage commissions, if any) for the shares of common stock so purchased exceeds (B) the aggregate purchase price of the shares of Common Stock delivered to the Company for reissuance as Unlegended Shares- together with interest thereon at a rate of 15% per annum, accruing until such amount and any accrued interest thereon is paid in full (which amount shall be paid as liquidated damages and not as a penalty). For example, if a Subscriber purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to $10,000 of purchase price of shares of Common Stock delivered to the Company for reissuance as Unlegended Shares, the Company shall be required to pay the Subscriber $1,000, plus interest. The Subscriber shall provide the Company written notice indicating the amounts payable to the Subscriber in respect of the Buy-In

(e)     In the event a Subscriber shall request delivery of Unlegended Shares as described in Section 10.7 and the Company is required to deliver such Unlegended Shares pursuant to Section 10.7, the Company may not refuse to deliver Unlegended Shares based on any claim that such Subscriber or any one associated or affiliated with such Subscriber has been engaged in any violation of law, or for any other reason, unless, an injunction or temporary restraining order from a court, on notice, restraining and or enjoining delivery of such Unlegended Shares or exercise of all or part of said Warrant shall have been sought and obtained by the Company or at the Company's request or with the Company's assistance, and the Company has posted a surety bond for the benefit of such Subscriber in the amount of 120% of the amount of the aggregate purchase price of the Common Stock and Warrant Shares which are subject to the injunction or temporary restraining order, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Subscriber to the extent Subscriber obtains judgment in Subscriber's favor.

11.    (a)     <u>Right of First Refusal</u>. Until 365 days after the Actual Effective Date, the Subscribers shall be given not less than five (5) business days prior written notice of any proposed sale by the Company of its Common Stock, other equity securities, obligations convertible or exercisable for equity securities or debt obligations, except in connection with (i) full or partial consideration in connection with a strategic merger, acquisition, consolidation or purchase of substantially all of the securities or assets of corporation or other entity which holders of such securities or debt are not at any time granted registration rights, (ii) the Company's issuance of securities in connection with strategic license agreements and other partnering arrangements so long as such issuances are not for the purpose of raising capital and which holders of such securities or debt are not at any time granted registration rights, and (iii) the Company's issuance of Common Stock or the issuances or grants of options to purchase Common Stock pursuant to stock option plans and employee stock purchase plans described on **Schedule 5(d)** hereto at prices equal to or higher than the closing price of the Common Stock on the issue date of any of the foregoing (collectively the foregoing are "**Excepted Issuances**"). The Subscribers who exercise their rights pursuant to this Section 11(a) shall have the right during the five (5) business days following receipt of the notice to purchase such offered Common Stock, debt or other securities in accordance with the terms and conditions set forth in the notice of sale in the same proportion to each other as their purchase of Shares in the Offering. In the event such terms and conditions are modified during the notice period, the Subscribers shall be given prompt notice of such modification and shall have the right during the five (5) business days following the notice of modification, whichever is longer, to exercise such right.

21

(b)     <u>Favored Nations Provision</u>.   Other than the Excepted Issuances, if at any time Shares or Warrant Shares are held by a Subscriber, the Company shall offer, issue or agree to issue any Common Stock or securities convertible into or exercisable for shares of Common Stock (or modify any of the foregoing which may be outstanding) to any person or entity (**"Third Party Purchaser"**) at a price per share of Common Stock or exercise price per share of Common Stock which shall be less than the per share Purchase Price of the Shares, or less than the exercise price per Warrant Share, respectively, of the Subscribers holding Shares, Warrants, or Warrant Shares, then the Company shall issue, for each such occasion, additional shares of Common Stock to each Subscriber so that the average per share purchase price of the shares of Common Stock issued to the Subscriber (of only the Shares or Warrant Shares still owned by the Subscriber) is equal to such other lower price per share and the Warrant Exercise Price shall automatically be reduced to such other lower price per share.  The average Purchase Price of the Shares and average exercise price in relation to the Warrant Shares shall be calculated separately for the Shares and Warrant Shares.  The delivery to the Subscriber of the additional shares of Common Stock shall be not later than 15 business days from the closing date of the transaction giving rise to the requirement to issue additional shares of Common Stock.  If the Third Party Purchaser is offered registration rights with respect to the shares purchased by such Third Party Purchaser, the  Subscribers are granted, at their election, such other registration rights or the registration rights described in Section 10 hereof  in relation to such additional shares of Common Stock except that the Filing Date and Effective Date vis-à-vis such additional common shares shall be, respectively, the forty-fifth (45th) and ninetieth (90th) date after the closing date giving rise to the requirement to issue the additional shares of Common Stock.  For purposes of the issuance and adjustment described in this paragraph, the issuance of any security of the Company carrying the right to convert such security into shares of Common Stock or of any warrant, right or option to purchase Common Stock shall result in the issuance of the additional shares of Common Stock upon the actual issuance of such convertible security, warrant, right or option and again at any time upon any subsequent issuances of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the Conversion Price or Warrant exercise price in effect upon such issuance.  The Subscriber is also given the right to elect to substitute any term or terms of any other offering in connection with which the Subscriber has rights as described in Section 11(a), for any term or terms of the Offering in connection with Securities owned by Subscriber as of the date the notice described in Section 11(a) is required to be given to Subscriber..  The rights of the Subscriber set forth in this Section 11 are in addition to any other rights the Subscriber has pursuant to this Agreement, any Transaction Document, and any other agreement referred to or entered into in connection herewith.

(c)     <u>Maximum Exercise of Rights</u>.   In the event the exercise of the rights described in Sections 11(a) and 11(b) would result in the issuance of an amount of Common Stock of the Company that would exceed the maximum amount that may be issued to a Subscriber calculated in the manner described in Section 10 of the Warrant, then the issuance of such additional shares of Common Stock of the Company to such Subscriber will be deferred in whole or in part until such time as such Subscriber is able to beneficially own such Common Stock without exceeding the maximum amount set forth calculated in the manner described in Section 10 of the Warrant.  The determination of when such Common Stock may be issued shall be made by each Subscriber as to only such Subscriber.

22

(d)    From the date of this Agreement and until the earlier of (i) two (2) years after the Closing Date or (ii) until all the Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement, in the event the Company amends its certificate of incorporation to effect a reverse stock split of the Company's Common Stock, then the Company shall issue for each such occasion, additional shares of Common Stock to each Subscriber so that the average price of the Shares still held by the Subscriber shall be equal to 85% of the average of the closing price of the Common stock for the 20 trading days following the date of such reverse split.  This section shall apply only if the application shall result in the issuance of Common Stock to the Subscribers.

12.    Miscellaneous.

(a)    Notices.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be: (i) if to the Company, to: Silver Dragon Resources, Inc., 1121 Steeles Avenue West, Suite 803, Toronto, Ontario M2R 3W7, Attn: Marc M. Hazout, President and CEO, telecopier: (416) 661-9510, with a copy by telecopier only to: Garfin Zeidenberg LLP, Yonge-Norton Center, 5255 Yonge Street, Suite 800, Toronto, Ontario, Canada M2N 6P4, Attn: Stephen M. Cohen, B.A., LL.B., telecopier number: (416) 512-9992, and (ii) if to the Subscribers, to: the one or more addresses and telecopier numbers indicated on the signature pages hereto, with an additional copy by telecopier only to: Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, telecopier number: (212) 697-3575, and (iii) if to the Broker, to: the address and telecopier number set forth on **Schedule 7** hereto.

(b)    Closing.  The consummation of the transactions contemplated herein shall take place at the offices of Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, upon the satisfaction of all conditions to Closing set forth in this Agreement.  The "**Closing Date**" shall be the date that subscriber funds representing the net amount due to the Company from the Purchase Price of the Offering are received by the Company, provided such funds are received by the Company not later than the first business day after transmission of such funds, otherwise the Closing Date shall be the date such funds are actually received by the Company.

(c)    Entire Agreement; Assignment.  This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.  Neither the Company nor the Subscribers have relied on any representations not contained or referred to in this Agreement and the documents delivered herewith.   No right or obligation of either party shall be assigned by that party without prior notice to and the written consent of the other party.

(d)    Counterparts/Execution.  This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which,

when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument. This Agreement may be executed by facsimile signature and delivered by facsimile transmission.

(e)     <u>Law Governing this Agreement</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state of New York. **The parties and the individuals executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the jurisdiction of such courts and waive trial by jury.** The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

(f)     <u>Specific Enforcement, Consent to Jurisdiction</u>.  The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.  Subject to Section 12(e) hereof, each of the Company, Subscriber and any signator hereto in his personal capacity hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in New York of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper.  Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(g)     <u>Independent Nature of Subscribers</u>.  The Company acknowledges that the obligations of each Subscriber under the Transaction Documents are several and not joint with the obligations of any other Subscriber, and no Subscriber shall be responsible in any way for the performance of the obligations of any other Subscriber under the Transaction Documents.  The Company acknowledges that the decision of each Subscriber to purchase Securities has been made by such Subscriber independently of any other Subscriber and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company which may have been made or given by any other Subscriber or by any agent or employee of any other Subscriber, and no Subscriber or any of its agents or employees shall have any liability to any Subscriber (or any other person) relating to or arising from any such information, materials, statements or opinions.  The Company acknowledges that nothing contained in any Transaction Document, and no action taken by any Subscriber pursuant hereto or thereto (including, but not limited to, the (i) inclusion of a Subscriber in the SB-2 Registration Statement and (ii) review by, and consent to, such Registration Statement by a Subscriber) shall be deemed to constitute the Subscribers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Subscribers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents.  The Company acknowledges that each Subscriber shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of the Transaction Documents, and it shall not be necessary for any other Subscriber to

24

be joined as an additional party in any proceeding for such purpose. The Company acknowledges that it has elected to provide all Subscribers with the same terms and Transaction Documents for the convenience of the Company and not because Company was required or requested to do so by the Subscribers. The Company acknowledges that such procedure with respect to the Transaction Documents in no way creates a presumption that the Subscribers are in any way acting in concert or as a group with respect to Transaction Documents or the transactions contemplated thereby.

(h)     Consent.  As used in the Agreement, "consent of the Subscribers" or similar language means the consent of holders of not less than 70% of the total of the Shares and Warrant Shares owned by Subscribers on the date consent is requested.

(i)     Equitable Adjustment.  The Securities and the purchase prices of Securities shall be equitably adjusted to offset the effect of stock splits, stock dividends, and distributions of property or equity interests of the Company to its shareholders.

(j)     Currency.  All references to money, dollars and currency shall mean the currency of the United States.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

11/7/2007, 9:47 AM

## SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

SILVER DRAGON RESOURCES, INC.
a Delaware corporation

By: _____

Name: Marc M. Hazout
Title: President and CEO

Dated: as of November 2 , 2006

| SUBSCRIBER | PURCHASE PRICE | SHARES | CLASS A WARRANTS | CLASS B WARRANTS | CLASS C WARRANTS |
|---|---|---|---|---|---|
| ALPHA CAPITAL ANSTALT<br>Pradafant 7<br>9490 Furstentums<br>Vaduz, Lichtenstein<br>Fax: 011-42-32323196<br><br><br>_____<br>(Signature)<br>By:<br>Title: | $500,000.00 | 500,000 | 250,000 | 250,000 | 1,000,000 |

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Forms of Class A and Class B and Class C Warrants |
| Exhibit B | Escrow Agreement |
| Exhibit C | Form of Legal Opinion |
| Exhibit D | Form 8-K or Public Announcement |
| Exhibit E | Form of Lock Up Agreement |
| Schedule 5(a) | Subsidiaries |
| Schedule 5(d) | Additional Issuances / Capitalization |
| Schedule 5(q) | Undisclosed Liabilities |
| Schedule 5(v) | Transfer Agent |
| Schedule 7 | Broker |
| Schedule 8(e) | Use of Proceeds |
| Schedule 8(r) | Negative Covenants |
| Schedule 10.1 | Other Securities to be Registered |

EXHIBIT E

LOCK UP AGREEMENT

This AGREEMENT (the "Agreement") is made as of the 2nd day of November, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Silver Dragon Resources, Inc., a Delaware corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

1.     Background.

a.     Holder is the actual and/or beneficial owner of the amount of shares of the Common Stock, $0.0001 par value, of the Company ("Common Stock") and rights to purchase Common Stock designated on the signature page hereto.

b.     Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's Common Stock and Warrants (the "Subscribers"), for the sale of Common Stock and Warrants to the Subscribers for an aggregate of up to $500,000 (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to obtain an agreement from the Holder to refrain from selling any securities of the Company at an effective price per share of Common Stock of less than $1.50 ("Minimum Price") from the date of the Subscription Agreement until six months after the Actual Effective Date (the "Restriction Period").

2.     Share Restriction.

a.     Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof or acquires hereafter during the Restriction Period at less than the Minimum Price, except in connection with an offer made to all shareholders of the Company in connection with any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

b.     Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

c.     Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

3.     Miscellaneous.

a.     At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the

intent and purposes of this Agreement.

b.      This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply.  Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

c.      This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

d.      This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

e.      This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

f.      The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement nor to amend or terminate this Agreement without the consent of the Subscribers.

g.      The Subscribers are third party beneficiaries of this Agreement, with right of enforcement.

h.      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Subscription Agreement.

i.      The Minimum Price shall be adjusted to equitably offset stock splits and similar events.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

HOLDER:

_____
(Signature of Holder)

_____
(Print Name of Holder)

_____
Number of Shares of Common Stock Owned

_____
Number of Shares of Common Stock
Beneficially Owned

_____
Number of shares of Common Stock issuable
upon exercise of Stock Options and Warrants
Beneficially Owned

COMPANY:
**SILVER DRAGON RESOURCES, INC.**

By:_____

**SCHEDULE 7**

BROKER:    DRAGONFLY CAPITAL PARTNERS, LLC.
The Packard Building
1310 S. Tryon Street, Suite 109
Charlotte, NC 28203
Fax: (704) 342-9750

Cash Fee.   The Company agrees that it will pay the Broker, on the Closing Date a fee of seven percent (7%) of the Purchase Price ("**Broker's Cash Fee**").  The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the Offering except the Broker.

Broker's Warrants.  On the Closing Date, the Company will issue to the Broker, seven (7) Class A Warrants for each one hundred (100) Shares issued to the Subscribers and seven (7) Class B Warrants for each one hundred (100) Shares issued to the Subscribers on the Closing (collectively "**Broker's Warrants**") similar to and carrying the same rights as the Class A and Class B Warrants issuable to the Subscribers.

All the representations, covenants, warranties, undertakings, remedies, liquidated damages, indemnification, and other rights including but not limited to reservation requirements and registration rights made or granted to or for the benefit of the Subscribers are hereby also made and granted to and for the benefit of the Broker in respect of the Broker's Warrants.

**EXHIBIT B**

CONFIDENTIAL DRAFT

# Silver Dragon Resources, Inc.

## SUMMARY OF TERMS AND CONDITIONS

*The purpose of this letter is to set forth the indicative terms pursuant to which, subject to certain conditions set forth herein, the Investors would purchase certain securities of the Issuer, and the Issuer would sell such securities to the Investors. The terms and conditions set forth herein are subject to change and this letter does not constitute an offer. The issuance and sale of such securities is subject to, among other things, completion of due diligence to the Investors' satisfaction, the preparation of definitive documentation to effect the Transaction that is mutually satisfactory to each party and, in the case of the Investors, that the Investors shall have determined that subsequent to the date hereof and prior to the closing of the Transaction, there shall have been no material adverse developments relating to the business, assets, operations, properties, condition (financial or otherwise) or prospects of the Issuer and its subsidiaries, taken as a whole and in the case of the Company, approval of the Board of Directors of the Company..*

**Issuer:**               Silver Dragon Resources, Inc. (the "Company"). The Common Stock of the Company is listed on the Bulletin Board under the symbol "SDRG."

**Investors:**            _____ (the "Investors" or "Holders").

**Securities Offered:** A minimum of 1,000,000 of SDRG common shares and warrants (the "Units") at the discretion SDRG (the "Financing Amount"). The Units will be issued in a private placement pursuant to Regulation D under the U.S. Securities Act. Each Unit will consist of one common share of the Company and two (2) 1/2 of one common share purchase warrants. The Company in its sole discretion has the right to accept additional subscriptions.

**Closing:**              All subscriptions for the Units are anticipated to be completed and accepted by the Company on or before the close of business on September 22, 2006, (the "Closing") or such other date as agreed to by the Company. Upon Closing, funds are to be released to the Company net of commission.

**Purchase Price:**       US$1.00 per Unit ("Purchase Price").

**Warrants:**             The Investor shall receive two (2) one-half of one (1/2) common share purchase warrants for each common share purchased entitling the Holder thereof to purchase one (1) additional common share of the Company for every two (2) warrants exercised for a period of 5 years from the date of Closing. One warrant shall be exercisable at $2.00 per common share and the other warrant shall be exercisable at $5.00 per common share. The warrants shall not be cashless. However, in the event that a registration statement for the shares underlying the warrants is not declared effective within one year of the Closing Date, the warrants shall become cashless.

**Registration Rights:** The Company shall file to register the shares of the Common Stock and Warrants issued within 45 days of the Closing Date. If the registration statement is not declared effective within 125 days following the Closing Date, then cash delay payments equal to 1.0% of the actual Financing Amount per month for the first two months, and then 1.5% for every month thereafter.

**Right of First Refusal:** From the Closing Date and until one year after the Registration Statement covering the Securities Offered is declared effective, the Investor will have a right of first refusal in any equity-related financing exclusive of Strategic Transactions or the issuance of shares and warrants issued. The Company must promptly disclose any planned equity financing to the Investor, and the Investor will have five (5) business days to notify the Company of its intention to participate.

**Ratchet Rights:** Should the company sell any Common shares or any instrument convertible into such, at a price per share that is less than $1.00, then the purchase price and the warrant exercise price shall automatically be lowered to that new price. Notwithstanding the foregoing, shares and warrants issued pursuant to Rule 144, employee stock options and/or warrants, warrants for commercial banks and equipment lessors, shares, options or warrants issued pursuant to strategic alliances and/or acquisitions approved by the Board will be excluded from this provision. Any shares issued to officers, directors and employees of the Company may be included in the Registration Statement.

**Additional Agreement:** The company will not raise any money through a convertible debt structure or an equity line with a conversion feature to it, for the first 24 months post close, without consent from investors.
The insiders of the company (CEO, CFO..) agree not to sell any stock below $1.50 for the first 6 months post an effective registration.

**Legal Fees:** On the Closing Date, the Company shall reimburse the Investors for legal, transactional and due diligence costs associated with this transaction. The amount will be $15,000, of which $4,000 shall be paid at the time this term sheet is executed.
The Investor is aware that the Company is pursuing an initial public offering of its stock on the Toronto Stock Exchange.

**Agreed to and Accepted by:**

**Silver Dragon Resources, Inc.**

Signature: _____
Marc Hazout– President and Chief Executive Officer

**EXHIBIT C**

REDACTED

REDACTED

---

**From:** COUNSLERS@aol.com [mailto:COUNSLERS@aol.com]
**Sent:** Monday, December 18, 2006 3:15 PM
**To:** ABrand@lhfin.com; Stephen Cohen; hazout@rogers.com
**Subject:** Silver Dragon Resources

In connection with the closing of an aggregate $500,000 investment in Common Stock and Warrants of Silver Dragon Resources, which took place on November 8, 2006, herewith please find Schedule 5(d) to the Subscription Agreement. Apparently, the Schedule attached to the Subscription Agreement in the closing packages which were sent out on November 9, 2006 contained an earlier version of Schedule 5(d). The Schedule attached herewith is the correct Schedule. Kindly replace this version of Schedule 5(d) with the one previously sent.

Sorry for the inconvenience.

*****************************************************
Barbara R. Mittman
Grushko & Mittman, P.C.
551 Fifth Avenue, Suite 1601
New York, NY 10176
(212) 697-9500, Ext: 105
(212) 697-3575 (fax)
counslers@aol.com (office email)
barbaramittman@aol.com (personal email)
*****************************************************

REDACTED

2/5/2008

REDACTED

2/5/2008

## SCHEDULE 5d

**Additional Issuances**

1.   3,000,000 warrants exerciseable at $2.00 per share issued in conjunction with private placement of restricted stock, previously raised.

2.   3,000,000 warrants exerciseable at $5.00 per share issued in conjunction with private placement of restricted stock previously raised.

3.   200,000 warrants exerciseable at $0.80 per share issued to consultants.  Restricted.

4.   50,000 restricted common shares pursuant to consulting agreement.  Shares owed but not yet issued.

5.   From $12- $18 Million in common stock plus warrants as per engagement letter with Union Securities

6.   Any additional issuances of restricted common stock

**Capitalization**

57,010,533 (not including the 500,000 shares to be issued pursuant to this Subscription Agreement)

**EXHIBIT D**

**Silver Dragon Resources Inc. (Stock Ledger)**
**Activity Report - Detailed**
Year Ended December 31, 2006

| Date | Num | Name | Private Placements | | |
|------|-----|------|--------|-------|--------|
| | | | Shares | Price | Amount |
| | | | | | |
| 11/01/2006 | 1786 | Alpha Capital Anstalt | 500,000 | $1.00 | 500,000 |
| 12/29/2006 | 1810 | Lee, Meng-Hung | 10,000 | $1.00 | 10,000 |
| 12/29/2006 | 1811 | Lai, Cheng-Yang | 17,000 | $1.00 | 17,000 |
| 12/29/2006 | 1812 | Copeland, Neville Ayson | 25,000 | $1.00 | 25,000 |
| 12/29/2006 | 1814 | Nagar, Azriel | 25,000 | $1.00 | 25,000 |
| 12/29/2006 | 1815 | Hsieh, Jen-Feng | 90,000 | $1.00 | 90,000 |
| 12/29/2006 | 1816 | Jovin, Chim Chai Shan | 100,000 | $1.00 | 100,000 |
| 12/29/2006 | 1817 | Bishop, Garry | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1818 | Edmund, Dang Man Gon | 230,000 | $1.00 | 230,000 |
| 12/29/2006 | 1819 | Mocholi, Vincent Rodrigo | 250,000 | $1.00 | 250,000 |
| 12/29/2006 | 1820 | Alvarez, Vincent Ricardo | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1821 | Alvarez, Vincent Ricardo | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1822 | Choi, Hui Hing | 500,000 | $1.00 | 500,000 |
| 12/29/2006 | 1823 | Hung, Lai Chun | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1824 | Kei, Ho Man | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1825 | Lau, Man Chu David | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1826 | Wa, Chan Yin | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1827 | Wong, Lincoln | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1828 | Chu, Chan King | 200,000 | $1.00 | 200,000 |
| 12/29/2006 | 1829 | Schweizer-Stitny, Christine | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1830 | Tang, Kam Yiu Mimi | 20,000 | $1.00 | 20,000 |
| 12/29/2006 | 1831 | Yung, Ng Sin | 70,000 | $1.00 | 70,000 |
| 12/29/2006 | 1832 | Su, Hu | 300,000 | $1.00 | 300,000 |
| 12/29/2006 | 1833 | Ling, Siu To | 200,000 | $1.00 | 200,000 |
| 12/29/2006 | 1834 | Zhongrong, Yuan | 100,000 | $1.00 | 100,000 |
| 12/29/2006 | 1835 | Yee, Yam Wai | 40,000 | $1.00 | 40,000 |
| 12/29/2006 | 1836 | Lai, Cheng-Yang | 10,000 | $1.00 | 10,000 |
| 12/29/2006 | 1837 | Michelson, Arthur M | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1838 | Cheung, Yau Shu | 50,000 | $1.00 | 50,000 |
| 12/29/2006 | 1813 | SwissFirst Bank AG | 250,000 | $1.00 | 250,000 |
| | | | | | |
| | | 2006 Issunaces from November | 3,487,000 | | 3,487,000 |

## Share Transaction Summary
### As of December 31, 2007

| Date | Num | Name | Private Placements | | |
|------|-----|------|-------|-------|--------|
| | | | Shares | Price | Amount |
| | | | | | |
| 02/05/2007 | 1854 | Kathuria, Hemant | 25,000 | $1.00 | 25,000 |
| 02/05/2007 | 1855 | Rich, Arjun | 75,000 | $1.00 | 75,000 |
| 02/05/2007 | 1856 | Heimowitz, Rachel | 96,000 | $1.00 | 96,000 |
| 02/05/2007 | 1857 | Kenton, Saul Marc | 88,000 | $1.00 | 88,000 |
| 02/05/2007 | 1858 | Chang, Yun Chi | 110,000 | $1.00 | 110,000 |
| 02/05/2007 | 1859 | Mocholi, Vincent Rodrigo | 50,000 | $1.00 | 50,000 |
| 02/05/2007 | 1860 | Wong, Debbie Suet Wa Lau | 10,000 | $1.00 | 10,000 |
| 02/05/2007 | 1861 | Wu, Chung Hao | 10,000 | $1.00 | 10,000 |
| 02/05/2007 | 1862 | Hsieh, Jen-Feng | 10,000 | $1.00 | 10,000 |
| 02/05/2007 | 1863 | Chan, Si Wa | 10,000 | $1.00 | 10,000 |
| 02/05/2007 | 1864 | Yau, Sik Hon | 100,000 | $1.00 | 100,000 |
| 04/02/2007 | 1879 | Reichman, Charles & Lisa J/T | 30,000 | $1.00 | 30,000 |
| 04/02/2007 | 1880 | Feuer, Daniel | 50,000 | $1.00 | 50,000 |
| 04/02/2007 | 1881 | Feldman Alfred & Judith J/T | 25,000 | $1.00 | 25,000 |
| 04/02/2007 | 1882 | Lehmann, Tamar | 50,000 | $1.00 | 50,000 |
| 04/02/2007 | 1883 | Schiff, Peter | 25,000 | $1.00 | 25,000 |
| 04/02/2007 | 1888 | Schweizer, Kurt | 50,000 | $1.00 | 50,000 |
| 05/22/2007 | 1923 | Leeds Ltd | 25,000 | $1.00 | 25,000 |
| 05/22/2007 | 1924 | Christie Street | 100,000 | $1.00 | 100,000 |
| 05/22/2007 | 1925 | Feldman Company | 50,000 | $1.00 | 50,000 |
| 07/27/2007 | 1975 | Hurvitz, Garry L | 500,000 | $1.00 | 500,000 |
| 10/19/2007 | 2069 | Marc Hazout | 300,000 | $1.00 | 300,000 |
| 10/19/2007 | 2070 | Manuel Chan | 200,000 | $1.00 | 200,000 |
| 11/16/2007 | 2182 | Hurvitz, Garry L | 500,000 | $1.00 | 500,000 |
| | | | | | |
| | | **2007 Issunaces from November** | 1,489,000 | | 1,489,000 |