United States District Court
Southern District of New York
--------------------------------------------------------x

Alpha Capital Anstalt,

                Plaintiff,

                                        07 CV 11430 (CM)

    vs.

Silver Dragon Resources, Inc.,

                Defendant.

--------------------------------------------------------x

### Affirmation of Asher Brand In Opposition To Defendant's
### Motion To Set Aside The Preliminary Injunction Granted By Default

Asher Brand hereby affirms under penalties of perjury:

I am employed by LH Financial Services, Inc. ("LH"), a New York corporation with its principal place of business in New York City. LH provides financial services to Alpha Capital Anstalt ("Alpha Capital"), the Plaintiff in this action. I was the person at LH primarily responsible for processing and concluding the transaction whereby Alpha Capital purchased 500,000 units of Defendant Silver Dragon Resources, Inc.'s ("SDRG") securities for $500,000 on November 8, 2006. I submit this affirmation in opposition to the motion by SDRG to re-open the Order Granting Preliminary Injunction By Default, which was entered by this Court on January 14, 2008 and the Order entered on January 25, 2008 which prohibited SDRG from issuing any shares of stock until it complied with the Court Order of January 14. I have personal knowledge of the matters set forth herein.

The essence of Marc Hazout's ("Hazout") affidavit in support of SDRG's motion is that SDRG was unaware of the contents of Schedule 5(d) when it entered into the Subscription Agreement, that neither Hazout nor its counsel, Stephen Cohen ("Cohen") received a copy of Schedule 5(d) during the negotiation of the Subscription Agreement and that said Schedule should have listed the warrant grant to an SDRG director on November 2, 2007 as an "Excepted Issuance" which would not trigger the "Favored Nations" provision contained in that agreement (Hazout Affidavit, ¶8). Mr. Hazout certainly implies, if he does not state outright, that Alpha Capital somehow acted improperly in preparing Schedule 5(d), which, by mutual agreement of the parties, according to Hazout, should have listed that warrant issuance as an issuance excepted from the application of the Favored Nations' provision.

Hazout's allegations are factually false and demonstrably so based on the clear documentary record. The transaction between Alpha Capital and SDRG closed in escrow because SDRG was located in Canada and Alpha Capital was located overseas. An escrow closing is a customary form of closing when the parties are located at great distances from one another. As is typical in an escrow closing, both Alpha Capital and SDRG submitted their signed documentation to an escrow agent. As is typical with transactions in which Alpha Capital invests, Alpha Capital prepares the underlying agreements but the schedules to those agreements, as in this case[1], are prepared by the Company because the Company, not Alpha Capital, has the information necessary to prepare the schedules. As with any escrow closing, the deal is not closed nor are the

---

[1]Except for Schedule 7 which was prepared by Alpha Capital because it relates to the Broker and its preparation does not require any information about the Company.

documents released from escrow, until all of the deal documents are agreed upon, the investor (in

this case Alpha Capital) wires the purchase money into the escrow agent's account and the

escrow agent wires the funds to the company (in this case SDRG). In this case Barbara Mittman

of Grushko and Mittman acted as the escrow agent.[2] With SDRG's full knowledge and consent,

the law firm of Grushko and Mittman, of which Ms. Mittman is a member, also acted as counsel

for Alpha Capital. SDRG, which is a public company, was represented throughout the transaction

by Stephen Cohen, Esq., ("Cohen") who is with Garfin Zeidenberg, a law firm located in

Toronto, Ontario, Canada and by Dorsey and Whitney as United States counsel.[3]


On November 2, 2006, prior to the anticipated closing, Cohen sent to Barbara Mittman,

both by courier and by fax,[4] the Subscription Agreement, signed by SDRG, along with all of the

Schedules thereto. Thus in his cover letter of November 2, 2006 (annexed as Exhibit D), Cohen

writes to Mittman:

> Enclosed please find the following:
>
> 1. Subscription Agreement dated November 2, 2006, **together with all schedules**, along with three (3) extra copies of the signature pages signed by our client. (Bold added)

---

[2]A copy of the separate Escrow Agreement is annexed hereto as Exhibit A.

[3]See Exhibit B which is an e-mail from Dorsey and Whitney forwarding a draft of the opinion letter and officer's certificate which were required to close the transaction. See also Exhibit C which demonstrates that Dorsey and Whitney issued the legal opinion which was used to close the transaction.

[4]The letter, by its terms, makes clear that Cohen is faxing only the signed signature pages to the Subscription Agreement with the entire agreement and the schedules to be delivered by courier.

Thus Hazout's sworn statement in his affidavit (¶8) that "[N]either Silver Dragon nor its counsel

Stephen Cohen, received a copy of Schedule 5(d) during the negotiation of the Subscription

Agreement" is patently false. If Cohen did not possess a copy of Schedule 5(d) prior to SDRG's

execution of the Subscription Agreement, then he could not have stated in his cover letter, as he

did, that he submitted the signed agreement with all of the schedules to the escrow agent on

November 2. Conspicuous by its glaring absence is any affidavit from Stephen Cohen stating that

he did not prepare Schedule 5(d) and that he did not have Schedule 5(d) in final form prior to the

closing of the transaction.[5] Cohen's November 2 letter makes clear that he was anticipating a

closing on November 3. He provided in that letter wiring instructions for the funds to be sent to

SDRG.

Based on the documentary evidence, it appears that on the same morning that Cohen

delivered to Barbara Mittman the documents signed by SDRG (November 3), I reviewed the last

version of the transaction documents to be circulated. Either I or Barbara Mittman noticed that

the schedules were missing from the final execution set of documents. On November 3, 2006, at

10:18 a.m., therefore, I sent an e-mail to Jeffrey Singer ("Singer") of Dragonfly Capital Group,

the broker through whom this transaction was brought to Alpha Capital's attention (Exhibit E),

noting that omission and requesting that SDRG send a final set of schedules so that they could be

appended to the Subscription Agreement in order to facilitate the closing. I sent a copy of that e-

---

[5]Mr. Cohen, presumably, is a competent attorney and, as such, would not submit a copy
of the Subscription Agreement signed by his client unless it was complete or, if it was not yet
complete, make such fact known, in the cover letter or otherwise, when he submitted the
Subscription Agreement to the Escrow Agent.

mail to Cohen, Hazout and to Dorsey and Whitney. At 11:58 a.m. on November 3, I received a

response by e-mail from Cohen (copies to Hazout and Barbara Mittman) (Exhibit E) in which

Cohen states:

> Barbara:
>
> All of the Schedules were attached to the Subscription Agreement
> which was delivered to you, except for Exhibit D, which is
> attached and Exhibit C, Legal Opinion, which was forwarded
> separately. Please advise if everything is in order for the closing
> today.[6]

Alpha Capital submitted its signed copy of the Subscription Agreement to Ms. Mittman

on November 3 (Exhibit E). The transaction, however, did not close until November 8, when the

funds were actually wired to SDRG (Exhibit F). In the interim, after I received a copy of

Schedule D from Cohen, I requested that certain changes be made to the language in Schedule

5(d) because it was not acceptable to Alpha Capital in its then current form. Cohen made the

changes to Schedule 5(d) which Alpha Capital requested. On November 6, 2006, at 12:05 p.m.,

Cohen sent the revised Schedule 5(d) to Singer (Exhibit G), which Singer immediately forwarded

to me (at 12:07 p.m.) (Exhibit G) by e-mail in which Singer stated:

---

[6]Even if Cohen's November 2 letter erroneously stated that Schedule 5(d) was enclosed, it
is clear from his e-mails on November 3 and 6 that he had a copy of the schedule before
November 2. There is no indication in his November 3 or 6 e-mails that he did not have the
schedule prior to November 2 or that he had first received it between November 2 and November
6.

Asher-

See the attached doc with a revised Schedule D that includes the language you requested. Let me know if this is now acceptable.

A copy of the Schedule 5(d) forwarded to me by Singer in that e-mail is annexed to the Subscription Agreement in Exhibit G. The language in that Schedule was still not acceptable to Alpha Capital. Cohen, therefore, again revised Schedule 5(d) and, on November 6 at 1:04 p.m. forwarded the newly revised Schedule 5(d) to Singer, with a copy to Hazout (Exhibit H). Singer, at 2:04 p.m. that same day, forwarded the newly revised Schedule 5(d) to me. A copy of that newly revised Schedule 5(d) is annexed to the Subscription Agreement in Exhibit H. As is obvious from a comparison of the twice revised Schedule 5(d), the only difference between the final revision (attached to Exhibit H) and the previous revision (attached to Exhibit G) is that the words "previously raised" were added to paragraphs 1 and 2 of the Additional Issuances, which would not trigger the Favored Nations clause of the Subscription Agreement. No version of Schedule 5(d), which was clearly drafted and revised by Cohen himself, ever contained an exemption for "employee stock option plans and the like" which Hazout claims (¶7 of his Affidavit) were intended to be listed on that Schedule.

Thus when Singer forwarded to me on November 6 at 2:04 p.m. the newly revised Schedule 5(d) (along with other documents) which he received from Cohen (Exhibit H), he writes:

6

Asher-

Attached are the following for your review and approval:

- Subscription Agreement with a revised schedule 5d with the "previously raised" added to #s1 and 2

Asher, please confirm that the attached revised documents are acceptable.

The documents were then acceptable to Alpha Capital. As noted above, the transaction

closed on November 8. On that date Grushko and Mittman wired $453,967.50 to SDRG, which

represented the purchase price of the securities net of all costs and expenses associated with the

transaction (Exhibit F). The signed transaction documents, including the Subscription Agreement

and the schedules thereto which included Schedule 5(d), were released from escrow on Novem-

ber 9 to the respective parties (see Exhibit C to the Hazout Affidavit, the December 18 e-mail

from Mittman to me, Cohen and Hazout).


Apparently when Ms. Mittman released the documents from escrow, she erroneously

attached what must have been the first or second version of Schedule 5(d) which Cohen had

revised on November 6, not the final version which he revised at approximately 1:00 p.m. that

day. On December 18, 2006, therefore, Ms. Mittman sent by e-mail to Cohen, Hazout and me the

correct final revision of Schedule 5(d). Neither Cohen nor Hazout ever informed Ms. Mittman, or

anyone else, that the document she forwarded on December 18, 2006, more than one year prior to

the institution of this lawsuit, was not the correct final Schedule 5(d) to which the parties had

agreed. Hazout implies (¶9 of his Affidavit) that Ms. Mittman, by forwarding the schedule on

December 18, was somehow attempting to replace a schedule which exempted employee stock

7

option and warrant issuances from the Favored Nations provision with a schedule which eliminated that exemption. That is false because a Schedule 5(d) which listed employee stock option and warrant issuances as exempt from the Favored Nations provision simply never existed.

Alpha Capital never agreed that all stock options and warrants issued to employees were intended to be "Excepted Issuances," as Hazout claims (¶6-7 of his Affidavit). The parties explicitly negotiated the terms of Schedule 5(d). SDRG's counsel drafted, reviewed and revised Schedule 5(d) immediately prior to the actual closing of the deal and the release of the signed documents from escrow. No stock options or warrants issued pursuant to employee plans are listed thereon. Hazout argues that because the text of §11(a)(iii) of the Subscription Agreement contemplates that certain issuances of common stock or the issuances of options pursuant to stock option plans and employee stock purchase plans would be Exempt Issuances to the extent that such plans were listed on Schedule 5(d), it follows that because no such plans were so listed, Schedule 5(d) does not reflect the true agreement of the parties (Hazout Affidavit, ¶7).

That argument is incorrect. If SDRG had in fact adopted such employee option or warrant plans (which it admittedly did not and still has not (Hazout Affidavit ¶6)), Alpha Capital would have reviewed the actual plans and come to a determination whether or not it agreed that such plans constituted Excepted Issuances. Alpha Capital never agreed, and never would agree, that any plan SDRG adopted in the future which would permit the issuance of stock options or warrants at any price and upon any terms would be an Exempt Issuance. If that were the

8

agreement of the parties (which it was not), it would have been very simple for Cohen to have drafted a sentence on Schedule 5(d) exempting "Any additional issuances of options or warrants pursuant to any plan" from the Favored Nations provision as he did for any additional issuances of restricted stock (see Schedule 5(d) para. 6).[7] He did not draft such a sentence because that was not the agreement of the parties.

To the extent that the Term Sheet which Hazout signed at the beginning of the negotiations contained a provision which indicated that employee stock and warrant issuances would be excepted from any "Ratchet Rights" (Hazout Affidavit, ¶6 and Exhibit B thereto), the Term Sheet is not a binding contract and is subject to further negotiation and the execution of a formal contract. Thus the Term Sheet, signed only by SDRG and not by Alpha Capital, explicitly states in the introductory paragraph that:

> The terms and conditions set forth herein are subject to change and this letter does not constitute an offer. The issuance and sale of such securities is subject to, among other things, completion of due diligence to the Investors' satisfaction, the preparation of definitive documentation to effect the Transaction that is mutually satisfactory to each party . . .

---

[7]Schedule 5(d) itself proves that Alpha Capital never agreed to an open ended exemption for any stock option or warrant plans which SDRG may adopt at any time in the future. With respect to additional issuances by SDRG of restricted stock, as to which Alpha Capital had no objection because the exemption had limitations contained in §11(a)(iii) as to the price at which the additional restricted shares could be issued, Section 5(d) explicitly sets forth "Any additional issuances of restricted common stock" as an Excepted Issuance. No such language appears for stock option or warrant issuances.

9

The fact, therefore, that the Term Sheet by its own terms was subject to change and to the preparation of a final agreement negates SDRG's argument that the final agreement does not reflect the intention of the parties because it does not include employee option or warrant issuances as Exempt Issuances, as provided in the Term Sheet. The final agreement, in very clear terms, simply does not provide that any employee stock or warrant issuances are Exempt Issuances. The Subscription Agreement executed by the parties contains a "merger clause" (¶12(c) thereof) which explicitly provides that the Subscription Agreement and the other documents delivered in connection therewith contain the entire agreement of the parties and can only be amended by a signed writing. The executed Subscription Agreement does not exempt the warrant issuance at $0.60 per share from the Favored Nations provision.

Hazout claims (Hazout Affidavit ¶11, 14) that SDRG on two previous occasions, August 16, 2007 and August 29, 2007, issued warrants to its directors at prices below $1 per share to which Alpha Capital did not object, thereby indicating, according to Hazout, that the parties had agreed that such issuances were exceptions to the Favored Nations provision. Hazout twice claims that such issuances were disclosed both in forms 8-K filed by SDRG and/or in press releases (Hazout Affidavit, ¶11, 14). That is untrue. Hazout attaches none of those "disclosure documents" to his affidavit. None of the press releases mentioned any of the warrant issuances of August 16, August 29 and November 7. The 8-K for the August 16 issuance did not specifically state the price at which the warrants were issued. No form 8-K was filed for either the August 29 or the November 2 warrant issuances. Alpha Capital did not learn of the warrant issuance at

$0.60 until November 14, 2007, the date SDRG filed its 10QSB which clearly stated the issuance and the price.

Hazout also claims that SDRG defaulted because it had insufficient time to retain New York counsel before the return date of the preliminary injunction motion. That also is apparently untrue. Hazout admits that he received the papers on December 28, 2007 (Hazout affidavit, ¶15). As a courtesy, our attorney forwarded the papers to Cohen by e-mail on January 2, 2008 (see Exhibit I). The fact that Colin Sutherland was on vacation (Hazout affidavit, ¶16) provides no excuse for SDRG's default. Hazout sets forth no reason why he needed to have Sutherland, SDRG's chief financial officer, review the actual Court papers before contacting counsel to deal with what was obviously a pressing legal matter. Hazout sets forth no attempt to contact Sutherland by telephone and why action by SDRG to retain counsel had to await Sutherland's return on January 7. Although SDRG did make a totally unacceptable offer to settle this matter in which SDRG sought to require Alpha Capital to invest up to an additional $325,000 (Exhibit J), I at no time indicated to Hazout (or anyone else) that Alpha Capital would agree to delay the Court hearing because of the offer. Thus Hazout's claim that SDRG "focused its efforts during that short time frame, in good faith, on negotiating a resolution of the matter" (Hazout Affidavit, ¶20) is untrue.

SDRG's default appears willful. SDRG had a relationship with Dorsey and Whitney, who are representing it on this motion, long prior to the initiation of this lawsuit. Dorsey and Whitney acted as securities counsel for SDRG in connection with its preparation of form SB-2, which

11

SDRG filed with the SEC. Dorsey and Whitney was also involved in providing the legal opinion necessary for SDRG to close the transaction with Alpha Capital (Exhibits B and C). A simple call to Dorsey and Whitney and a simple appearance by them would, in all likelihood, have prevented the default. Hazout does not tell this Court when it retained Dorsey and Whitney (Hazout Affidavit, ¶21). I submit that it was only after the Court entered the January 25 Order prohibiting SDRG from issuing any stock pending compliance with the Court's injunction, which prevents SDRG's transfer agent located in Texas from issuing any SDRG stock, did SDRG realize that it could not hide behind the fact that it and its assets and officers were located outside of the United States and ignore Alpha Capital's lawsuit and this Court's orders. Such belated realization that it could not ignore the jurisdiction of this Court provides no excuse to re-open the default.

Hazout contends that this lawsuit is in retaliation for SDRG's refusal to grant an extension of the exercise date for the Class C Warrants (Hazout Affidavit, ¶13, 28). That is untrue. In fact, SDRG was liable for liquidated damages based upon its failure to honor its obligations to register shares pursuant to §10.4 of the Subscription Agreement. Beginning August 13, 2007, Alpha Capital sent three letters to SDRG requesting payment of the liquidated damages. On or about November 4, 2007, I attempted to negotiate an extension of the Class C Warrants in exchange for relinquishing Alpha Capital's claim for liquidated damages. SDRG refused the offer and never responded to the demand for payment of the liquidated damages.

In any event, as set forth herein and in the memorandum of law served herewith, SDRG has no valid defense to Alpha Capital's entitlement to the preliminary injunction. The only defense alleged - that Alpha Capital's counsel somehow attached the wrong Schedule 5(d) to the final agreement - is patently false based upon the contemporaneous documentary evidence, as set forth herein. The parties never agreed to exempt any and all issuances of stock options or warrants to employees from the operation of the Favored Nations provision. The Subscription Agreement is clear on its face in that regard.

Hazout contends (Hazout affidavit, ¶26-28) that Alpha Capital will suffer only negligible harm if the default is re-opened. That is untrue. Hazout does not contest any of the irreparable harm that Alpha Capital will suffer, absent the grant of the preliminary injunction, as set forth in the Ackermann affirmation which was submitted in support of Alpha Capital's initial motion for the preliminary injunction (annexed hereto as Exhibit K). In short, SDRG itself has expressed doubt about its ability to continue as a going concern, SDRG admittedly is judgment proof in the United States and appears to be judgment proof even outside of the United States. Thus there is no assurance that SDRG will be able to respond to any ultimate award which the Court may grant to Alpha Capital. That alone, I am informed, constitutes irreparable harm supporting the grant of injunctive relief. The value of SDRG's stock continues to decline. It stood at $0.67 per share when Alpha Capital served its preliminary injunction motion on December 26, 2007 and now stands at $0.48 (see Exhibit L). Thus Alpha Capital is suffering and will continue to suffer real damage which it will likely never recover in the event the Court re-opens the default.

Hazout claims that SDRG will suffer harm if the preliminary injunction is not vacated because the financings which it is pursuing will be put in jeopardy (Hazout Affidavit, ¶27). The simple answer is that SDRG will suffer no harm if it simply complies with the Court Order by issuing the 333,333 shares and acknowledging the lower exercise price for the Class A and Class B Warrants. According to its most recently filed form 10-QSB (filed November 14, 2007) SDRG has over 66 million shares outstanding (Exhibit M). Issuing another 333,333 shares of stock to Alpha Capital hardly constitutes harm to SDRG.

For the foregoing reasons, SDRG's motion to re-open the Order Granting Preliminary Injunction By Default should be in all respects denied. Because Hazout has submitted such an obviously false and misleading affidavit, the Court should, in addition, impose sanctions on Hazout and SDRG.

Dated: New York, New York
February 20, 2008

Asher Brand

14

## FUNDS ESCROW AGREEMENT

This Agreement is dated as of the 8th day of November, 2006 among Silver Dragon Resources, Inc., a Delaware corporation (the "Company"), the Subscribers identified on Schedule A hereto (each a "Subscriber" and collectively "Subscribers"), and Grushko & Mittman, P.C. (the "Escrow Agent"):

### W I T N E S S E T H:

WHEREAS, the Company and Subscribers have entered into a Subscription Agreement calling for the sale by the Company to the Subscriber of $.0001 par value Common Stock of the Company ("Common Stock") and Warrants for an aggregate purchase price of $500,000; and

WHEREAS, the parties hereto require the Company to deliver the Common Stock and Warrants against payment therefor, with such Common Stock, Warrants and the Escrowed Funds to be delivered to the Escrow Agent to be held in escrow and released by the Escrow Agent in accordance with the terms and conditions of this Agreement; and

WHEREAS, the Escrow Agent is willing to serve as escrow agent pursuant to the terms and conditions of this Agreement;

NOW THEREFORE, the parties agree as follows:

### ARTICLE I

### INTERPRETATION

1.1.    Definitions.  Capitalized terms used and not otherwise defined herein that are defined in the Subscription Agreement shall have the meanings given to such terms in the Subscription Agreement. Whenever used in this Agreement, the following terms shall have the following respective meanings:

- "Agreement" means this Agreement and all amendments made hereto and thereto by written agreement between the parties;

- "Broker" shall have the meaning set forth in Section 7(a) and Schedule 7 of the Subscription Agreement;

- "Broker's Fee" shall have the meaning set forth in Section 7(a) and Schedule 7 of the Subscription Agreement;

- "Broker's Warrant" shall have the meaning set forth in Section 7(a) and Schedule 7 of the Subscription Agreement;

- "Closing Date" shall have the meaning set forth in Section 12(b) of the Subscription Agreement;

- "Common Stock" shall have the meaning set forth in the recital above;

- "Escrowed Payment" means an aggregate cash payment of $500,000 which is the Purchase Price;

■    "Legal Fees" shall have the meaning set forth in Section 7(b) of the Subscription Agreement;

■    "Legal Opinion" means the original signed legal opinion referred to in Section 6 of the Subscription Agreement;

■    "Purchase Price" shall mean $500,000;

■    "Subscription Agreement" means the Subscription Agreement (and the exhibits thereto) entered into or to be entered into by the parties in reference to the sale and purchase of the Notes and Warrants;

■    "Warrants" shall have the meaning set forth in Section 3 of the Subscription Agreement;

■    Collectively, the executed Subscription Agreement, Common Stock, Legal Opinion, Broker's Fees, Broker's Warrants, and Warrants are referred to as "Company Documents"; and

■    Collectively, the Escrowed Payment and the executed Subscription Agreement are referred to as "Subscriber Documents".

1.2.    <u>Entire Agreement</u>.  This Agreement along with the Company Documents and the Subscriber Documents constitute the entire agreement between the parties hereto pertaining to the Company Documents and Subscriber Documents and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. There are no warranties, representations and other agreements made by the parties in connection with the subject matter hereof except as specifically set forth in this Agreement, the Company Documents and the Subscriber Documents.

1.3.    <u>Extended Meanings</u>.  In this Agreement words importing the singular number include the plural and vice versa; words importing the masculine gender include the feminine and neuter genders. The word "person" includes an individual, body corporate, partnership, trustee or trust or unincorporated association, executor, administrator or legal representative.

1.4.    <u>Waivers and Amendments</u>.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by all parties, or, in the case of a waiver, by the party waiving compliance. Except as expressly stated herein, no delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder preclude any other or future exercise of any other right, power or privilege hereunder.

1.5.    <u>Headings</u>.  The division of this Agreement into articles, sections, subsections and paragraphs and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

1.6.    <u>Law Governing this Agreement</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the

(Funds Escrow Agreement)

state of New York. Both parties and the individuals executing this Agreement and other agreements on behalf of the Company agree to submit to the jurisdiction of such courts and waive trial by jury. The prevailing party (which shall be the party which receives an award most closely resembling the remedy or action sought) shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

     1.7.   <u>Specific Enforcement, Consent to Jurisdiction</u>. The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injuction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof or thereof, this being in addition to any other remedy to which any of them may be entitled by law or equity. Subject to Section 1.6 hereof, each of the Company and Subscriber hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

## ARTICLE II

### DELIVERIES TO THE ESCROW AGENT

     2.1.   <u>Company Deliveries</u>. On or before the Closing Date, the Company shall deliver the Company Documents to the Escrow Agent.

     2.2.   <u>Subscriber Deliveries.</u> On or before the Closing Date, each Subscriber shall deliver to the Escrow Agent such Subscriber's portion of the Purchase Price and the executed Subscription Agreement. The Escrowed Payment will be delivered pursuant to the following wire transfer instructions:

Citibank, N.A.<br>
1155 6th Avenue<br>
New York, NY 10036, USA<br>
ABA Number: 0210-00089<br>
For Credit to: Grushko & Mittman, IOLA Trust Account<br>
Account Number: 45208884

     2.3.   <u>Intention to Create Escrow Over Company Documents and Subscriber Documents</u>. The Subscriber and Company intend that the Company Documents and Subscriber Documents shall be held in escrow by the Escrow Agent pursuant to this Agreement for their benefit as set forth herein.

     2.4.   <u>Escrow Agent to Deliver Company Documents and Subscriber Documents</u>. The Escrow Agent shall hold and release the Company Documents and Subscriber Documents only in accordance with the terms and conditions of this Agreement.

3

**ARTICLE III**

**RELEASE OF COMPANY DOCUMENTS AND SUBSCRIBER DOCUMENTS**

3.1.    <u>Release of Escrow</u>.  Subject to the provisions of Section 4.2, the Escrow Agent shall release the Company Documents and Subscriber Documents as follows:

(a)    On the Closing Date, the Escrow Agent will simultaneously release the Company Documents to the Subscriber and release the Subscriber Documents and Purchase Price to the Company except that the Legal Fees will be released to the Subscriber's attorneys; and the Broker's Fee and Broker's Warrants will be released to the Broker.

(b)    All funds to be delivered to the Company shall be delivered pursuant to the wire instructions to be provided in writing by the Company to the Escrow Agent.

(c)    Notwithstanding the above, upon receipt by the Escrow Agent of joint written instructions ("Joint Instructions") signed by the Company and the Subscriber, it shall deliver the Company Documents and Subscriber Documents in accordance with the terms of the Joint Instructions.

(d)    Notwithstanding the above, upon receipt by the Escrow Agent of a final and non-appealable judgment, order, decree or award of a court of competent jurisdiction (a "Court Order"), the Escrow Agent shall deliver the Company Documents and Subscriber Documents in accordance with the Court Order.  Any Court Order shall be accompanied by an opinion of counsel for the party presenting the Court Order to the Escrow Agent (which opinion shall be satisfactory to the Escrow Agent) to the effect that the court issuing the Court Order has competent jurisdiction and that the Court Order is final and non-appealable.

3.2.    <u>Acknowledgement of Company and Subscriber; Disputes</u>.  The Company and the Subscriber acknowledge that the only terms and conditions upon which the Company Documents and Subscriber Documents are to be released are set forth in Sections 3 and 4 of this Agreement.  The Company and the Subscriber reaffirm their agreement to abide by the terms and conditions of this Agreement with respect to the release of the Company Documents and Subscriber Documents.  Any dispute with respect to the release of the Company Documents and Subscriber Documents shall be resolved pursuant to Section 4.2 or by agreement between the Company and Subscriber.

**ARTICLE IV**

**CONCERNING THE ESCROW AGENT**

4.1.    <u>Duties and Responsibilities of the Escrow Agent</u>.  The Escrow Agent's duties and responsibilities shall be subject to the following terms and conditions:

(a)    The Subscriber and Company acknowledge and agree that the Escrow Agent (i) shall not be responsible for or bound by, and shall not be required to inquire into whether either the Subscriber or Company is entitled to receipt of the Company Documents and Subscriber Documents pursuant to, any other agreement or otherwise; (ii) shall be obligated only for the performance of such duties as are specifically assumed by the Escrow Agent pursuant to this Agreement; (iii) may rely on and shall be protected in acting or refraining from acting upon any written notice, instruction, instrument, statement, request or document furnished to it hereunder and believed by the Escrow Agent in good faith to be genuine and to have been signed or presented by the proper person or party, without being required

4

(Funds Escrow Agreement)

to determine the authenticity or correctness of any fact stated therein or the propriety or validity or the service thereof; (iv) may assume that any person believed by the Escrow Agent in good faith to be authorized to give notice or make any statement or execute any document in connection with the provisions hereof is so authorized; (v) shall not be under any duty to give the property held by Escrow Agent hereunder any greater degree of care than Escrow Agent gives its own similar property; and (vi) may consult counsel satisfactory to Escrow Agent, the opinion of such counsel to be full and complete authorization and protection in respect of any action taken, suffered or omitted by Escrow Agent hereunder in good faith and in accordance with the opinion of such counsel.

(b)     The Subscriber and Company acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and that the Escrow Agent shall not be liable for any action taken by Escrow Agent in good faith and believed by Escrow Agent to be authorized or within the rights or powers conferred upon Escrow Agent by this Agreement. The Subscriber and Company, jointly and severally, agree to indemnify and hold harmless the Escrow Agent and any of Escrow Agent's partners, employees, agents and representatives for any action taken or omitted to be taken by Escrow Agent or any of them hereunder, including the fees of outside counsel and other costs and expenses of defending itself against any claim or liability under this Agreement, except in the case of gross negligence or willful misconduct on Escrow Agent's part committed in its capacity as Escrow Agent under this Agreement. The Escrow Agent shall owe a duty only to the Subscriber and Company under this Agreement and to no other person.

(c)     The Subscriber and Company jointly and severally agrees to reimburse the Escrow Agent for outside counsel fees, to the extent authorized hereunder and incurred in connection with the performance of its duties and responsibilities hereunder.

(d)     The Escrow Agent may at any time resign as Escrow Agent hereunder by giving five (5) days prior written notice of resignation to the Subscriber and the Company. Prior to the effective date of the resignation as specified in such notice, the Subscriber and Company will issue to the Escrow Agent a Joint Instruction authorizing delivery of the Company Documents and Subscriber Documents to a substitute Escrow Agent selected by the Subscriber and Company. If no successor Escrow Agent is named by the Subscriber and Company, the Escrow Agent may apply to a court of competent jurisdiction in the State of New York for appointment of a successor Escrow Agent, and to deposit the Company Documents and Subscriber Documents with the clerk of any such court.

(e)     The Escrow Agent does not have and will not have any interest in the Company Documents and Subscriber Documents, but is serving only as escrow agent, having only possession thereof. The Escrow Agent shall not be liable for any loss resulting from the making or retention of any investment in accordance with this Escrow Agreement.

(f)     This Agreement sets forth exclusively the duties of the Escrow Agent with respect to any and all matters pertinent thereto and no implied duties or obligations shall be read into this Agreement.

(g)     The Escrow Agent shall be permitted to act as counsel for the Subscriber in any dispute as to the disposition of the Company Documents and Subscriber Documents, in any other dispute between the Subscriber and Company, whether or not the Escrow Agent is then holding the Company Documents and Subscriber Documents and continues to act as the Escrow Agent hereunder.

(Funds Escrow Agreement)

(h)    The provisions of this Section 4.1 shall survive the resignation of the Escrow Agent or the termination of this Agreement.

4.2.    Dispute Resolution: Judgments.  Resolution of disputes arising under this Agreement shall be subject to the following terms and conditions:

(a)    If any dispute shall arise with respect to the delivery, ownership, right of possession or disposition of the Company Documents and Subscriber Documents, or if the Escrow Agent shall in good faith be uncertain as to its duties or rights hereunder, the Escrow Agent shall be authorized, without liability to anyone, to (i) refrain from taking any action other than to continue to hold the Company Documents and Subscriber Documents pending receipt of a Joint Instruction from the Subscriber and Company, or (ii) deposit the Company Documents and Subscriber Documents with any court of competent jurisdiction in the State of New York, in which event the Escrow Agent shall give written notice thereof to the Subscriber and the Company and shall thereupon be relieved and discharged from all further obligations pursuant to this Agreement.  The Escrow Agent may, but shall be under no duty to, institute or defend any legal proceedings which relate to the Company Documents and Subscriber Documents.  The Escrow Agent shall have the right to retain counsel if it becomes involved in any disagreement, dispute or litigation on account of this Agreement or otherwise determines that it is necessary to consult counsel.

(b)    The Escrow Agent is hereby expressly authorized to comply with and obey any Court Order.  In case the Escrow Agent obeys or complies with a Court Order, the Escrow Agent shall not be liable to the Subscriber and Company or to any other person, firm, corporation or entity by reason of such compliance.

## ARTICLE V

## GENERAL MATTERS

5.1.    Termination.  This escrow shall terminate upon the release of all of the Company Documents and Subscriber Documents or at any time upon the agreement in writing of the Subscriber and Company.

5.2.    Notices.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

6

(Funds Escrow Agreement)

(a)    If to the Company, to:

> Silver Dragon Resources, Inc.
> 1121 Steeles Avenue West, Suite 803
> Toronto, Ontario M2R 3W7
> Attn: Marc M. Hazout, President and CEO
> Fax: (416) 661-9510

With a copy by telecopier only to:

> Garfin Zeidenberg LLP
> Yonge-Norton Center
> 5255 Yonge Street, Suite 800
> Toronto, Ontario, Canada M2N 6P4
> Attn: Stephen M. Cohen, B.A., LL.B.
> Fax: (416) 512-9992

(b)    If to the Subscribers, to: the addresses and fax numbers listed on Schedule A hereto

(c)    If to the Broker, to:

> Dragonfly Capital Partners, LLC.
> The Packard Building
> 1310 S. Tryon Street, Suite 109
> Charlotte, NC 28203
> Fax: (704) 342-9750

(d)    If to the Escrow Agent, to:

> Grushko & Mittman, P.C.
> 551 Fifth Avenue, Suite 1601
> New York, New York 10176
> Fax: 212-697-3575

or to such other address as any of them shall give to the others by notice made pursuant to this Section 5.2, provided that the Company and its attorneys may only provide an alternate address located in the United States and an alternate fax number that terminates in the United States.

    5.3.    _Interest._  The Escrowed Payment shall not be held in an interest bearing account nor will interest be payable in connection therewith.  In the event the Escrowed Payment is deposited in an interest bearing account, each Subscriber shall be entitled to receive its pro rata portion of any accrued interest thereon, but only if the Escrow Agent receives from such Subscriber the Subscriber's United States taxpayer identification number and other requested information and forms.

    5.4.    _Assignment; Binding Agreement._  Neither this Agreement nor any right or obligation hereunder shall be assignable by any party without the prior written consent of the other parties hereto. This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns.

(Funds Escrow Agreement)

5.5.    Invalidity.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal, or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

5.6.    Counterparts/Execution.  This Agreement may be executed in any number of counterparts and by different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  This Agreement may be executed by facsimile transmission and delivered by facsimile transmission.

5.7.    Agreement.  Each of the undersigned states that he has read the foregoing Funds Escrow Agreement and understands and agrees to it.

SILVER DRAGON RESOURCES, INC.
the "Company"

By:_____

_____
ALPHA CAPITAL ANSTALT – "Subscriber"

ESCROW AGENT:

GRUSHKO & MITTMAN, P.C.

NOV-02-2006(THU) 22:44    LH Financial
NOV-02-2006(THU) 21:45    LH Financial    ALPHA CAPITAL    (FAX)2125868244    P. 002/003
→ ASHER BRAND    002.
(FAX)2125868244    P. 002/003

**5.5.    Invalidity.** In the event that any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal, or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

**5.6.    Counterparts/Execution.** This Agreement may be executed in any number of counterparts and by different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument. This Agreement may be executed by facsimile transmission and delivered by facsimile transmission.

**5.7.    Agreement.** Each of the undersigned states that he has read the foregoing Funds Escrow Agreement and understands and agrees to it.

SILVER DRAGON RESOURCES, INC.
the "Company"

By: _____


X _____
ALPHA CAPITAL ANSTALT – "Subscriber"


ESCROW AGENT:


_____
GRUSHKO & MITTMAN, P.C.

## SCHEDULE A TO FUNDS ESCROW AGREEMENT

| SUBSCRIBER | PURCHASE PRICE | SHARES | CLASS A WARRANTS | CLASS B WARRANTS | CLASS C WARRANTS |
|---|---|---|---|---|---|
| ALPHA CAPITAL ANSTALT Pradafant 7 9490 Furstentums Vaduz, Lichtenstein Fax: 011-42-32323196 | $500,000.00 | 500,000 | 250,000 | 250,000 | 1,000,000 |

## Asher Brand

**From:**          Park, Bo-Yong [Park.Bo.Yong@dorsey.com]
**Sent:**          Thursday, October 05, 2006 10:43 AM
**To:**            COUNSLERS@aol.com
**Cc:**            jeff@dragonflycapitalgroup.com; smc@gzlegal.com; Asher Brand; hazout@rogers.com; Ira
                   Lindenberg; Edgrushko@aol.com; Cornblum, Gil; Pomerance, Martin; Lee, Jaewon
**Subject:**       Silver Dragon -- Draft opinion and Officer's certificate
**Attachments:**   Silver Resources Officer's Back-up Certificate redlined.rtf; Silver Resources -- Opinion
                   redlined.doc


Attached are drafts of opinion letter and officer's certificate.  Please let me know if you have comments.

**Bo-Yong Park**
**DORSEY & WHITNEY LLP**
250 Park Avenue
New York, NY 10177
Phone: (212) 415-9368
Fax: (212) 953-7201
Email: Park.bo.yong@dorsey.com

CONFIDENTIAL COMMUNICATION: E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient.  Use or distribution by an unintended recipient is prohibited, and may be a violation of law.  If you believe that you received this e-mail in error, please do not read this e-mail or any attached items.  Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof.  Thank you.



DORSEY & WHITNEY LLP

November 3, 2006

To the Investors listed on the
Schedule I hereto

Re:    Private Placement of Units of Silver Dragon Resources Inc.

Ladies and Gentlemen:

       We have acted as special counsel to Silver Dragon Resources Inc., a Delaware corporation (the "***Company***"), in connection with the issuance and sale by the Company to the Investors listed on Schedule I hereto (each, an "***Investor***" and collectively, the "***Investors***"), of Units (each, a "***Unit***" and collectively, the "***Units***") of the Company pursuant to the Subscription Agreement dated November 2, 2006 among the Company and the Investors named therein (the "***Agreement***"), each Unit consisting of one share (each, a "***Share***" and collectively, the "***Shares***") of the Company's Common Stock, $0.0001 par value per share (the "***Common Stock***"), and one-half of one Class A Warrant, one-half of one Class B Warrant and two Class C Warrants (each Class A Warrant, Class B Warrant and Class C Warrant, a "***Warrant***" and collectively, the "***Warrants***") entitling the holder of the each Warrant to purchase one share of Common Stock (each, a "***Warrant Share***" and collectively, the "***Warrant Shares***"). This opinion is furnished to you pursuant to Section 6 of the Agreement. All capitalized terms used herein and not defined herein shall have the meanings assigned to them in the Agreement.

       For purposes of rendering the opinions set forth herein, we have examined (i) the Agreement, (ii) the form of each of the Warrants, (iii) the form of the Funds Escrow Agreement (the Agreement, the Warrants and the Funds Escrow Agreement being herein referred to individually as a "***Transaction Document***" and collectively as the "***Transaction Documents***"), (iv) the resolutions adopted by the Board of Directors of the Company relating to the execution, delivery and performance by the Company of its obligations under the Transaction Documents and the consummation of the transactions contemplated therein, (v) the Officer's Certificate of the Company dated November 3, 2006 (the "***Officer's Certificate***") attached hereto as Schedule II, (vi) the Certificate of Incorporation and Bylaws of the Company as in effect on the date hereof, (vii) the Good Standing Certificate dated November 1, 2006 issued by the Secretary of State of the State of Delaware (the "***Good Standing Certificate***") attached hereto as Schedule III, and (viii) the material agreements list in Schedule IV hereto (each, a "***Material Agreement***" and collectively, the "***Material Agreements***"). We have also examined such other documents and have reviewed such questions of law as we have considered necessary and appropriate for purposes of the opinions set forth below.

       In rendering such opinions, we have assumed the genuineness of all signatures, the legal capacity of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or copies, and the authenticity of the originals of such copies. We have also assumed, with respect

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T** 416.367.7370 • **F** 416.367.7371
CANADA TRUST TOWER • BCE PLACE • 161 BAY STREET • SUITE 4310 • P.O. BOX 512 • TORONTO, ONTARIO, CANADA M5J 2S1

USA   CANADA   EUROPE   ASIA

4832-7080-1921\3\479999\0000111/2/2006 5:05 PM

November 3, 2006                                              ◯ ⟫ **DORSEY**

to the parties to agreements or instruments relevant hereto (other than the Company), that such parties (other than the Company) have the requisite power and authority (corporate or otherwise) to execute, deliver and perform such agreements or instruments, that such agreements or instruments have been duly authorized by all requisite action (corporate or otherwise) on the part of such parties and have been executed and delivered by such parties, and that such agreements or instruments are the valid, binding and enforceable obligations of such parties. We have also assumed that there are no other documents or agreements among the Company and the Investors, or any one of them, which would modify the respective rights and obligations of the Company and the Investors as set forth in the Agreement and the documents required or contemplated thereby. As to questions of fact material to our opinion, we have relied upon the representations and warranties made by the Company and the Investors in the Transaction Documents, the Officer's Certificate and certificates of public officials (including, without limitation, those certificates delivered at the Closing).

Our opinions expressed below as to certain factual matters are qualified as being limited "to our actual knowledge" or by other words to the same or similar effect. Such qualification, as used therein, means that prior to or during the course of this firm's representation of the Company in connection with the specific transactions contemplated by the Transaction Documents, no contrary information came to the attention of Gil Cornblum or Bo-Yong Park, the attorneys in our firm who have represented the Company in connection with the transactions contemplated by the Transaction Documents and the preparation of this opinion. In rendering such opinions, we have not conducted any independent investigation or consulted with other attorneys in our firm with respect to the matters covered hereby. No inference as to our knowledge with respect to such matters should be drawn from the fact of our representation of the Company.

We are admitted to the Bar of the State of New York, and we express no opinion with respect to the laws of any other jurisdiction other than the federal laws of the United States of America to the extent referred to specifically herein and the Delaware General Corporation Law.

Based upon the foregoing and subject to the limitations, qualifications, exceptions and assumptions set forth herein, we are of the opinion that:

1.  The Company is duly incorporated and, based solely upon a certificate from the Secretary of State of the State of Delaware, validly existing and in good standing under the laws of the State of Delaware.

2.  The Company has the requisite corporate power and authority to enter into and perform its obligations under the Transaction Documents. The execution and delivery of each of the Transaction Documents by the Company and the performance of its obligations thereunder has been duly and validly authorized.

3.  Each of the Transaction Documents has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by each of

November 3, 2006                                       DORSEY

the other parties thereto, constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

4.  The Shares have been duly authorized and, when delivered against payment in full as provided in the Agreement, will be validly issued, fully paid and non-assessable.

5.  The Warrant Shares issuable upon exercise of the Warrants (excluding any increase or decrease in the number of Shares due to anti-dilution or similar provisions) have been duly reserved for issuance and, when and if issued and paid for in accordance with the terms and conditions of the Warrants, will be validly issued, fully paid and non-assessable.

6.  The execution and delivery of the Transaction Documents and the performance by the Company of its obligations thereunder will not violate (a) any provision of the Company's Certificate of Incorporation or Bylaws, each as in effect of the date hereof; (b) any provision of a Material Agreement; (c) any United States Federal, state or local statute, rule, regulation, order, judgment, injunction or decree (excluding United States Federal and state securities laws and regulations except to the extent specifically addressed in paragraph 8 below) applicable to the Company or to transactions of the type contemplated by the Agreement; or (d) any rule or regulation of the Principal Market (as defined in the Agreement) applicable to the Company or to transactions of the type contemplated by the Agreement, except for such violations as would not, individually or in the aggregate, have a material adverse effect upon the Company.

7.  No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority on the part of the Company is required under applicable United States Federal, state or local law, rule or regulation applicable to the Company or to transactions of the type contemplated by the Agreement in connection with the valid execution and delivery of the Transaction Documents and the performance by the Company of its obligations thereunder (excluding United States Federal and state securities laws and regulations except to the extent specifically addressed in paragraph 8 below).

8.  Assuming the accuracy of the representations, warranties and agreements of the Company and of each Investor in the Transaction Documents, the offer and sale of the Shares, the Warrants and the Warrant Shares issuable to the Investors are exempt from the registration requirements of the Securities Act of 1933, as amended.

9.  To our knowledge, there is no action, proceeding or governmental investigation pending or overtly threatened against the Company which questions the validity of the Transaction Documents.

3

November 3, 2006                                    ◖ ⟫ DORSEY

10. We are not aware of any litigation pending or overtly threatened in writing against the Company.

11. To our knowledge, the Company has 150,000,000 authorized shares of Common Stock, of which 57,010,533 shares are currently issued and outstanding and 20,000,000 shares of Preferred Stock, $0.0001 par value, none of which shares is issued and outstanding.

The opinions set forth above are subject to the following qualifications and exceptions:

(a) For the purposes of the matters addressed in paragraph 1 above, relating to the valid existence and good standing of the Company under the laws of Delaware, we have relied solely upon the Good Standing Certificate.

(b) Our opinion in paragraph 3 above is subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting creditors' rights, including, without limitation, applicable fraudulent transfer laws.

(c) Our opinion in paragraph 3 above is subject to the general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, election of remedies, estoppel and other similar doctrines affecting the enforceability of agreements generally (regardless of whether considered in a proceeding in equity or at law). Without limiting the generality of the foregoing, the availability of specific performance, injunctive relief and other equitable measures is subject to the discretion of the tribunal before which any request for such remedy may be brought.

(d) Our opinion in paragraph 3 above is subject to possible judicial action giving rights to government actions or foreign laws against creditors' rights.

(e) The enforceability of provisions stating, in effect, that terms may not be waived or modified except in writing may be limited under certain circumstances.

(f) Our opinion in paragraph 3 above, insofar as it relates to the enforceability of any indemnification or contribution provisions set forth in the Agreement, is subject to the effect of public policy relating thereto and of Federal and state securities laws.

(g) We express no opinion with respect to the effect of non-compliance by an Investor with any foreign or United States Federal, state or local laws or regulations applicable to such Investor in connection with the transactions contemplated by the Transaction Documents.

(h) We express no opinion regarding the enforceability of the choice of law section in any Transaction Document.

November 3, 2006                                           DORSEY

(i) We express no opinion regarding terms purporting to establish evidentiary standards, or terms to the effect that provisions in the Transaction Documents may not be waived or modified except in writing.

(j) With respect to our opinion in paragraph 8 above, regarding the registration requirements under United States Federal and state securities laws, such opinion is based solely upon our review of the facts provided in the Officer's Certificate and the representations of the Investors set forth in the Agreement.

(k) With respect to our opinion in paragraph 11 above, regarding authorized and issued and outstanding capital stock of the Company, such opinion is based solely upon our review of the Officer's Certificate and the Certificate of Incorporation of the Company, as amended.

(l) With respect to our opinion in paragraphs 9 and 10 above, regarding litigation, such opinion is based solely upon the Officer's Certificate and our actual knowledge.

This opinion is solely for your benefit in connection with the transactions contemplated by the Agreement, may not be relied upon by you for any other purpose, and may not be relied upon or used by, circulated, quoted, or referred to, nor may copies hereof be delivered to, another person for any purpose without our prior written approval. We disclaim any obligation to update this opinion letter for events occurring or coming to our attention, any additional information becoming available to us, or any changes in the law taking effect after the date hereof.

Very truly yours,

Dorsey + Whitney LLP

GC

4832-7080-1921\3\479999\0000111/2/2006 5:05 PM                         DORSEY & WHITNEY LLP

November 3, 2006



## <u>SCHEDULE I</u>

### <u>List of Investors</u>

Alpha Capital Anstalt
Pradafant 7
9490 Furstentums
Vaduz, Lichtenstein



**GARFIN ZEIDENBERG** LLP
—LAWYERS·SINCE 1976—

November 2, 2006

Stephen M. Cohen
Direct Line: 416-642-5404
Email:smc@gzlegal.com

*VIA COURIER AND VIA FACSIMILE AT (212) 697-3575*

**PERSONAL AND CONFIDENTIAL**

**Grushko & Mittman, P.C.**
551 Fifth Avenue
Suite 1601
New York, NY
10176

Attention: Barbara R. Mittman

Dear Ms. Mittman:

Re:     **Silver Dragon Resources Inc. - Financing**
          **Our File Number - 39061149**

Enclosed please find the following:

1. Subscription Agreement dated November 2, 2006 together with all schedules, along with three (3) extra copies of the signature pages signed by our client;

2. Original Class A Warrant;

3. Original Class B Warrant;

4. Original Class C Warrant; and

5. Original Funds Escrow Agreement along with three (3) extra copies of the signature page signed by our client.

The Transfer Agent has been instructed to deliver the certificate for 500,000 shares in the name of Alpha Capital Anstalt directly to your office. You should receive it tomorrow morning.

The enclosed documents plus the Share Certificate are being provided to you pursuant to the terms of the Funds Escrow Agreement. Please be advised that

our client is expecting the funds to be wired to its account by end of day tomorrow.  Our client's account details are set out below.

Name of account: **Silver Dragon Resources Inc.**
Bank: **HSBC Bank of Canada**
Account No.:**10162-056664-070**
Currency: **USD**
ABA # **021001088 Intermidiary Bank**

Address: 7398 Yonge Street
Vaughan, Ontario, Canada
L4J 8J2

Phone: (905) 771-8727
Fax:   (905) 771-8802

Note that I am faxing only the signature pages, with originals included in the courier package.

Please fax to my attention the payout statement of the funds as soon as possible, and return two (2) fully signed copies of the Subscription Agreement and Funds Escrow Agreement to my attention.

Yours very truly,
GARFIN ZEIDENBERG LLP

STEPHEN M. COHEN
SMC/av

Encl.

Cc.    Silver Dragon Resources Inc.

W:\GENERAL\CORPCOM\39061149\Letter to G & M - Nov. 2, 2006.doc.



Subj:    **RE: SDRG**
Date:    11/8/2006 3:11:51 PM Eastern Standard Time
From:    smc@gzlegal.com
:        COUNSLERS@aol.com
CC:      hazout@rogers.com

Barbara:

Please return 2 fully signed copies of the Subscription Agreement and the Escrow Agreement to me.

Stephen M. Cohen, B.A., LL.B.
Garfin Zeldenberg LLP
Lawyers
Yonge-Norton Centre
5255 Yonge Street, Suite 800
Toronto, Ontario, Canada  M2N 6P4
Tel:  (416) 512-8000 Ext. 404
Direct Line: (416) 642-5404
Fax:  (416) 512-9992
smc@gzlegal.com

CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and contains information that is privileged and confidential.  If the reader is not the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately and delete this message.  Thank you.

-----Original Message-----
**From:** COUNSLERS@aol.com [mailto:COUNSLERS@aol.com]
**Sent:** Wednesday, November 08, 2006 2:04 PM
**To:** jeff@dragonflycapitalgroup.com; Stephen Cohen; abrand@lhfin.com; hazout@rogers.com; Park.Bo.Yong@dorsey.com; ira@lhfin.com; Barbaramittman@aol.com
**Subject:** SDRG

Just a quick note to let everyone know that the transaction between Silver Dragon and Alpha Capital closed this afternoon.  All wires have been sent out.

*****************************************************
Barbara R. Mittman
Grushko & Mittman, P.C.
551 Fifth Avenue, Suite 1601
New York, NY 10176
(212) 697-9500, Ext: 105
(212) 697-3575 (fax)
counslers@aol.com (office email)
barbaramittman@aol.com (personal email)
*****************************************************

Wednesday, November 08, 2006 America Online: COUNSLERS

**Asher Brand**

| | |
|---|---|
| **From:** | Stephen Cohen [smc@gzlegal.com] |
| **Sent:** | Friday, November 03, 2006 11:58 AM |
| **To:** | Asher Brand; jeff@dragonflycapitalgroup.com; COUNSLERS@aol.com; hazout@rogers.com; Edgrushko@aol.com; Barbaramittman@aol.com |
| **Subject:** | Silver Dragon |
| **Attachments:** | Exhibit D - Public Announcement.doc |

Barbara:

All of the Schedules were attached to the Subscription Agreement which was delivered to you, except for Exhibit D, which is attached, and Exhibit C, Legal Opinion, which was forwarded separately. Please advise if everything is in order for the closing today.

Stephen M. Cohen, B.A., LL.B.
Garfin Zeidenberg LLP
Lawyers
Yonge-Norton Centre
5255 Yonge Street, Suite 800
Toronto, Ontario, Canada  M2N 6P4
Tel:  (416) 512-8000 Ext. 404
Direct Line:  (416) 642-5404
Fax:  (416) 512-9992
smc@gzlegal.com

CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and contains information that is privileged and confidential. If the reader is not the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately and delete this message. Thank you.


-----Original Message-----
**From:** Asher Brand [mailto:abrand@lhfin.com]
**Sent:** Friday, November 03, 2006 10:18 AM
**To:** jeff@dragonflycapitalgroup.com; COUNSLERS@aol.com; Stephen Cohen; hazout@rogers.com; Park.Bo.Yong@dorsey.com; Edgrushko@aol.com; Barbaramittman@aol.com
**Subject:** RE: SDRG - Draft Disbursement Letter

Jeff,
I reviewed the docs and all of the schedules are missing except for Schedule 7. Please have the company send those to Barbara so she can attach them to the subscription document and facilitate a closing. We have already faxed our signature pages and requested the wire be sent to escrow.

Sincerely,

Asher Brand
LH Financial Sevices Corp.
150 Central Park South
2nd Floor
New York, NY 10019
212-586-8224 x102
212-586-8244 fax

**From:** Jeffrey Singer [mailto:jeff@dragonflycapitalgroup.com]
**Sent:** Thursday, November 02, 2006 5:17 PM
**To:** COUNSLERS@aol.com; jeff@dragonflycapitalgroup.com; smc@gzlegal.com; Asher Brand; hazout@rogers.com; Park.Bo.Yong@dorsey.com; Ira Lindenberg; Edgrushko@aol.com; Barbaramittman@aol.com
**Subject:** Re: SDRG - Draft Disbursement Letter

Dragonfly wiring instructions to be added to the disbursement letter:
Wachovia Bank
1065 Providence Road
Charlotte, NC  28207
Acct # 2000015184281
R/T # 053000219

**<COUNSLERS@aol.com> wrote:**

Please review and provide your comments.


*******************************************************
Barbara R. Mittman
Grushko & Mittman, P.C.
551 Fifth Avenue, Suite 1601
New York, NY 10176
(212) 697-9500, Ext: 105
(212) 697-3575 (fax)
counslers@aol.com (office email)
barbaramittman@aol.com (personal email)
*******************************************************

-------------- Jeffrey Singer Managing Director Dragonfly Capital Partners Member NASD/SIPC Office (646) 383-8605 Fax (646) 619-4972 Mobile (917) 846-3970 jeff@dragonflycapitalgroup.com

## ACTIVITY LOG

**Date:**      November 8, 2006                                          ⊡ Save Activity Log

**User:**      EDWARD M GRUSHKO                                              [ Close ]

| Time | Description | Amount | Account | Effective Date |
|------|-------------|--------|---------|----------------|
| Date: November 8, 2006 | | | | |
| 1:59p | WIRE TRANSFER | 453,967.50 | from 000045208884 | 11/8 |
| 2:00p | WIRE TRANSFER | 34,987.50 | from 000045208884 | 11/8 |

(1) for the 1:59p row, (2) for the 2:00p row

RE:   Silver Dragon Resources Inc. and Alpha Capital Anstalt

(1)   Silver Dragon Resources, Inc.

(2)   Dragonfly Capital Partners, LLC

(3)   Grushko & Mittman IOLA Trust Account Check No.: 2497
      drawn to the order of Grushko & MIttman, P.C. in the
      amount of $11,020

Main Menu > Transfers and Payments >    Help

# DOMESTIC WIRE (USA DESTINATION)

*Cash Manager*

**WIRE:**  From Account: **45208884**   Currency: **US Dollars**

Status:  **Processed** - Confirmation Number is **3120243216**.
Wire Fee: **$12.50**
Saved as Model

| Beneficiary | Bank |
|---|---|
| **SILVER DRAGON RESOURCES INC.**<br>1121 STEELES AVENUE WEST<br>SUITE 803<br>TORONTO, ONTARIO | Name: **HSBC BANK USA**<br>ABA: **021001088**<br>Address:<br>**BUFFALO**<br>**New York** |

Beneficiary's Account number: **10162-056664-070**

Amount: **$453,967.50**

Date of transfer(s): **November 8, 2006**

Special Instructions:
ESCROW RELEASE - SILVER DRAGON
AND ALPHA CAPITAL ANSTALT

[ Save as model ]   Model Name: SILVER DRAGON RESOURCES INC.

[ Process another Wire ]

( 1 )

Main Menu > Transfers and Payments >                                                                    Help

# DOMESTIC WIRE (USA DESTINATION)

*Cash Manager*

WIRE:     From Account: **45208884**   Currency: **US Dollars**

Status:   **Processed** - Confirmation Number Is **3120243516.**
          **Wire Fee: $12.50**
          Saved as Model

| Beneficiary **DRAGONFLY CAPITAL PARTNERS, LLC** | Bank Name: **WACHOVIA BANK, NA** ABA: **053000219** Address: **1065 PROVIDENCE ROAD CHARLOTTE North Carolina** |
|---|---|

Beneficiary's Account number: **2000015184281**

Amount: **$34,987.50**

Date of transfer(s): **November 8, 2006**

Special Instructions:
ESCROW RELEASE - SILVER DRAGON
AND ALPHA CAPITAL ANSTALT
BROKER'S FEES

[ Save as model ]   Model Name: DRAGONFLY CAPITAL PARTNERS, LLL

[ Process another Wire ]

(2)

Main Menu > Balance and Information Reporting >                                    Help

## INCOMING WIRE TRANSFERS

*Cash Manager*

| Here is the information on your Incoming Wire: | |
|---|---|
| **Date Received** | 11/08/06 |
| **Date Posted** | 11/08/06 |
| **Time (ET)** | 16:00:28 |
| **Account** | 45208884 |
| **Beneficiary** | GRUSHKO & MITTMAN |
| **Amount** | 453,967.50 |
| **Sending Bank** | G.F.T. REVERSAL ACCOUNT |
| **Originator** | GRUSHKO MITTMAN |
| **Global Reference #** | F07631200FA601 |
| **Other Reference Number #** | 20061108B1Q8984C00507420061108B1Q8024R004006 |
| **Additional Information** | SENDER REF: 312024321645533<br>NEED ACCOUNT TO CREDIT |

Note: Time is in 24-hour format.

◀ **Back**

*453,967.50*
*20.00*
*453,947.50*

Subj:     **RE: Silver Dragon**
Date:     11/8/2006 4:35:30 PM Eastern Standard Time
From:     smc@gzlegal.com
To:       COUNSLERS@aol.com

Barbara:

I'm attaching the details below again.  Make sure you specify HSBC Bank of Canada.
Please confirm.

## Name of account:

**Silver Dragon Resources Inc.**
**Bank: HSBC Bank of Canada**
**Account No.:10162–056664–070**
**Currency: USD**
**ABA # 021001088 Intermediary Bank**

**Address:**     **7398 Yonge Street, Vaughan, Ontario, Canada, L4J 8J2**
**Phone: (905) 771-8727**
**Fax:   (905) 771-8802**

Stephen M. Cohen, B.A., LL.B.
Garfin Zeidenberg LLP
Lawyers
Yonge-Norton Centre
5255 Yonge Street, Suite 800
Toronto, Ontario, Canada  M2N 6P4
Tel:  (416) 512-8000 Ext. 404
Direct Line:  (416) 642-5404
Fax:  (416) 512-9992
smc@gzlegal.com

CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and contains information that is
privileged and confidential.  If the reader is not the intended recipient you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please
notify us immediately and delete this message.  Thank you.

-----Original Message-----
**From:** COUNSLERS@aol.com [mailto:COUNSLERS@aol.com]
**Sent:** Wednesday, November 08, 2006 4:20 PM
**To:** Stephen Cohen
**Subject:** Silver Dragon

Hi Stephen:

The wire to Silver Dragon Resources got kicked back.  HSBC does not recognize the account number.  We send the
wire as follows:

HSBC Bank
ABA Number: 021001088
For Credit to: Silver Dragon Resources, Inc.

Wednesday, November 08, 2006 America Online: COUNSLERS

Account Number: 10162-056664-070

Please verify.

Thank you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Barbara R. Mittman
Grushko & Mittman, P.C.
551 Fifth Avenue, Suite 1601
New York, NY 10176
(212) 697-9500, Ext: 105
(212) 697-3575 (fax)
counslers@aol.com (office email)
barbaramittman@aol.com (personal email)
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Asher Brand**

| | |
|---|---|
| **From:** | Jeffrey Singer [jeff@dragonflycapitalgroup.com] |
| **Sent:** | Monday, November 06, 2006 12:07 PM |
| **To:** | Asher Brand |
| **Subject:** | FW: Revised Schedule D |
| **Attachments:** | Scehedule 5d.doc |

Asher-

See the attached doc with a revised Schedule D that includes the language you requested. Let me know if this is now acceptable.
Also, let me know as soon as possible on the press release.

Jeff

---------------------------
Jeffrey Singer
Managing Director
Dragonfly Capital Partners
Member NASD/SIPC
The Graybar Building
420 Lexington Avenue, Suite 2620
New York, NY 10170
(646) 383-8605 Office
(646) 619-4972 Fax
(917) 846-3970 Mobile
jeff@dragonflycapitalgroup.com
www.dragonflycapitalgroup.com

This message may contain confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message that arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments.

-----Original Message-----
**From:** Stephen Cohen [mailto:smc@gzlegal.com]
**Sent:** Monday, November 06, 2006 12:05 PM
**To:** jeff@dragonflycapitalgroup.com
**Subject:**


<<Scehedule 5d.doc>>

Stephen M. Cohen, B.A., LL.B.

Garfin Zeidenberg LLP

Lawyers

Yonge-Norton Centre

5255 Yonge Street, Suite 800

Toronto, Ontario, Canada  M2N 6P4

Tel:  (416) 512-8000 Ext. 404

Direct Line:  (416) 642-5404

Fax:  (416) 512-9992

smc@gzlegal.com

CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and contains information that is privileged and confidential.  If the reader is not the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately and delete this message.  Thank you.

## SUBSCRIPTION AGREEMENT

THIS SUBSCRIPTION AGREEMENT (this "**Agreement**"), dated as of November 2, 2006, by and among Silver Dragon Resources, Inc., a Delaware corporation (the "**Company**"), and the subscribers identified on the signature page hereto (each a "**Subscriber**" and collectively "**Subscribers**").

WHEREAS, the Company and the Subscribers are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**Commission**") under the Securities Act of 1933, as amended (the "1933 Act").

WHEREAS, the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Subscribers, as provided herein, and the Subscribers shall purchase Five Hundred Thousand Dollars ($500,000) (the "**Purchase Price**") of the Company's Units at a per Unit Purchase Price of $1.00, subject to adjustment as described in this Agreement, each Unit consisting of one share of common stock, $.0001 par value (the "**Common Stock**" or "**Shares**"), and share purchase warrants in the form attached hereto as **Exhibit A** (the "**Warrants**"), to purchase shares of Common Stock (the "**Warrant Shares**"). The Purchase Price shall be payable to the Company on the Closing Date. The Common Stock, the Warrants and the Warrant Shares are collectively referred to herein as the "**Securities**"; and

WHEREAS, the aggregate proceeds of the sale of the Common Stock and the Warrants contemplated hereby may be held in escrow pursuant to the terms of a Funds Escrow Agreement which may be executed by the parties substantially in the form attached hereto as **Exhibit B** (the "**Escrow Agreement**").

NOW, THEREFORE, in consideration of the mutual covenants and other agreements contained in this Agreement, the Company and the Subscribers hereby agree as follows:

      1.    <u>Purchase and Sale of Shares and Warrants</u>. Subject to the satisfaction (or waiver) of the conditions to Closing set forth in this Agreement and the Escrow Agreement, each Subscriber shall purchase the Shares and Warrants for the portion of the Purchase Price indicated on the signature page hereto, and the Company shall sell such Shares and Warrants to the Subscriber. The Purchase Price for the Shares and Warrants shall be paid in cash. The entire Purchase Price shall be allocated to the Shares.

      2.    <u>Escrow Arrangements; Deliveries</u>. Upon execution hereof by the parties and pursuant to the terms of the Escrow Agreement, each Subscriber agrees to make the deliveries required of such Subscriber as set forth in the Escrow Agreement and the Company agrees to make the deliveries required of the Company as set forth in the Escrow Agreement.

      3.    <u>Warrants</u>.

      (a)    <u>A Warrants</u>. On the Closing Date, the Company will issue and deliver Class A Warrants to the Subscribers. One Class A Warrant will be issued for each two Shares issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class A Warrant shall be $2.00. The Class A Warrants shall be exercisable until five (5) years after the Closing Date.

1

(b)    B Warrants.    On the Closing Date, the Company will issue and deliver Class B Warrants to the Subscribers. One Class B Warrant will be issued for each two Shares issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class B Warrant shall be $5.00. The Class B Warrants shall be exercisable until five (5) years after the Closing Date.

(c)    C Warrants.    On the Closing Date, the Company will issue and deliver Class C Warrants to the Subscribers. Two Class C Warrants will be issued for each Share issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class C Warrant shall be $1.00. The Class C Warrants shall be exercisable until one (1) year after the Closing Date.

4.    Subscriber's Representations and Warranties. Each Subscriber hereby represents and warrants to and agrees with the Company only as to such Subscriber that:

(a)    Information on Company.    The Subscriber has been furnished with or has had access at the EDGAR Website of the Commission to the Company's Form 10-KSB for the year ended December 31, 2005 as filed with the Commission, together with all subsequently filed Forms 10-QSB, 8-K, and filings made with the Commission available at the EDGAR website (hereinafter referred to collectively as the "**Reports**"). In addition, the Subscriber has received in writing from the Company such other information concerning its operations, financial condition and other matters as the Subscriber has requested in writing (such other information is collectively, the "**Other Written Information**"), and considered all factors the Subscriber deems material in deciding on the advisability of investing in the Securities.

(b)    Information on Subscriber.    The Subscriber (and, if the Subscriber is acting on behalf of a principal, such principal) is, and will be at the time of the issuance of the Common Stock and exercise of any of the Warrants, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable the Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment. The Subscriber has the authority and is duly and legally qualified to purchase and own the Securities. The Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof. The information set forth on the signature page hereto regarding the Subscriber is accurate and complete.

(c)    Purchase of Common Stock and Warrants.    On the Closing Date, the Subscriber will have purchased the Common Stock and Warrants as principal for its own account (or, if the Subscriber is acting on behalf of a principal, such principal) for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(d)    Compliance with Securities Act.    The Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration. Until the Actual Effective Date, the

2

Subscriber will not maintain a net short position in the Common Stock contrary to applicable rules and regulations. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "**Affiliate**" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity. Affiliate when employed in connection with the Company includes each Subsidiary [as defined in Section 5(a)] of the Company. For purposes of this definition, "**control**" means the power to direct the management and policies of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(e)    Shares Legend.  The Shares and the Warrant Shares shall bear the following or similar legend:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THESE SHARES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SILVER DRAGON RESOURCES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED."

(f)    Warrants Legend.  The Warrants shall bear the following or similar legend:

"THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS WARRANT UNDER SAID ACT OR ANY APPLICABLE STATE SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SILVER DRAGON RESOURCES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED."

(g)    Communication of Offer.  The offer to sell the Securities was directly communicated to the Subscriber by the Company.  At no time was the Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(h)    Authority; Enforceability.  This Agreement and other agreements delivered together with this Agreement or in connection herewith have been duly authorized, executed and delivered by the Subscriber and are valid and binding agreements enforceable in accordance with their

3

terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity; and Subscriber has full corporate power and authority necessary to enter into this Agreement and such other agreements and to perform its obligations hereunder and under all other agreements entered into by the Subscriber relating hereto.

(i)    No Governmental Review. Each Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(j)    Correctness of Representations. Each Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless a Subscriber otherwise notifies the Company prior to the Closing Date (as hereinafter defined), shall be true and correct as of the Closing Date.

(k)    Organization and Standing of the Subscribers. If the Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate power to own its assets and to carry on its business.

(l)    No Conflicts. The execution, delivery and performance of this Agreement and the consummation by such Subscriber of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber). Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement or to purchase the Notes or acquire the Warrants in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(m)    Survival. The foregoing representations and warranties shall survive the Closing Date for a period of three years.

5.    Company Representations and Warranties. The Company represents and warrants to and agrees with each Subscriber that except as set forth in the Reports or the Other Written Information and as otherwise qualified in the Transaction Documents:

(a)    Due Incorporation. The Company is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power to own its properties and to carry on its business as disclosed in the Reports. The Company is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect. For purpose of this Agreement, a "**Material Adverse**

4

Effect" shall mean a material adverse effect on the financial condition, results of operations, properties or business of the Company taken individually, or in the aggregate, as a whole. For purposes of this Agreement, "**Subsidiary**" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity) of which more than 50% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity. All the Company's Subsidiaries as of the Closing Date are set forth on **Schedule 5(a)** hereto.

(b)      Outstanding Stock. All issued and outstanding shares of capital stock of the Company and each of its subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable.

(c)      Authority; Enforceability. This Agreement, the Common Stock, the Warrants and the Escrow Agreement and any other agreements delivered together with this Agreement or in connection herewith (collectively "**Transaction Documents**") have been duly authorized, executed and delivered by the Company and are valid and binding agreements enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d)      Additional Issuances. There are no outstanding agreements or preemptive or similar rights affecting the Company's common stock or equity and no outstanding rights, warrants or options to acquire, or instruments convertible into or exchangeable for, or agreements or understandings with respect to the sale or issuance of any shares of common stock or equity of the Company or other equity interest in any of the subsidiaries of the Company except as described on **Schedule 5(d)**. The common stock of the Company on a fully diluted basis outstanding as of the last trading day preceding the Closing Date is set forth on **Schedule 5(d)**.

(e)      Consents. No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its affiliates, the American Stock Exchange, the National Association of Securities Dealers, Inc., Nasdaq National Market, the OTC Bulletin Board ("**Bulletin Board**") nor the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities.

(f)      No Violation or Conflict. Assuming the representations and warranties of the Subscribers in Section 4 are true and correct, neither the issuance and sale of the Securities nor the performance of the Company's obligations under the Transaction Documents by the Company will:

(i)      violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having

jurisdiction over the Company or any of its subsidiaries or over the properties or assets of the Company or any of its affiliates, (C) the terms of any bond, debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its affiliates or subsidiaries is a party, by which the Company or any of its affiliates or subsidiaries is bound, or to which any of the properties of the Company or any of its affiliates or subsidiaries is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its affiliates or subsidiaries is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect on the Company; or

(ii)     result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company, its subsidiaries or any of its affiliates; or

(iii)     result in the activation of any anti-dilution rights or a reset or repricing of any debt or security instrument of any other creditor or equity holder of the Company, nor result in the acceleration of the due date of any obligation of the Company; or

(iv)     result in the activation of any piggy-back registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company; or

(v)     result in a violation of Section 5 under the 1933 Act.

(g)     The Securities.  The Securities upon issuance:

(i)     are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

(ii)     have been, or will be, duly and validly authorized and on the date of issuance of the Shares and upon exercise of the Warrants, the Shares and Warrant Shares will be duly and validly issued, fully paid and nonassessable (and if registered pursuant to the 1933 Act, and resold pursuant to an effective registration statement will be free trading and unrestricted, provided that each Subscriber complies with the prospectus delivery requirements of the 1933 Act);

(iii)     will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company;

(iv)     will not subject the holders thereof to personal liability by reason of being such holders; and

(v)     provided Subscriber's representations herein are true and accurate, will have been issued in reliance upon an exemption from the registration requirements of and will not result in a violation of Section 5 under the 1933 Act.

(h)     Litigation.  There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its affiliates that would affect the execution by the Company or the performance by the Company of its obligations under the Transaction Documents.  There is no pending or, to the best knowledge of the Company, basis for or threatened action,

suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its affiliates which litigation if adversely determined would have a Material Adverse Effect on the Company.

(i)    Reporting Company.  The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "**1934 Act**") and has a class of common shares registered pursuant to Section 12(g) of the 1934 Act. Pursuant to the provisions of the 1934 Act, the Company has timely filed all reports and other materials required to be filed thereunder with the Commission during the twelve months preceding the Closing Date **except Form 10-KSB for the for the fiscal year ended December 31, 2005 and Form 10-QSB for the quarter ended June 30, 2006.**

(j)    No Market Manipulation.  The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the common stock of the Company to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(k)    Information Concerning Company.  The Reports contain all material information relating to the Company and its operations and financial condition as of their respective dates and all the information required to be disclosed therein.  Since the last day of the fiscal year of the most recent audited financial statements included in the Reports ("**Latest Financial Date**"), and except as modified in the Other Written Information or in the Schedules hereto, there has been no Material Adverse Event relating to the Company's business, financial condition or affairs not disclosed in the Reports. The Reports do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made.

(l)    Dilution.  The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company.  The Company specifically acknowledges that its obligation to issue the Warrant Shares upon exercise of the Warrants is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(m)    Defaults.  The Company is not in violation of its articles of incorporation or bylaws.  The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters, or (iii) to the Company's knowledge not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect.

(n)    Not an Integrated Offering.  Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of

7

any security or solicited any offers to buy any security under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. Nor will the Company or any of its Affiliates take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. The Company will not conduct any offering other than the transactions contemplated hereby that will be integrated with the offer or issuance of the Securities, which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(o)     No General Solicitation.  Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities.

(p)     Listing.  The Company's common stock is quoted on the Bulletin Board under the symbol SDRG.OB. The Company has not received any oral or written notice that its common stock is not eligible nor will become ineligible for quotation on the Bulletin Board nor that its common stock does not meet all requirements for the continuation of such quotation.  The Company satisfies all the requirements for the continued quotation of its common stock on the Bulletin Board.

(q)     No Undisclosed Liabilities.  The Company has no liabilities or obligations which are material and which are not disclosed in the Reports and Other Written Information, other than those incurred in the ordinary course of the Company's businesses since June 30, 2006 and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed on **Schedule 5(q)**.

(r)     No Undisclosed Events or Circumstances.  Since June 30, 2006, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(s)     Capitalization.  The authorized and outstanding capital stock of the Company and Subsidiaries as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on **Schedule 5(d)**.  Except as set forth on **Schedule 5(d)**, there are no options, warrants, or rights to subscribe to, securities, rights or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock of the Company or any of its Subsidiaries.  All of the outstanding shares of Common Stock of the Company have been duly and validly authorized and issued and are fully paid and nonassessable.

(t)     No Disagreements with Accountants and Lawyers.  There are no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers.

(u)     Transfer Agent.  The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is set forth on **Schedule 5(u)** hereto.

8

(v)     Investment Company.  Neither the Company nor any Affiliate is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(w)     Company Predecessor.  All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 8(g) through 8(l) shall relate, apply and refer to the Company, its predecessors, and the Subsidiaries.

(x)     Subsidiary Representations.  The Company makes each of the representations contained in Sections 5(a), (b), (d), (e), (f), (h), (k), (m), (q), (r), (s), (t), (v) and (w) of this Agreement, as same relate to each Subsidiary of the Company, with the same qualifications to each such representation.

(y)     Correctness of Representations.  The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscribers prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date.

(z)     Survival.  The foregoing representations and warranties shall survive the Closing Date for a period of three years.

6.     Regulation D Offering.  The offer and issuance of the Securities to the Subscribers is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder.  On the Closing Date, the Company will provide an opinion reasonably acceptable to Subscriber from the Company's legal counsel opining on the availability of an exemption from registration under the 1933 Act as it relates to the offer and issuance of the Securities and other matters reasonably requested by Subscribers.  A form of the legal opinion is annexed hereto as **Exhibit C**.  The Company will provide, at the Company's expense, such other legal opinions in the future as are reasonably necessary for the resale of the Common Stock and exercise of the Warrants and resale of the Warrant Shares.

7.     Broker/Legal Fees.

(a)     Broker's Commission.  The Company on the one hand, and each Subscriber (for himself only) on the other hand, agrees to indemnify the other against and hold the other harmless from any and all liabilities to any persons claiming brokerage commissions or similar fees other than the entity identified on **Schedule 7** hereto ("**Broker**") on account of services purported to have been rendered on behalf of the indemnifying party in connection with this Agreement or the transactions contemplated hereby and arising out of such party's actions.  Anything in this Agreement to the contrary notwithstanding, each Subscriber is providing indemnification only for such Subscriber's own actions and not for any action of any other Subscriber.  Each Subscriber's liability hereunder is several and not joint.  The Company agrees that it will pay the Broker the fees set forth on **Schedule 7** hereto ("**Broker's Fees**").  The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the offering described in this Agreement except the Broker.

(b)     Legal Fees.  The Company shall pay to Grushko & Mittman, P.C., a cash fee of $15,000, of which $3,980 has already been paid ("**Subscriber's Legal Fees**") as reimbursement for services rendered to the Subscribers in connection with this Agreement and the purchase and sale of the Shares and Warrants (the "**Offering**").  The Subscriber's Legal Fees will be payable on the Closing Date out of funds held pursuant to the Escrow Agreement.

9

8.      Covenants of the Company.  The Company covenants and agrees with the Subscribers as follows:

(a)      Stop Orders.  The Company will advise the Subscribers, within twenty-four (24) hours after the Company receives notice of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose.

(b)      Listing.  If applicable, the Company shall promptly secure the listing of the shares of Common Stock and the Warrant Shares upon each national securities exchange, or electronic or automated quotation system upon which they are or become eligible for listing and shall maintain such listing so long as any Notes or Warrants are outstanding.  The Company will maintain the listing or quotation of its Common Stock on the American Stock Exchange, Nasdaq Capital Market, Nasdaq National Market System, Bulletin Board, or New York Stock Exchange (whichever of the foregoing is at the time the principal trading exchange or market for the Common Stock (the "**Principal Market**")), and will comply in all material respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market, as applicable. The Company will provide the Subscribers copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock from any Principal Market.  As of the date of this Agreement, the Bulletin Board is the Principal Market. The Company may list the Common Stock on the Toronto Stock Exchange ("**TSX**") provided the Shares and Warrant Shares are contemporaneously listed thereon.  Such TSX listing notwithstanding, the Company must maintain its listing on one of the above listed Principal Markets.

(c)      Market Regulations.  If applicable, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscribers and promptly provide copies thereof to Subscriber.

(d)      Filing Requirements.  From the date of this Agreement and until the earlier of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement as defined in Section 10 or pursuant to Rule 144, without regard to volume limitations, the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) timely comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement.  The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until two (2) years after the Closing Date.   Until the later of the resale of the Shares and the Warrant Shares by each Subscriber or two (2) years after the Closing Date, the Company will use its best efforts to continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market.  The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

(e)      Use of Proceeds.  The proceeds of the Offering will be employed by the Company for the purposes set forth on **Schedule 8(e)** hereto.  Except as set forth on **Schedule 8(e)**, the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company, litigation related expenses or settlements, brokerage fees, nor non-trade obligations outstanding on a Closing Date.

(f)      Reservation.  Prior to the Closing Date, the Company undertakes to reserve, pro rata, on behalf of the Subscribers from its authorized but unissued Common Stock, a number of common shares equal to 100% of the amount of Shares and Warrant Shares issuable upon exercise of the Warrants.  Failure to have sufficient shares reserved pursuant to this Section 8(f) shall be a material default of the Company's obligations under this Agreement.

(g)      Taxes.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

(h)      Insurance.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will keep its assets which are of an insurable character **(it being understood that the Company's mining rights are not insurable)** insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business, in amounts sufficient to prevent the Company from becoming a co-insurer and not in any event less than one hundred percent (100%) of the insurable value of the property insured less reasonable deductible amounts; and the Company will maintain, with financially sound and reputable insurers, insurance against other hazards and risks and liability to persons and property to the extent and in the manner customary for companies in similar businesses similarly situated and to the extent available on commercially reasonable terms.

(i)      Books and Records.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(j)      Governmental Authorities.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall duly observe and conform in all material

11

respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(k)     Intellectual Property.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.

(l)     Properties.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement (as defined in Section 10.1(ii) hereof) or pursuant to Rule 144, without regard to volume limitations, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases to which it is a party or under which it occupies property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.

(m)     Confidentiality/Public Announcement.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company agrees that except in connection with a Form 8-K or the Registration Statement or as otherwise required in any other Commission filing, it will not disclose publicly or privately the identity of the Subscribers unless expressly agreed to in writing by a Subscriber, only to the extent required by law and then only upon reasonable prior notice to Subscriber. In any event and subject to the foregoing, the Company shall file a Form 8-K or make a public announcement describing the Offering not later than the first business day after the Closing Date.  In the Form 8-K or public announcement, the Company will specifically disclose the amount of Common Stock outstanding immediately after the Closing.  A form of the proposed Form 8-K or public announcement to be employed in connection with the Closing is annexed hereto as **Exhibit D**.

(n)     Further Registration Statements.  Except for a registration statement filed on behalf of the Subscribers pursuant to Section 10 of this Agreement **and the registration statements relating to the proposed initial public offering of the Company's securities in Canada**, or as described on **Schedule 10.1**, the Company will not file any registration statement with the Commission or with state regulatory authorities without the consent of the Subscribers until the expiration of the "**Exclusion Period**", which is defined as the sooner of (i) the Registration Statement shall have been current and available for use in connection with the resale of the Registrable Securities (as defined in Section 10.1(i) for a period of 365 days, or (ii) until all the Shares and Warrant Shares have been resold or transferred by the Subscribers pursuant to the Registration Statement or Rule 144(k) under the 1933 Act, without regard to volume limitations.

(o)     Blackout.  The Company undertakes and covenants that until **December 31, 2006** the Company will not enter into any acquisition, merger, exchange or sale or other transaction that delays the effectiveness of any pending registration statement or causes an already effective registration statement to no longer be effective or current for more than 20 consecutive days or 45 days during any 365 day period, provided that the Company may enter into a definitive agreement with Hubei

Silver Mine Co., Ltd. and Cistex Global Investment Inc., relating to the acquisition by the Company of a 60% equity interest in Hubei Silver Mine Co., Ltd. provided the Company is able to timely and fully comply with Form 8-K reporting obligations in connection with such acquisition.

(p)     <u>Non-Public Information</u>.  The Company covenants and agrees that neither it nor any other person acting on its behalf will provide any Subscriber or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Subscriber shall have agreed in writing to receive such information.  The Company understands and confirms that each Subscriber shall be relying on the foregoing representations in effecting transactions in securities of the Company. In any event, the Company will offer to the Subscriber an opportunity to review and comment on the Registration Statement thereto between three and five business days prior to the proposed filing date thereof.

(q)     <u>Offering Restrictions</u>.  **Until 30 days after the expiration of the Exclusion Period**, except for the Excepted Issuances [as defined in Section 11(a)], the Company will not enter into an agreement to nor issue any convertible debt or other securities convertible into common stock or equity of the Company nor modify any of the foregoing which may be outstanding at anytime, nor enter into any equity line of credit or similar agreement, nor issue nor agree to issue any floating or variable priced equity linked instruments nor any of the foregoing or equity with price reset rights, without the prior written consent of the Subscriber, which consent may be withheld for any reason.

(r)     <u>Negative Covenants</u>.  Until the sooner of (i) two years after the Closing Date, or (ii) the date Subscribers are no longer holders of the Shares or Warrant Shares issued and issuable hereunder and when liquidated damages are accruing or are outstanding, without the consent of the Subscribers, which consent will not be unreasonably withheld, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i)     create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "**Lien**") upon any of its property, whether now owned or hereafter acquired, if such Lien is a result of a convertible note or other similar convertible equity instrument that is secured by any lockbox arrangement, except for (i) the Excepted Issuances (as defined in Section 12(a) hereof), (ii) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property, or (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "**Permitted Lien**") and (iii) indebtedness for

13

borrowed money which is not senior or pari passu in right of payment to the payment of the Notes;

(ii)    amend its certificate of incorporation, bylaws or its charter documents so as to materially adversely affect any rights of the Subscriber; or

(iii)    repay, repurchase or offer to repay, repurchase, redeem, or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities or debt other than (1) dividend or distribution of the securities held by the Company, (2) to the extent permitted or required under the Transaction Documents, and (3) any financing disclosed on **Schedule 8(r).**

(s)    Lock Up Agreement.    The Company will deliver to the Subscribers on or before the Closing Date and enforce the provisions of the irrevocable Lock Up Agreement ("**Lock Up Agreement**") in the form annexed hereto as **Exhibit E**, with Marc Hazout.

9.    Covenants of the Company and Subscriber Regarding Indemnification.

(a)    The Company agrees to indemnify, hold harmless, reimburse and defend the Subscribers, the Subscribers' officers, directors, agents, affiliates, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any warranty by Company in any of the Transaction Documents; or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any covenant or undertaking to be performed by the Company under any Transaction Documents other than its obligations under Section 10 of this Agreement.

(b)    Each Subscriber agrees to indemnify, hold harmless, reimburse and defend the Company and each of the Company's officers, directors, agents, affiliates, control persons against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Company or any such person which results, arises out of or is based upon (i) any material misrepresentation by such Subscriber in this Agreement or in any Exhibits or Schedules attached hereto, or other agreement delivered pursuant hereto; or (ii) after any applicable notice and/or cure periods, any breach or default in performance by such Subscriber of any covenant or undertaking to be performed by such Subscriber hereunder, or any other agreement entered into by the Company and Subscribers, relating hereto.

(c)    In no event shall the liability of any Subscriber or permitted successor hereunder or under any other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber upon the sale of Registrable Securities (as defined herein), except with respect to such Subscribers fraud or willful negligence.

(d)    The procedures set forth in Section 10.5 shall apply to the indemnifications set forth in Sections 9(a) and 9(b) above.

10.1.    Registration Rights.    The Company hereby grants the following registration rights to holders of the Securities.

(i)    On one occasion, for a period commencing one hundred and twenty-six (126) days after the Closing Date, but not later than two (2) years after the Closing Date ("**Request Date**"), upon a written request therefor from any record holder or holders of more than 50% of the Shares and Warrant Shares actually issued upon exercise of the Warrants, the Company shall prepare and file with the

14

Commission a registration statement under the 1933 Act registering the Shares and Warrant Shares issuable upon exercise of the Warrants (collectively "**Registrable Securities**") which are the subject of such request for unrestricted public resale by the holder thereof. For purposes of Sections 10.1(i) and 10.1(ii), Registrable Securities shall not include (A) which are registered for resale in an effective registration statement, (B) included for registration in a pending registration statement, or (C) which have been issued without further transfer restrictions after a sale or transfer pursuant to an effective registration statement or Rule 144 under the 1933 Act. Upon the receipt of such request, the Company shall promptly give written notice to all other record holders of the Registrable Securities that such registration statement is to be filed and shall include in such registration statement Registrable Securities for which it has received written requests within ten (10) days after the Company gives such written notice. Such other requesting record holders shall be deemed to have exercised their demand registration right under this Section 10.1(i).

(ii)    If the Company at any time proposes to register any of its securities under the 1933 Act for sale to the public, whether for its own account or for the account of other security holders or both, except with respect to registration statements on Forms S-4, S-8 or another form not available for registering the Registrable Securities for sale to the public, provided the Registrable Securities are not otherwise registered for resale by the Subscribers or Holder pursuant to an effective registration statement, each such time it will give at least fifteen (15) days' prior written notice to the record holder of the Registrable Securities of its intention so to do. Upon the written request of the holder, received by the Company within ten (10) days after the giving of any such notice by the Company, to register any of the Registrable Securities not previously registered, the Company will cause such Registrable Securities as to which registration shall have been so requested to be included with the securities to be covered by the registration statement proposed to be filed by the Company, all to the extent required to permit the sale or other disposition of the Registrable Securities so registered by the holder of such Registrable Securities (the "**Seller**" or "**Sellers**"). In the event that any registration pursuant to this Section 10.1(ii) shall be, in whole or in part, an underwritten public offering of Common Stock of the Company, the number of shares of Registrable Securities to be included in such an underwriting may be reduced by the managing underwriter if and to the extent that the Company and the underwriter shall reasonably be of the opinion that such inclusion would adversely affect the marketing of the securities to be sold by the Company therein; provided, however, that the Company shall notify the Seller in writing of any such reduction. Notwithstanding the foregoing provisions, or Section 10.4 hereof, the Company may withdraw or delay or suffer a delay of any registration statement referred to in this Section 10.1(ii) without thereby incurring any liability to the Seller.

(iii)    The Company shall file with the Commission a Form SB-2 registration statement (the "**Registration Statement**") (or such other form that it is eligible to use) in order to register the Registrable Securities for resale and distribution under the 1933 Act not later than forty-five (45) days after the Closing Date (the "**Filing Date**"), and use its reasonable efforts to cause the Registration Statement to be declared effective not later than one hundred and twenty-five (125) days after the Closing Date (the "**Effective Date**"). The "**Actual Effective Date**" shall be the date the Registration is actually declared effective. The Registration Statement will cover not less than a number of shares of Common Stock that is equal to the Shares and Warrant Shares issuable pursuant to this Agreement upon exercise of the Warrants (the "**Registrable Securities**"). The Registrable Securities shall be reserved and set aside exclusively for the benefit of each Subscriber and Warrant holder, pro rata, and not issued, employed or reserved for anyone other than each such Subscriber and Warrant holder. The Registration Statement will promptly be amended or one or more additional registration statements will be promptly filed by the Company as necessary to register additional shares of Common Stock to allow the public resale of all Common Stock included in and issuable by virtue of the Registrable Securities. Without the consent of a majority of the Subscribers, no securities of the Company other than the Registrable Securities will be

included in the Registration Statement, except as described on **Schedule 10.1**. The Company will promptly provide to the holders of the Registrable Securities, copies of all filings and Commission letters of comment and notify Subscribers (by telecopier and by e-mail addresses provided by Subscribers) and Grushko & Mittman, P.C. (by telecopier and by email to Counslers@aol.com) on or before the second business day following the day the Company receives notice that (i) the Commission has no comments or no further comments on the Registration Statement, and (ii) the registration statement has been declared effective.

    10.2. <u>Registration Procedures</u>. If and whenever the Company is required by the provisions of Section 10.1(i) to effect the registration of any Registrable Securities under the 1933 Act, the Company will, as expeditiously as practicable:

      (a) use its reasonable efforts to prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective until such registration statement has been effective for a period of two (2) years, and comply in all material respects with the provisions of the 1933 Act with respect to the disposition of all of the Registrable Securities covered by such registration statement in accordance with the intended method of disposition for the holder of such registrable securities ("Seller') set forth in such registration statement for such period. If the Registration Statement is withdrawn for any reason, the Company shall file replacement registration statement as expeditiously as practicable;

      (c) furnish to the Sellers, at the Company's expense, such number of copies of the registration statement and the prospectus included therein (including each preliminary prospectus) as such persons reasonably may request in order to facilitate the public sale or their disposition of the securities covered by such registration statement;

      (d) use its commercially reasonable efforts to register or qualify the Registrable Securities covered by such registration statement under the securities or "blue sky" laws of New York and such jurisdictions as the Sellers shall request in writing, provided, however, that the Company shall not for any such purpose be required to qualify generally to transact business as a foreign corporation in any jurisdiction where it is not so qualified, subject itself to in any such jurisdiction or to consent to general service of process in any such jurisdiction;

      (e) if applicable, list the Registrable Securities covered by such registration statement with any securities exchange or market on which the Common Stock of the Company is then listed;

      (f) notify the Subscribers not later than the next day after the Company becomes aware that a prospectus relating thereto is required to be delivered under the 1933 Act, of the happening of any event of which the Company has knowledge as a result of which the prospectus contained in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or which becomes subject to a Commission, state or other governmental order suspending the effectiveness of the registration statement covering any of the Shares or Warrant Shares;

      (g) provided same would not be in violation of the provision of Regulation FD under the 1934 Act, make available for inspection by the Sellers, and any attorney, accountant or other agent retained by the Seller or underwriter, all publicly available, non-confidential financial and other

records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors and employees to supply all publicly available, non-confidential information reasonably requested by the seller, attorney, accountant or agent in connection with such registration statement; and

(h)    provide to the Sellers copies of the Registration Statement and amendments thereto three business days prior to the filing thereof with the Commission10.3.
Provision of Documents. In connection with each registration described in this Section 10, each Seller or holder of Registrable Securities will furnish to the Company in writing such information and representation letters with respect to itself and the proposed distribution by it as the Company shall reasonably deem necessary in order to assure compliance with federal and applicable state securities laws.

10.4.    Non-Registration Events. The Company and the Subscribers agree that the Sellers will suffer damages if the Registration Statement is not filed by the Filing Date and not declared effective by the Commission by the Effective Date, and any registration statement required under Section 10.1(i) or 10.1(ii) is not filed within 60 days after written request and declared effective by the Commission within 120 days after such request, and maintained in the manner and within the time periods contemplated by Section 10 hereof, if (A) the Company does not use its best efforts in causing the Registration Statement to become effective as early as reasonably possible with all material needed within a reasonable time frame, (B) the Registration Statement is not declared effective within five (5) business days after receipt by the Company or its attorneys of a written or oral communication from the Commission that the Registration Statement will not be reviewed or that the Commission has no further comments, (C) if the registration statement described in Sections 10.1(i) or 10.1(ii) is not filed within 60 days after such written request, or is not declared effective within 125 days after such written request, or (D) any registration statement described in Sections 10.1(i), 10.1(ii) or 10.1(iv) is filed and declared effective but shall thereafter cease to be effective for a period of time which shall exceed 45 days in the aggregate per year (defined as a period of 365 days commencing on the date the Registration Statement is declared effective) or more than 20 consecutive days (each such event referred to in clauses A through E of this Section 10.4 is referred to herein as a "**Non-Registration Event**"), then the Company shall pay to the holders of Registrable Securities included in the Registration Statement, as Liquidated Damages, an aggregate amount equal to one percent (1%) of the Purchase Price of the Shares owned of record by such holder which are subject to such Non-Registration Event for each thirty (30) days of the initial aggregate sixty (60) days of the pendency of Non-Registration Events and one and one-half percent (1.5%) thereafter for each thirty (30) days of the pendency of Non-Registration Events. A prorated portion shall be payable for any period of less than 30 days. The Company must pay the Liquidated Damages in cash. The Liquidated Damages must be paid within ten (10) days after the end of each thirty (30) day period or shorter part thereof for which Liquidated Damages are payable. In the event a Registration Statement is filed by the Filing Date but is withdrawn prior to being declared effective by the Commission, then such Registration Statement will be deemed to have not been filed. All oral or written comments received from the Commission relating to the Registration Statement must be responded to within twelve (12) business days after receipt of comments from the Commission. Notwithstanding the foregoing, the Company shall not be liable to the Subscriber under this Section 10.4 for any events or delays occurring as a consequence of the acts or omissions of the Subscribers contrary to the obligations undertaken by Subscribers in this Agreement. Liquidated Damages will not accrue nor be payable pursuant to this Section 10.4 nor will a Non-Registration Event be deemed to have occurred for times during which Registrable Securities are transferable by the holder of Registrable Securities pursuant to Rule 144(k) under the 1933 Act.

10.5.    Expenses. All expenses incurred by the Company in complying with Section 11, including, without limitation, all registration and filing fees, printing expenses (if required), fees and disbursements of counsel and independent public accountants for the Company, fees and expenses (including reasonable counsel fees) incurred in connection with complying with state securities or "blue

sky" laws, fees of the National Association of Securities Dealers, Inc., transfer taxes, and fees of transfer agents and registrars, are called "**Registration Expenses.**" All underwriting discounts and selling commissions applicable to the sale of Registrable Securities are called "**Selling Expenses.**" The Company will pay all Registration Expenses in connection with the registration statement under Section 11. Selling Expenses in connection with each registration statement under Section 11 shall be borne by the Seller and may be apportioned among the Sellers in proportion to the number of shares sold by the Seller relative to the number of shares sold under such registration statement or as all Sellers thereunder may agree.

10.6.    <u>Indemnification and Contribution</u>.

(a)    In the event of a registration of any Registrable Securities under the 1933 Act pursuant to Section 10, the Company will, to the extent permitted by law, indemnify and hold harmless the Seller, each officer of the Seller, each director of the Seller, each underwriter of such Registrable Securities thereunder and each other person, if any, who controls such Seller or underwriter within the meaning of the 1933 Act, against any losses, claims, damages or liabilities, joint or several, to which the Seller, or such underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such Registrable Securities was registered under the 1933 Act pursuant to Section 10, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made, and will, subject to the provisions of Section 10.6(c), reimburse the Seller, each such underwriter and each such controlling person for any reasonable legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable to the Seller to the extent that any such damages arise out of or are based upon an untrue statement or omission made in any preliminary prospectus if (i) the Seller failed to send or deliver a copy of the final prospectus delivered by the Company to the Seller with or prior to the delivery of written confirmation of the sale by the Seller to the person asserting the claim from which such damages arise, (ii) the final prospectus would have corrected such untrue statement or alleged untrue statement or such omission or alleged omission, (iii) to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission so made in conformity with information furnished by any such Seller, or any such controlling person, in writing specifically for use in such registration statement or prospectus, (iv) to the extent that any such loss, claim, damage or liability results from the settlement of any claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld, delayed or conditioned.

(b)    In the event of a registration of any of the Registrable Securities under the 1933 Act pursuant to Section 10, each of the Sellers severally but not jointly will, to the extent permitted by law, indemnify and hold harmless the Company, and each person, if any, who controls the Company within the meaning of the 1933 Act, each officer of the Company who signs the registration statement, each director of the Company, each underwriter and each person who controls any underwriter within the meaning of the 1933 Act, against all losses, claims, damages or liabilities, joint or several, to which the Company or such officer, director, underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the registration statement under which such Registrable Securities were registered under the 1933 Act pursuant to Section 10, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to

18

state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and each such officer, director, underwriter and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action, provided, however, that the Seller will be liable hereunder in any such case if and only to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with information pertaining to such Seller, as such, furnished in writing to the Company by such Seller specifically for use in such registration statement or prospectus, and provided, further, however, that the liability of the Seller hereunder shall be limited to the net proceeds actually received by the Seller from the sale of Registrable Securities covered by such registration statement. Seller shall not be liable under this Section 10.6(b) for any such loss, claim, damage or liability that results from the settlement of any claim if such settlement is effected without the prior written consent of the Seller, which consent shall not be unreasonably withheld, delayed or conditioned.

(c)     Promptly after receipt by an indemnified party hereunder of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party hereunder, notify the indemnifying party in writing thereof, but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to such indemnified party other than under this Section 10.6(c) and shall only relieve it from any liability which it may have to such indemnified party under this Section 10.6(c), except and only if and to the extent the indemnifying party is prejudiced by such omission. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate in and, to the extent it shall wish, to assume and undertake the defense thereof with counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume and undertake the defense thereof, the indemnifying party shall not be liable to such indemnified party under this Section 10.6(c) for any legal expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation and of liaison with counsel so selected, provided, however, that, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be reasonable defenses available to it which are different from or additional to those available to the indemnifying party or if the interests of the indemnified party reasonably may be deemed to conflict with the interests of the indemnifying party, the indemnified parties, as a group, shall have the right to select one separate counsel and to assume such legal defenses and otherwise to participate in the defense of such action, with the reasonable expenses and fees of such separate counsel and other expenses related to such participation to be reimbursed by the indemnifying party as incurred.

(d)     In order to provide for just and equitable contribution in the event of joint liability under the 1933 Act in any case in which either (i) a Seller, or any controlling person of a Seller, makes a claim for indemnification pursuant to this Section 10.6 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 10.6 provides for indemnification in such case, or (ii) contribution under the 1933 Act may be required on the part of the Seller or controlling person of the Seller in circumstances for which indemnification is not provided under this Section 10.6; then, and in each such case, the Company and the Seller will contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that the Seller is responsible only for the portion represented by the percentage that the public offering price of its securities offered by the registration statement bears to the public offering price of all securities offered by such registration statement, provided, however, that, in any such case, (y) the Seller will not be required to

19

contribute any amount in excess of the public offering price of all such securities sold by it pursuant to such registration statement; and (z) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

        10.7.   <u>Delivery of Unlegended Shares</u>.

        (a)     Within five (5) business days (such fifth business day being the **"Unlegended Shares Delivery Date"**) after the business day on which the Company has received (i) a notice that Shares or Warrant Shares or any other Common Stock held by a Subscriber have been sold pursuant to the Registration Statement or Rule 144 under the 1933 Act, (ii) a representation that the prospectus delivery requirements, or the requirements of Rule 144, as applicable and if required, have been satisfied, and (iii) the original share certificates representing the shares of Common Stock that have been sold, and (iv) in the case of sales under Rule 144, customary representation letters of the Subscriber and/or Subscriber's broker regarding compliance with the requirements of Rule 144, the Company at its expense, (y) shall deliver, and shall cause legal counsel selected by the Company to deliver to its transfer agent (with copies to Subscriber) an appropriate instruction and opinion of such counsel, directing the delivery of shares of Common Stock without any legends including the legend set forth in Section 4(e) above, reissuable pursuant to any effective and current Registration Statement described in Section 11 of this Agreement or pursuant to Rule 144 under the 1933 Act (the **"Unlegended Shares"**); and (z) cause the transmission of the certificates representing the Unlegended Shares together with a legended certificate representing the balance of the submitted Shares certificate, if any, to the Subscriber at the address specified in the notice of sale, via express courier, by electronic transfer or otherwise on or before the Unlegended Shares Delivery Date.

        (b)     In lieu of delivering physical certificates representing the Unlegended Shares, if the Company's transfer agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer program, upon request of a Subscriber, so long as the certificates therefor do not bear a legend and the Subscriber is not obligated to return such certificate for the placement of a legend thereon, the Company shall cause its transfer agent to electronically transmit the Unlegended Shares by crediting the account of Subscriber's prime broker with DTC through its Deposit Withdrawal Agent Commission system. Such delivery must be made on or before the Unlegended Shares Delivery Date.

        (c)     The Company understands that a delay in the delivery of the Unlegended Shares pursuant to Section 10 hereof later than five (5) business days after the Unlegended Shares Delivery Date could result in economic loss to a Subscriber. As compensation to a Subscriber for such loss, the Company agrees to pay late payment fees (as liquidated damages and not as a penalty) to the Subscriber for late delivery of Unlegended Shares in the amount of $100 per business day after the Delivery Date for each $10,000 of purchase price of the Unlegended Shares subject to the delivery default. If during any 360 day period, the Company fails to deliver Unlegended Shares as required by this Section 10.7 for an aggregate of thirty (30) days, then each Subscriber or assignee holding Securities subject to such default may, at its option, require the Company to redeem all or any portion of the Shares and Warrant Shares subject to such default at a price per share equal to 120% of the Purchase Price of such Common Stock and Warrant Shares ("**Unlegended Redemption Amount**"). The amount of the aforedescribed liquidated damages that have accrued or have been paid for the twenty-day period prior to the receipt by the Subscriber of the Unlegended Redemption Amount shall be credited against the Unlegended Redemption Amount. The Company shall pay any payments incurred under this Section in immediately available funds upon demand.

        (d)     In addition to any other rights available to a Subscriber, if the Company

fails to deliver to a Subscriber Unlegended Shares as required pursuant to this Agreement, within five (5) business days after the Unlegended Shares Delivery Date and the Subscriber or a broker on the Subscriber's behalf, purchases (in an open market transaction or otherwise) shares of common stock to deliver in satisfaction of a sale by such Subscriber of the shares of Common Stock which the Subscriber was entitled to receive from the Company (a "**Buy-In**"), then the Company shall pay in cash to the Subscriber (in addition to any remedies available to or elected by the Subscriber) the amount by which (A) the Subscriber's total purchase price (including brokerage commissions, if any) for the shares of common stock so purchased exceeds (B) the aggregate purchase price of the shares of Common Stock delivered to the Company for reissuance as Unlegended Shares- together with interest thereon at a rate of 15% per annum, accruing until such amount and any accrued interest thereon is paid in full (which amount shall be paid as liquidated damages and not as a penalty).  For example, if a Subscriber purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to $10,000 of purchase price of shares of Common Stock delivered to the Company for reissuance as Unlegended Shares, the Company shall be required to pay the Subscriber $1,000, plus interest. The Subscriber shall provide the Company written notice indicating the amounts payable to the Subscriber in respect of the Buy-In

(e)     In the event a Subscriber shall request delivery of Unlegended Shares as described in Section 10.7 and the Company is required to deliver such Unlegended Shares pursuant to Section 10.7, the Company may not refuse to deliver Unlegended Shares based on any claim that such Subscriber or any one associated or affiliated with such Subscriber has been engaged in any violation of law, or for any other reason, unless, an injunction or temporary restraining order from a court, on notice, restraining and or enjoining delivery of such Unlegended Shares or exercise of all or part of said Warrant shall have been sought and obtained by the Company or at the Company's request or with the Company's assistance, and the Company has posted a surety bond for the benefit of such Subscriber in the amount of 120% of the amount of the aggregate purchase price of the Common Stock and Warrant Shares which are subject to the injunction or temporary restraining order, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Subscriber to the extent Subscriber obtains judgment in Subscriber's favor.

11.     (a)     <u>Right of First Refusal</u>.  Until 365 days after the Actual Effective Date, the Subscribers shall be given not less than five (5) business days prior written notice of any proposed sale by the Company of its Common Stock, other equity securities, obligations convertible or exercisable for equity securities or debt obligations, except in connection with (i) full or partial consideration in connection with a strategic merger, acquisition, consolidation or purchase of substantially all of the securities or assets of corporation or other entity which holders of such securities or debt are not at any time granted registration rights, (ii) the Company's issuance of securities in connection with strategic license agreements and other partnering arrangements so long as such issuances are not for the purpose of raising capital and which holders of such securities or debt are not at any time granted registration rights, and (iii) the Company's issuance of Common Stock or the issuances or grants of options to purchase Common Stock pursuant to stock option plans and employee stock purchase plans described on **Schedule 5(d)** hereto at prices equal to or higher than the closing price of the Common Stock on the issue date of any of the foregoing (collectively the foregoing are "**Excepted Issuances**").   The Subscribers who exercise their rights pursuant to this Section 11(a) shall have the right during the five (5) business days following receipt of the notice to purchase such offered Common Stock, debt or other securities in accordance with the terms and conditions set forth in the notice of sale in the same proportion to each other as their purchase of Shares in the Offering.  In the event such terms and conditions are modified during the notice period, the Subscribers shall be given prompt notice of such modification and shall have the right during the five (5) business days following the notice of modification, whichever is longer, to exercise such right.

(b)    <u>Favored Nations Provision</u>.  Other than the Excepted Issuances, if at any time Shares or Warrant Shares are held by a Subscriber, the Company shall offer, issue or agree to issue any Common Stock or securities convertible into or exercisable for shares of Common Stock (or modify any of the foregoing which may be outstanding) to any person or entity ("**Third Party Purchaser**") at a price per share of Common Stock or exercise price per share of Common Stock which shall be less than the per share Purchase Price of the Shares, or less than the exercise price per Warrant Share, respectively, of the Subscribers holding Shares, Warrants, or Warrant Shares, then the Company shall issue, for each such occasion, additional shares of Common Stock to each Subscriber so that the average per share purchase price of the shares of Common Stock issued to the Subscriber (of only the Shares or Warrant Shares still owned by the Subscriber) is equal to such other lower price per share and the Warrant Exercise Price shall automatically be reduced to such other lower price per share.  The average Purchase Price of the Shares and average exercise price in relation to the Warrant Shares shall be calculated separately for the Shares and Warrant Shares.  The delivery to the Subscriber of the additional shares of Common Stock shall be not later than 15 business days from the closing date of the transaction giving rise to the requirement to issue additional shares of Common Stock.  If the Third Party Purchaser is offered registration rights with respect to the shares purchased by such Third Party Purchaser, the  Subscribers are granted, at their election, such other registration rights or the registration rights described in Section 10 hereof  in relation to such additional shares of Common Stock except that the Filing Date and Effective Date vis-à-vis such additional common shares shall be, respectively, the forty-fifth (45th) and ninetieth (90th) date after the closing date giving rise to the requirement to issue the additional shares of Common Stock.  For purposes of the issuance and adjustment described in this paragraph, the issuance of any security of the Company carrying the right to convert such security into shares of Common Stock or of any warrant, right or option to purchase Common Stock shall result in the issuance of the additional shares of Common Stock upon the actual issuance of such convertible security, warrant, right or option and again at any time upon any subsequent issuances of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the Conversion Price or Warrant exercise price in effect upon such issuance.  The Subscriber is also given the right to elect to substitute any term or terms of any other offering in connection with which the Subscriber has rights as described in Section 11(a), for any term or terms of the Offering in connection with Securities owned by Subscriber as of the date the notice described in Section 11(a) is required to be given to Subscriber..  The rights of the Subscriber set forth in this Section 11 are in addition to any other rights the Subscriber has pursuant to this Agreement, any Transaction Document, and any other agreement referred to or entered into in connection herewith.

(c)    <u>Maximum Exercise of Rights</u>.  In the event the exercise of the rights described in Sections 11(a) and 11(b) would result in the issuance of an amount of Common Stock of the Company that would exceed the maximum amount that may be issued to a Subscriber calculated in the manner described in Section 10 of the Warrant, then the issuance of such additional shares of Common Stock of the Company to such Subscriber will be deferred in whole or in part until such time as such Subscriber is able to beneficially own such Common Stock without exceeding the maximum amount set forth calculated in the manner described in Section 10 of the Warrant.  The determination of when such Common Stock may be issued shall be made by each Subscriber as to only such Subscriber.

(d)    From the date of this Agreement and until the earlier of (i) two (2) years after the Closing Date or (ii) until all the Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement, in the event the Company amends its certificate of incorporation to effect a reverse stock split of the Company's Common Stock, then the Company shall issue for each such occasion, additional shares of Common Stock to each Subscriber so that the average price of the Shares still held by the Subscriber shall be equal to 85% of the average of the closing price of the Common stock for the 20 trading days following the date of such reverse split. This section shall apply only if the application shall result in the issuance of Common Stock to the Subscribers.

12.    <u>Miscellaneous</u>.

(a)    <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to the Company, to: Silver Dragon Resources, Inc., 1121 Steeles Avenue West, Suite 803, Toronto, Ontario M2R 3W7, Attn: Marc M. Hazout, President and CEO, telecopier: (416) 661-9510, with a copy by telecopier only to: Garfin Zeidenberg LLP, Yonge-Norton Center, 5255 Yonge Street, Suite 800, Toronto, Ontario, Canada M2N 6P4, Attn: Stephen M. Cohen, B.A., LL.B., telecopier number: (416) 512-9992, and (ii) if to the Subscribers, to: the one or more addresses and telecopier numbers indicated on the signature pages hereto, with an additional copy by telecopier only to: Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, telecopier number: (212) 697-3575, and (iii) if to the Broker, to: the address and telecopier number set forth on **Schedule 7** hereto.

(b)    <u>Closing</u>. The consummation of the transactions contemplated herein shall take place at the offices of Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, upon the satisfaction of all conditions to Closing set forth in this Agreement. The "**Closing Date**" shall be the date that subscriber funds representing the net amount due to the Company from the Purchase Price of the Offering are received by the Company, provided such funds are received by the Company not later than the first business day after transmission of such funds, otherwise the Closing Date shall be the date such funds are actually received by the Company.

(c)    <u>Entire Agreement; Assignment</u>. This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties. Neither the Company nor the Subscribers have relied on any representations not contained or referred to in this Agreement and the documents delivered herewith. No right or obligation of either party shall be assigned by that party without prior notice to and the written consent of the other party.

(d)    <u>Counterparts/Execution</u>. This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which,

23

when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument. This Agreement may be executed by facsimile signature and delivered by facsimile transmission.

(e)    <u>Law Governing this Agreement</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state of New York. **The parties and the individuals executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the jurisdiction of such courts and waive trial by jury.** The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

(f)    <u>Specific Enforcement, Consent to Jurisdiction</u>. The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity. Subject to Section 12(e) hereof, each of the Company, Subscriber and any signator hereto in his personal capacity hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in New York of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(g)    <u>Independent Nature of Subscribers</u>. The Company acknowledges that the obligations of each Subscriber under the Transaction Documents are several and not joint with the obligations of any other Subscriber, and no Subscriber shall be responsible in any way for the performance of the obligations of any other Subscriber under the Transaction Documents. The Company acknowledges that the decision of each Subscriber to purchase Securities has been made by such Subscriber independently of any other Subscriber and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company which may have been made or given by any other Subscriber or by any agent or employee of any other Subscriber, and no Subscriber or any of its agents or employees shall have any liability to any Subscriber (or any other person) relating to or arising from any such information, materials, statements or opinions. The Company acknowledges that nothing contained in any Transaction Document, and no action taken by any Subscriber pursuant hereto or thereto (including, but not limited to, the (i) inclusion of a Subscriber in the SB-2 Registration Statement and (ii) review by, and consent to, such Registration Statement by a Subscriber) shall be deemed to constitute the Subscribers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Subscribers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. The Company acknowledges that each Subscriber shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of the Transaction Documents, and it shall not be necessary for any other Subscriber to

2/7/2008, 6:01 PM

be joined as an additional party in any proceeding for such purpose. The Company acknowledges that it has elected to provide all Subscribers with the same terms and Transaction Documents for the convenience of the Company and not because Company was required or requested to do so by the Subscribers. The Company acknowledges that such procedure with respect to the Transaction Documents in no way creates a presumption that the Subscribers are in any way acting in concert or as a group with respect to the Transaction Documents or the transactions contemplated thereby.

(h)    Consent.    As used in the Agreement, "consent of the Subscribers" or similar language means the consent of holders of not less than 70% of the total of the Shares and Warrant Shares owned by Subscribers on the date consent is requested.

(i)    Equitable Adjustment.    The Securities and the purchase prices of Securities shall be equitably adjusted to offset the effect of stock splits, stock dividends, and distributions of property or equity interests of the Company to its shareholders.

(j)    Currency.    All references to money, dollars and currency shall mean the currency of the United States.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

**<u>SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT</u>**


Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

SILVER DRAGON RESOURCES, INC.
a Delaware corporation



By:_____
          Name: Marc M. Hazout
          Title: President and CEO

Dated: as of November 2, 2006


| SUBSCRIBER | PURCHASE PRICE | SHARES | CLASS A WARRANTS | CLASS B WARRANTS | CLASS C WARRANTS |
|---|---|---|---|---|---|
| ALPHA CAPITAL ANSTALT<br>Pradafant 7<br>9490 Furstentums<br>Vaduz, Lichtenstein<br>Fax: 011-42-32323196<br><br><br><br>_____<br>(Signature)<br>By:<br>Title: | $500,000.00 | 500,000 | 250,000 | 250,000 | 1,000,000 |

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Forms of Class A and Class B and Class C Warrants |
| Exhibit B | Escrow Agreement |
| Exhibit C | Form of Legal Opinion |
| Exhibit D | Form 8-K or Public Announcement |
| Exhibit E | Form of Lock Up Agreement |
| Schedule 5(a) | Subsidiaries |
| Schedule 5(d) | Additional Issuances / Capitalization |
| Schedule 5(q) | Undisclosed Liabilities |
| Schedule 5(v) | Transfer Agent |
| Schedule 7 | Broker |
| Schedule 8(e) | Use of Proceeds |
| Schedule 8(r) | Negative Covenants |
| Schedule 10.1 | Other Securities to be Registered |

**EXHIBIT E**

**LOCK UP AGREEMENT**

This AGREEMENT (the "Agreement") is made as of the 2nd day of November, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Silver Dragon Resources, Inc., a Delaware corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

1.    Background.

    a.    Holder is the actual and/or beneficial owner of the amount of shares of the Common Stock, $0.0001 par value, of the Company ("Common Stock") and rights to purchase Common Stock designated on the signature page hereto.

    b.    Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's Common Stock and Warrants (the "Subscribers"), for the sale of Common Stock and Warrants to the Subscribers for an aggregate of up to $500,000 (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to obtain an agreement from the Holder to refrain from selling any securities of the Company at an effective price per share of Common Stock of less than $1.50 ("Minimum Price") from the date of the Subscription Agreement until six months after the Actual Effective Date (the "Restriction Period").

2.    Share Restriction.

    a.    Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof or acquires hereafter during the Restriction Period at less than the Minimum Price, except in connection with an offer made to all shareholders of the Company in connection with any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

    b.    Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

    c.    Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

3.    Miscellaneous.

    a.    At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the

intent and purposes of this Agreement.

        b.      This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply.  Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

        c.      This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

        d.      This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

        e.      This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

        f.      The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement nor to amend or terminate this Agreement without the consent of the Subscribers.

        g.      The Subscribers are third party beneficiaries of this Agreement, with right of enforcement.

        h.      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Subscription Agreement.

        i.      The Minimum Price shall be adjusted to equitably offset stock splits and similar events.

        IN WITNESS WHEREOF, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

HOLDER:

_____
(Signature of Holder)

_____
(Print Name of Holder)

_____
Number of Shares of Common Stock Owned

_____
Number of Shares of Common Stock
Beneficially Owned

_____
Number of shares of Common Stock issuable
upon exercise of Stock Options and Warrants
Beneficially Owned

COMPANY:
**SILVER DRAGON RESOURCES, INC.**

By:_____

## SCHEDULE 7

BROKER:    DRAGONFLY CAPITAL PARTNERS, LLC.
           The Packard Building
           1310 S. Tryon Street, Suite 109
           Charlotte, NC 28203
           Fax: (704) 342-9750


Cash Fee.   The Company agrees that it will pay the Broker, on the Closing Date a fee of seven percent (7%) of the Purchase Price ("**Broker's Cash Fee**").  The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the Offering except the Broker.

Broker's Warrants.  On the Closing Date, the Company will issue to the Broker, seven (7) Class A Warrants for each one hundred (100) Shares issued to the Subscribers and seven (7) Class B Warrants for each one hundred (100) Shares issued to the Subscribers on the Closing (collectively "**Broker's Warrants**") similar to and carrying the same rights as the Class A and Class B Warrants issuable to the Subscribers.

All the representations, covenants, warranties, undertakings, remedies, liquidated damages, indemnification, and other rights including but not limited to reservation requirements and registration rights made or granted to or for the benefit of the Subscribers are hereby also made and granted to and for the benefit of the Broker in respect of the Broker's Warrants.

## <u>SCHEDULE 5a</u>

**<u>Company's Subsidiaries</u>**

Silver Dragon Mining de Mexico S.A. de C.V.

## SCHEDULE 5d

**Additional Issuances**

1.     3,000,000 warrants exerciseable at $2.00 per share issued in conjunction with private placement of restricted stock

2.     3,000,000 warrants exerciseable at $5.00 per share issued in conjunction with private placement of restricted stock

3.     200,000 warrants exerciseable at $0.80 per share issued to consultants.  Restricted.

4.     50,000 restricted common shares pursuant to consulting agreement.  Shares owed but not yet issued.

5.     From $12- $18 Million in common stock plus warrants as per engagement letter with Union Securities

6.   Any additional issuances of restricted common stock

**Capitalization**

57,010,533 (not including the 500,000 shares to be issued pursuant to this Subscription Agreement)

**SCHEDULE 5q**

**UNDISCLOSED LIABILITIES**

None.

**SCHEDULE 5v**

**Transfer Agent**

Signature Stock Transfer Inc.
2301 Ohio Drive
Suite 100
Plano, Texas, 75093
Tel: (972) 612-4120

Attention:  Jason Bogutski

## **SCHEDULE 8e**

**Use of Proceeds**

The proceeds will be used to finance the Company's projects in Mexico and China, as well as for general corporate purposes.

## **SCHEDULE 8r**

### **Negative Covenants**

None.

## **SCHEDULE 10.1**

**Other Securities to be registered**

250,000 Units to Heller Capital Investments LLC at $1.00 per Unit.  Each Unit consists of one share of Common Stock and 2 one half of one (1/2) Common Stock purchase warrants.  The first half warrant is exercisable at $2.00 per share and the second half warrant is exercisable at $5.00 per share.



**Asher Brand**

| | |
|---|---|
| **From:** | Jeffrey Singer [jeff@dragonflycapitalgroup.com] |
| **Sent:** | Monday, November 06, 2006 2:04 PM |
| **To:** | Asher Brand |
| **Cc:** | counslers@aol.com; Edgrushko@aol.com; Barbaramittman@aol.com |
| **Subject:** | SDRG |
| **Attachments:** | Scehedule 5d.doc; SCHEDULE 7.doc; Press Release $6. 5 M Financing November 7 2006 final.doc |

Asher-

Attached are the following for your review and approval:
-revised press release in your suggested format
-Subscription Agreement with a revised schedule 5d with the "previously raised" added to #s 1 and 2
-Revised Schedule 7 that shows Dragonfly receiving 35,000 warrants in total, not 70,000 (Barbara miscalculated when she put the disbursement agreement together).

Asher, please confirm that the attached revised documents are acceptable. The only other outstanding item is the disbursement letter. Barbara, as per my email last week, Dragonfly does not require our warrants to be in the disbursement letter, so please accept the letter without this item.

Regards,
Jeff


-------------------------
Jeffrey Singer
Managing Director
Dragonfly Capital Partners
Member NASD/SIPC
The Graybar Building
420 Lexington Avenue, Suite 2620
New York, NY 10170
(646) 383-8605 Office
(646) 619-4972 Fax
(917) 846-3970 Mobile
jeff@dragonflycapitalgroup.com
www.dragonflycapitalgroup.com

This message may contain confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message that arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments.

-----Original Message-----
**From:** Stephen Cohen [mailto:smc@gzlegal.com]
**Sent:** Monday, November 06, 2006 1:04 PM
**To:** jeff@dragonflycapitalgroup.com
**Cc:** hazout@rogers.com
**Subject:**


<<Scehedule 5d.doc>> <<SCHEDULE 7.doc>>

New Schedule 5d attached.

Also, new Schedule 7 is attached.

Stephen M. Cohen, B.A., LL.B.

Garfin Zeidenberg LLP

Lawyers

Yonge-Norton Centre

5255 Yonge Street, Suite 800

Toronto, Ontario, Canada  M2N 6P4

Tel:  (416) 512-8000 Ext. 404

Direct Line:  (416) 642-5404

Fax:  (416) 512-9992

smc@gzlegal.com


CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and contains information that
is privileged and confidential.  If the reader is not the intended recipient you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited.  If you have received this communication in error,
please notify us immediately and delete this message.  Thank you.

## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "**Agreement**"), dated as of November 2, 2006, by and among Silver Dragon Resources, Inc., a Delaware corporation (the "**Company**"), and the subscribers identified on the signature page hereto (each a "**Subscriber**" and collectively "**Subscribers**").

**WHEREAS**, the Company and the Subscribers are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**Commission**") under the Securities Act of 1933, as amended (the "1933 Act").

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Subscribers, as provided herein, and the Subscribers shall purchase Five Hundred Thousand Dollars ($500,000) (the "**Purchase Price**") of the Company's Units at a per Unit Purchase Price of $1.00, subject to adjustment as described in this Agreement, each Unit consisting of one share of common stock, $.0001 par value (the "**Common Stock**" or "**Shares**"), and share purchase warrants in the form attached hereto as **Exhibit A** (the "**Warrants**"), to purchase shares of Common Stock (the "**Warrant Shares**"). The Purchase Price shall be payable to the Company on the Closing Date. The Common Stock, the Warrants and the Warrant Shares are collectively referred to herein as the "**Securities**"; and

**WHEREAS**, the aggregate proceeds of the sale of the Common Stock and the Warrants contemplated hereby may be held in escrow pursuant to the terms of a Funds Escrow Agreement which may be executed by the parties substantially in the form attached hereto as **Exhibit B** (the "**Escrow Agreement**").

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement, the Company and the Subscribers hereby agree as follows:

1.     <u>Purchase and Sale of Shares and Warrants</u>. Subject to the satisfaction (or waiver) of the conditions to Closing set forth in this Agreement and the Escrow Agreement, each Subscriber shall purchase the Shares and Warrants for the portion of the Purchase Price indicated on the signature page hereto, and the Company shall sell such Shares and Warrants to the Subscriber. The Purchase Price for the Shares and Warrants shall be paid in cash. The entire Purchase Price shall be allocated to the Shares.

2.     <u>Escrow Arrangements; Deliveries</u>. Upon execution hereof by the parties and pursuant to the terms of the Escrow Agreement, each Subscriber agrees to make the deliveries required of such Subscriber as set forth in the Escrow Agreement and the Company agrees to make the deliveries required of the Company as set forth in the Escrow Agreement.

3.     <u>Warrants</u>.

(a)     <u>A Warrants</u>. On the Closing Date, the Company will issue and deliver Class A Warrants to the Subscribers. One Class A Warrant will be issued for each two Shares issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class A Warrant shall be $2.00. The Class A Warrants shall be exercisable until five (5) years after the Closing Date.

1

(b)     B Warrants.     On the Closing Date, the Company will issue and deliver Class B Warrants to the Subscribers. One Class B Warrant will be issued for each two Shares issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class B Warrant shall be $5.00. The Class B Warrants shall be exercisable until five (5) years after the Closing Date.

(c)     C Warrants.     On the Closing Date, the Company will issue and deliver Class C Warrants to the Subscribers. Two Class C Warrants will be issued for each Share issued on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class C Warrant shall be $1.00. The Class C Warrants shall be exercisable until one (1) year after the Closing Date.

4.     Subscriber's Representations and Warranties. Each Subscriber hereby represents and warrants to and agrees with the Company only as to such Subscriber that:

(a)     Information on Company.     The Subscriber has been furnished with or has had access at the EDGAR Website of the Commission to the Company's Form 10-KSB for the year ended December 31, 2005 as filed with the Commission, together with all subsequently filed Forms 10-QSB, 8-K, and filings made with the Commission available at the EDGAR website (hereinafter referred to collectively as the "**Reports**"). In addition, the Subscriber has received in writing from the Company such other information concerning its operations, financial condition and other matters as the Subscriber has requested in writing (such other information is collectively, the "**Other Written Information**"), and considered all factors the Subscriber deems material in deciding on the advisability of investing in the Securities.

(b)     Information on Subscriber.     The Subscriber (and, if the Subscriber is acting on behalf of a principal, such principal) is, and will be at the time of the issuance of the Common Stock and exercise of any of the Warrants, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable the Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment. The Subscriber has the authority and is duly and legally qualified to purchase and own the Securities. The Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof. The information set forth on the signature page hereto regarding the Subscriber is accurate and complete.

(c)     Purchase of Common Stock and Warrants.     On the Closing Date, the Subscriber will have purchased the Common Stock and Warrants as principal for its own account (or, if the Subscriber is acting on behalf of a principal, such principal) for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(d)     Compliance with Securities Act.     The Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration. Until the Actual Effective Date, the

2

Subscriber will not maintain a net short position in the Common Stock contrary to applicable rules and regulations. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "**Affiliate**" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity. Affiliate when employed in connection with the Company includes each Subsidiary [as defined in Section 5(a)] of the Company. For purposes of this definition, "**control**" means the power to direct the management and policies of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(e)     Shares Legend. The Shares and the Warrant Shares shall bear the following or similar legend:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THESE SHARES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SILVER DRAGON RESOURCES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED."

(f)     Warrants Legend. The Warrants shall bear the following or similar legend:

"THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS WARRANT UNDER SAID ACT OR ANY APPLICABLE STATE SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SILVER DRAGON RESOURCES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED."

(g)     Communication of Offer. The offer to sell the Securities was directly communicated to the Subscriber by the Company. At no time was the Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(h)     Authority; Enforceability. This Agreement and other agreements delivered together with this Agreement or in connection herewith have been duly authorized, executed and delivered by the Subscriber and are valid and binding agreements enforceable in accordance with their

3

terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity; and Subscriber has full corporate power and authority necessary to enter into this Agreement and such other agreements and to perform its obligations hereunder and under all other agreements entered into by the Subscriber relating hereto.

(i)      No Governmental Review. Each Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(j)      Correctness of Representations. Each Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless a Subscriber otherwise notifies the Company prior to the Closing Date (as hereinafter defined), shall be true and correct as of the Closing Date.

(k)      Organization and Standing of the Subscribers. If the Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate power to own its assets and to carry on its business.

(l)      No Conflicts. The execution, delivery and performance of this Agreement and the consummation by such Subscriber of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber). Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement or to purchase the Notes or acquire the Warrants in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(m)      Survival. The foregoing representations and warranties shall survive the Closing Date for a period of three years.

5.      Company Representations and Warranties. The Company represents and warrants to and agrees with each Subscriber that except as set forth in the Reports or the Other Written Information and as otherwise qualified in the Transaction Documents:

(a)      Due Incorporation. The Company is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power to own its properties and to carry on its business as disclosed in the Reports. The Company is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect. For purpose of this Agreement, a "**Material Adverse**

Effect" shall mean a material adverse effect on the financial condition, results of operations, properties or business of the Company taken individually, or in the aggregate, as a whole. For purposes of this Agreement, "**Subsidiary**" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity) of which more than 50% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity. All the Company's Subsidiaries as of the Closing Date are set forth on **Schedule 5(a)** hereto.

(b)    Outstanding Stock.  All issued and outstanding shares of capital stock of the Company and each of its subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable.

(c)    Authority; Enforceability.  This Agreement, the Common Stock, the Warrants and the Escrow Agreement and any other agreements delivered together with this Agreement or in connection herewith (collectively "**Transaction Documents**") have been duly authorized, executed and delivered by the Company and are valid and binding agreements enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d)    Additional Issuances.   There are no outstanding agreements or preemptive or similar rights affecting the Company's common stock or equity and no outstanding rights, warrants or options to acquire, or instruments convertible into or exchangeable for, or agreements or understandings with respect to the sale or issuance of any shares of common stock or equity of the Company or other equity interest in any of the subsidiaries of the Company except as described on **Schedule 5(d)**. The common stock of the Company on a fully diluted basis outstanding as of the last trading day preceding the Closing Date is set forth on **Schedule 5(d)**.

(e)    Consents.  No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its affiliates, the American Stock Exchange, the National Association of Securities Dealers, Inc., Nasdaq National Market, the OTC Bulletin Board ("**Bulletin Board**") nor the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities.

(f)    No Violation or Conflict.  Assuming the representations and warranties of the Subscribers in Section 4 are true and correct, neither the issuance and sale of the Securities nor the performance of the Company's obligations under the Transaction Documents by the Company will:

(i)    violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having

5

jurisdiction over the Company or any of its subsidiaries or over the properties or assets of the Company or any of its affiliates, (C) the terms of any bond, debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its affiliates or subsidiaries is a party, by which the Company or any of its affiliates or subsidiaries is bound, or to which any of the properties of the Company or any of its affiliates or subsidiaries is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its affiliates or subsidiaries is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect on the Company; or

        (ii)     result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company, its subsidiaries or any of its affiliates; or

        (iii)     result in the activation of any anti-dilution rights or a reset or repricing of any debt or security instrument of any other creditor or equity holder of the Company, nor result in the acceleration of the due date of any obligation of the Company; or

        (iv)     result in the activation of any piggy-back registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company; or

        (v)     result in a violation of Section 5 under the 1933 Act.

        (g)     <u>The Securities</u>.  The Securities upon issuance:

        (i)     are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

        (ii)     have been, or will be, duly and validly authorized and on the date of issuance of the Shares and upon exercise of the Warrants, the Shares and Warrant Shares will be duly and validly issued, fully paid and nonassessable (and if registered pursuant to the 1933 Act, and resold pursuant to an effective registration statement will be free trading and unrestricted, provided that each Subscriber complies with the prospectus delivery requirements of the 1933 Act);

        (iii)     will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company;

        (iv)     will not subject the holders thereof to personal liability by reason of being such holders; and

        (v)     provided Subscriber's representations herein are true and accurate, will have been issued in reliance upon an exemption from the registration requirements of and will not result in a violation of Section 5 under the 1933 Act.

        (h)     <u>Litigation</u>.  There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its affiliates that would affect the execution by the Company or the performance by the Company of its obligations under the Transaction Documents.  There is no pending or, to the best knowledge of the Company, basis for or threatened action,

suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its affiliates which litigation if adversely determined would have a Material Adverse Effect on the Company.

(i)    Reporting Company.  The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "**1934 Act**") and has a class of common shares registered pursuant to Section 12(g) of the 1934 Act. Pursuant to the provisions of the 1934 Act, the Company has timely filed all reports and other materials required to be filed thereunder with the Commission during the twelve months preceding the Closing Date **except Form 10-KSB for the for the fiscal year ended December 31, 2005 and Form 10-QSB for the quarter ended June 30, 2006.**

(j)    No Market Manipulation.  The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the common stock of the Company to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(k)    Information Concerning Company.  The Reports contain all material information relating to the Company and its operations and financial condition as of their respective dates and all the information required to be disclosed therein.  Since the last day of the fiscal year of the most recent audited financial statements included in the Reports ("**Latest Financial Date**"), and except as modified in the Other Written Information or in the Schedules hereto, there has been no Material Adverse Event relating to the Company's business, financial condition or affairs not disclosed in the Reports. The Reports do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made.

(l)    Dilution.  The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company.  The Company specifically acknowledges that its obligation to issue the Warrant Shares upon exercise of the Warrants is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(m)    Defaults.  The Company is not in violation of its articles of incorporation or bylaws.  The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters, or (iii) to the Company's knowledge not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect.

(n)    Not an Integrated Offering.  Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of

7

any security or solicited any offers to buy any security under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. Nor will the Company or any of its Affiliates take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. The Company will not conduct any offering other than the transactions contemplated hereby that will be integrated with the offer or issuance of the Securities, which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(o)    <u>No General Solicitation</u>.  Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities.

(p)    <u>Listing</u>.  The Company's common stock is quoted on the Bulletin Board under the symbol SDRG.OB. The Company has not received any oral or written notice that its common stock is not eligible nor will become ineligible for quotation on the Bulletin Board nor that its common stock does not meet all requirements for the continuation of such quotation. The Company satisfies all the requirements for the continued quotation of its common stock on the Bulletin Board.

(q)    <u>No Undisclosed Liabilities</u>.  The Company has no liabilities or obligations which are material and which are not disclosed in the Reports and Other Written Information, other than those incurred in the ordinary course of the Company's businesses since June 30, 2006 and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed on **Schedule 5(q)**.

(r)    <u>No Undisclosed Events or Circumstances</u>.  Since June 30, 2006, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(s)    <u>Capitalization</u>.  The authorized and outstanding capital stock of the Company and Subsidiaries as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on **Schedule 5(d)**.  Except as set forth on **Schedule 5(d)**, there are no options, warrants, or rights to subscribe to, securities, rights or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock of the Company or any of its Subsidiaries. All of the outstanding shares of Common Stock of the Company have been duly and validly authorized and issued and are fully paid and nonassessable.

(t)    <u>No Disagreements with Accountants and Lawyers.</u>  There are no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers.

(u)    <u>Transfer Agent</u>.  The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is set forth on **Schedule 5(u)** hereto.

(v)     Investment Company.   Neither the Company nor any Affiliate is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(w)     Company Predecessor.   All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 8(g) through 8(l) shall relate, apply and refer to the Company, its predecessors, and the Subsidiaries.

(x)     Subsidiary Representations.   The Company makes each of the representations contained in Sections 5(a), (b), (d), (e), (f), (h), (k), (m), (q), (r), (s), (t), (v) and (w) of this Agreement, as same relate to each Subsidiary of the Company, with the same qualifications to each such representation.

(y)     Correctness of Representations.   The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscribers prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date.

(z)     Survival.   The foregoing representations and warranties shall survive the Closing Date for a period of three years.

6.     Regulation D Offering.   The offer and issuance of the Securities to the Subscribers is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder.  On the Closing Date, the Company will provide an opinion reasonably acceptable to Subscriber from the Company's legal counsel opining on the availability of an exemption from registration under the 1933 Act as it relates to the offer and issuance of the Securities and other matters reasonably requested by Subscribers.  A form of the legal opinion is annexed hereto as **Exhibit C**.  The Company will provide, at the Company's expense, such other legal opinions in the future as are reasonably necessary for the resale of the Common Stock and exercise of the Warrants and resale of the Warrant Shares.

7.     Broker/Legal Fees.

(a)     Broker's Commission.   The Company on the one hand, and each Subscriber (for himself only) on the other hand, agrees to indemnify the other against and hold the other harmless from any and all liabilities to any persons claiming brokerage commissions or similar fees other than the entity identified on **Schedule 7** hereto ("**Broker**") on account of services purported to have been rendered on behalf of the indemnifying party in connection with this Agreement or the transactions contemplated hereby and arising out of such party's actions.  Anything in this Agreement to the contrary notwithstanding, each Subscriber is providing indemnification only for such Subscriber's own actions and not for any action of any other Subscriber.  Each Subscriber's liability hereunder is several and not joint. The Company agrees that it will pay the Broker the fees set forth on **Schedule 7** hereto ("**Broker's Fees**"). The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the offering described in this Agreement except the Broker.

(b)     Legal Fees.   The Company shall pay to Grushko & Mittman, P.C., a cash fee of $15,000, of which $3,980 has already been paid ("**Subscriber's Legal Fees**") as reimbursement for services rendered to the Subscribers in connection with this Agreement and the purchase and sale of the Shares and Warrants (the "**Offering**").  The Subscriber's Legal Fees will be payable on the Closing Date out of funds held pursuant to the Escrow Agreement.

9

8.    <u>Covenants of the Company</u>.  The Company covenants and agrees with the Subscribers as follows:

(a)    <u>Stop Orders</u>.  The Company will advise the Subscribers, within twenty-four (24) hours after the Company receives notice of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose.

(b)    <u>Listing</u>.  If applicable, the Company shall promptly secure the listing of the shares of Common Stock and the Warrant Shares upon each national securities exchange, or electronic or automated quotation system upon which they are or become eligible for listing and shall maintain such listing so long as any Notes or Warrants are outstanding.  The Company will maintain the listing or quotation of its Common Stock on the American Stock Exchange, Nasdaq Capital Market, Nasdaq National Market System, Bulletin Board, or New York Stock Exchange (whichever of the foregoing is at the time the principal trading exchange or market for the Common Stock (the "**Principal Market**")), and will comply in all material respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market, as applicable. The Company will provide the Subscribers copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock from any Principal Market.  As of the date of this Agreement, the Bulletin Board is the Principal Market. The Company may list the Common Stock on the Toronto Stock Exchange ("**TSX**") provided the Shares and Warrant Shares are contemporaneously listed thereon.  Such TSX listing notwithstanding, the Company must maintain its listing on one of the above listed Principal Markets.

(c)    <u>Market Regulations</u>.  If applicable, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscribers and promptly provide copies thereof to Subscriber.

(d)    <u>Filing Requirements</u>.  From the date of this Agreement and until the earlier of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement as defined in Section 10 or pursuant to Rule 144, without regard to volume limitations, the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) timely comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement.  The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until two (2) years after the Closing Date.   Until the later of the resale of the Shares and the Warrant Shares by each Subscriber or two (2) years after the Closing Date, the Company will use its best efforts to continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market.  The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

(e)     <u>Use of Proceeds</u>.  The proceeds of the Offering will be employed by the Company for the purposes set forth on **Schedule 8(e)** hereto.  Except as set forth on **Schedule 8(e)**, the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company, litigation related expenses or settlements, brokerage fees, nor non-trade obligations outstanding on a Closing Date.

(f)     <u>Reservation</u>.  Prior to the Closing Date, the Company undertakes to reserve, pro rata, on behalf of the Subscribers from its authorized but unissued Common Stock, a number of common shares equal to 100% of the amount of Shares and Warrant Shares issuable upon exercise of the Warrants.  Failure to have sufficient shares reserved pursuant to this Section 8(f) shall be a material default of the Company's obligations under this Agreement.

(g)     <u>Taxes</u>.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

(h)     <u>Insurance</u>.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will keep its assets which are of an insurable character **(it being understood that the Company's mining rights are not insurable)** insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business, in amounts sufficient to prevent the Company from becoming a co-insurer and not in any event less than one hundred percent (100%) of the insurable value of the property insured less reasonable deductible amounts; and the Company will maintain, with financially sound and reputable insurers, insurance against other hazards and risks and liability to persons and property to the extent and in the manner customary for companies in similar businesses similarly situated and to the extent available on commercially reasonable terms.

(i)     <u>Books and Records</u>.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(j)     <u>Governmental Authorities</u>.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall duly observe and conform in all material

11

respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(k)  Intellectual Property.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.

(l)  Properties.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement (as defined in Section 10.1(ii) hereof) or pursuant to Rule 144, without regard to volume limitations, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases to which it is a party or under which it occupies property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.

(m)  Confidentiality/Public Announcement.  From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company agrees that except in connection with a Form 8-K or the Registration Statement or as otherwise required in any other Commission filing, it will not disclose publicly or privately the identity of the Subscribers unless expressly agreed to in writing by a Subscriber, only to the extent required by law and then only upon reasonable prior notice to Subscriber. In any event and subject to the foregoing, the Company shall file a Form 8-K or make a public announcement describing the Offering not later than the first business day after the Closing Date.  In the Form 8-K or public announcement, the Company will specifically disclose the amount of Common Stock outstanding immediately after the Closing.  A form of the proposed Form 8-K or public announcement to be employed in connection with the Closing is annexed hereto as **Exhibit D**.

(n)  Further Registration Statements.  Except for a registration statement filed on behalf of the Subscribers pursuant to Section 10 of this Agreement **and the registration statements relating to the proposed initial public offering of the Company's securities in Canada**, or as described on **Schedule 10.1**, the Company will not file any registration statement with the Commission or with state regulatory authorities without the consent of the Subscribers until the expiration of the "**Exclusion Period**", which is defined as the sooner of (i) the Registration Statement shall have been current and available for use in connection with the resale of the Registrable Securities (as defined in Section 10.1(i) for a period of 365 days, or (ii) until all the Shares and Warrant Shares have been resold or transferred by the Subscribers pursuant to the Registration Statement or Rule 144(k) under the 1933 Act, without regard to volume limitations.

(o)  Blackout.  The Company undertakes and covenants that until **December 31, 2006** the Company will not enter into any acquisition, merger, exchange or sale or other transaction that delays the effectiveness of any pending registration statement or causes an already effective registration statement to no longer be effective or current for more than 20 consecutive days or 45 days during any 365 day period, provided that the Company may enter into a definitive agreement with Hubei

12

Silver Mine Co., Ltd. and Cistex Global Investment Inc., relating to the acquisition by the Company of a 60% equity interest in Hubei Silver Mine Co., Ltd. provided the Company is able to timely and fully comply with Form 8-K reporting obligations in connection with such acquisition.

(p)     Non-Public Information.  The Company covenants and agrees that neither it nor any other person acting on its behalf will provide any Subscriber or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Subscriber shall have agreed in writing to receive such information.  The Company understands and confirms that each Subscriber shall be relying on the foregoing representations in effecting transactions in securities of the Company. In any event, the Company will offer to the Subscriber an opportunity to review and comment on the Registration Statement thereto between three and five business days prior to the proposed filing date thereof.

(q)     Offering Restrictions.  **Until 30 days after the expiration of the Exclusion Period,** except for the Excepted Issuances [as defined in Section 11(a)], the Company will not enter into an agreement to nor issue any convertible debt or other securities convertible into common stock or equity of the Company nor modify any of the foregoing which may be outstanding at anytime, nor enter into any equity line of credit or similar agreement, nor issue nor agree to issue any floating or variable priced equity linked instruments nor any of the foregoing or equity with price reset rights, without the prior written consent of the Subscriber, which consent may be withheld for any reason.

(r)     Negative Covenants.  Until the sooner of (i) two years after the Closing Date, or (ii) the date Subscribers are no longer holders of the Shares or Warrant Shares issued and issuable hereunder and when liquidated damages are accruing or are outstanding, without the consent of the Subscribers, which consent will not be unreasonably withheld, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i)     create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "**Lien**") upon any of its property, whether now owned or hereafter acquired, if such Lien is a result of a convertible note or other similar convertible equity instrument that is secured by any lockbox arrangement, except for (i) the Excepted Issuances (as defined in Section 12(a) hereof), (ii) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property, or (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "**Permitted Lien**") and (iii) indebtedness for

borrowed money which is not senior or pari passu in right of payment to the payment of the Notes;

(ii)    amend its certificate of incorporation, bylaws or its charter documents so as to materially adversely affect any rights of the Subscriber; or

(iii)    repay, repurchase or offer to repay, repurchase, redeem, or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities or debt other than (1) dividend or distribution of the securities held by the Company, (2) to the extent permitted or required under the Transaction Documents, and (3) any financing disclosed on **Schedule 8(r)**.

(s)    <u>Lock Up Agreement</u>.   The Company will deliver to the Subscribers on or before the Closing Date and enforce the provisions of the irrevocable Lock Up Agreement ("**Lock Up Agreement**") in the form annexed hereto as **Exhibit E**, with Marc Hazout.

9.    <u>Covenants of the Company and Subscriber Regarding Indemnification.</u>

(a)    The Company agrees to indemnify, hold harmless, reimburse and defend the Subscribers, the Subscribers' officers, directors, agents, affiliates, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any warranty by Company in any of the Transaction Documents; or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any covenant or undertaking to be performed by the Company under any Transaction Documents other than its obligations under Section 10 of this Agreement.

(b)    Each Subscriber agrees to indemnify, hold harmless, reimburse and defend the Company and each of the Company's officers, directors, agents, affiliates, control persons against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Company or any such person which results, arises out of or is based upon (i) any material misrepresentation by such Subscriber in this Agreement or in any Exhibits or Schedules attached hereto, or other agreement delivered pursuant hereto; or (ii) after any applicable notice and/or cure periods, any breach or default in performance by such Subscriber of any covenant or undertaking to be performed by such Subscriber hereunder, or any other agreement entered into by the Company and Subscribers, relating hereto.

(c)    In no event shall the liability of any Subscriber or permitted successor hereunder or under any other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber upon the sale of Registrable Securities (as defined herein), except with respect to such Subscribers fraud or willful negligence.

(d)    The procedures set forth in Section 10.5 shall apply to the indemnifications set forth in Sections 9(a) and 9(b) above.

10.1.    <u>Registration Rights</u>.  The Company hereby grants the following registration rights to holders of the Securities.

(i)    On one occasion, for a period commencing one hundred and twenty-six (126) days after the Closing Date, but not later than two (2) years after the Closing Date ("**Request Date**"), upon a written request therefor from any record holder or holders of more than 50% of the Shares and Warrant Shares actually issued upon exercise of the Warrants, the Company shall prepare and file with the

14

Commission a registration statement under the 1933 Act registering the Shares and Warrant Shares issuable upon exercise of the Warrants (collectively "**Registrable Securities**") which are the subject of such request for unrestricted public resale by the holder thereof. For purposes of Sections 10.1(i) and 10.1(ii), Registrable Securities shall not include Securities (A) which are registered for resale in an effective registration statement, (B) included for registration in a pending registration statement, or (C) which have been issued without further transfer restrictions after a sale or transfer pursuant to an effective registration statement or Rule 144 under the 1933 Act. Upon the receipt of such request, the Company shall promptly give written notice to all other record holders of the Registrable Securities that such registration statement is to be filed and shall include in such registration statement Registrable Securities for which it has received written requests within ten (10) days after the Company gives such written notice. Such other requesting record holders shall be deemed to have exercised their demand registration right under this Section 10.1(i).

        (ii)      If the Company at any time proposes to register any of its securities under the 1933 Act for sale to the public, whether for its own account or for the account of other security holders or both, except with respect to registration statements on Forms S-4, S-8 or another form not available for registering the Registrable Securities for sale to the public, provided the Registrable Securities are not otherwise registered for resale by the Subscribers or Holder pursuant to an effective registration statement, each such time it will give at least fifteen (15) days' prior written notice to the record holder of the Registrable Securities of its intention so to do. Upon the written request of the holder, received by the Company within ten (10) days after the giving of any such notice by the Company, to register any of the Registrable Securities not previously registered, the Company will cause such Registrable Securities as to which registration shall have been so requested to be included with the securities to be covered by the registration statement proposed to be filed by the Company, all to the extent required to permit the sale or other disposition of the Registrable Securities so registered by the holder of such Registrable Securities (the "**Seller**" or "**Sellers**"). In the event that any registration pursuant to this Section 10.1(ii) shall be, in whole or in part, an underwritten public offering of Common Stock of the Company, the number of shares of Registrable Securities to be included in such an underwriting may be reduced by the managing underwriter if and to the extent that the Company and the underwriter shall reasonably be of the opinion that such inclusion would adversely affect the marketing of the securities to be sold by the Company therein; provided, however, that the Company shall notify the Seller in writing of any such reduction. Notwithstanding the foregoing provisions, or Section 10.4 hereof, the Company may withdraw or delay or suffer a delay of any registration statement referred to in this Section 10.1(ii) without thereby incurring any liability to the Seller.

        (iii)      The Company shall file with the Commission a Form SB-2 registration statement (the "**Registration Statement**") (or such other form that it is eligible to use) in order to register the Registrable Securities for resale and distribution under the 1933 Act not later than forty-five (45) days after the Closing Date (the "**Filing Date**"), and use its reasonable efforts to cause the Registration Statement to be declared effective not later than one hundred and twenty-five (125) days after the Closing Date (the "**Effective Date**"). The "**Actual Effective Date**" shall be the date the Registration is actually declared effective. The Registration Statement will cover not less than a number of shares of Common Stock that is equal to the Shares and Warrant Shares issuable pursuant to this Agreement upon exercise of the Warrants (the "**Registrable Securities**"). The Registrable Securities shall be reserved and set aside exclusively for the benefit of each Subscriber and Warrant holder, pro rata, and not issued, employed or reserved for anyone other than each such Subscriber and Warrant holder. The Registration Statement will promptly be amended or one or more additional registration statements will be promptly filed by the Company as necessary to register additional shares of Common Stock to allow the public resale of all Common Stock included in and issuable by virtue of the Registrable Securities. Without the consent of a majority of the Subscribers, no securities of the Company other than the Registrable Securities will be

included in the Registration Statement, except as described on **Schedule 10.1**. The Company will promptly provide to the holders of the Registrable Securities, copies of all filings and Commission letters of comment and notify Subscribers (by telecopier and by e-mail addresses provided by Subscribers) and Grushko & Mittman, P.C. (by telecopier and by email to Counslers@aol.com) on or before the second business day following the day the Company receives notice that (i) the Commission has no comments or no further comments on the Registration Statement, and (ii) the registration statement has been declared effective.

         10.2.   Registration Procedures. If and whenever the Company is required by the provisions of Section 10.1(i) to effect the registration of any Registrable Securities under the 1933 Act, the Company will, as expeditiously as practicable:

         (a)    use its reasonable efforts to prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective until such registration statement has been effective for a period of two (2) years, and comply in all material respects with the provisions of the 1933 Act with respect to the disposition of all of the Registrable Securities covered by such registration statement in accordance with the intended method of disposition for the holder of such registrable securities ("Seller') set forth in such registration statement for such period. If the Registration Statement is withdrawn for any reason, the Company shall file replacement registration statement as expeditiously as practicable;

         (c)    furnish to the Sellers, at the Company's expense, such number of copies of the registration statement and the prospectus included therein (including each preliminary prospectus) as such persons reasonably may request in order to facilitate the public sale or their disposition of the securities covered by such registration statement;

         (d)    use its commercially reasonable efforts to register or qualify the Registrable Securities covered by such registration statement under the securities or "blue sky" laws of New York and such jurisdictions as the Sellers shall request in writing, provided, however, that the Company shall not for any such purpose be required to qualify generally to transact business as a foreign corporation in any jurisdiction where it is not so qualified, subject itself to in any such jurisdiction or to consent to general service of process in any such jurisdiction;

         (e)    if applicable, list the Registrable Securities covered by such registration statement with any securities exchange or market on which the Common Stock of the Company is then listed;

         (f)    notify the Subscribers not later than the next day after the Company becomes aware that a prospectus relating thereto is required to be delivered under the 1933 Act, of the happening of any event of which the Company has knowledge as a result of which the prospectus contained in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or which becomes subject to a Commission, state or other governmental order suspending the effectiveness of the registration statement covering any of the Shares or Warrant Shares;

         (g)    provided same would not be in violation of the provision of Regulation FD under the 1934 Act, make available for inspection by the Sellers, and any attorney, accountant or other agent retained by the Seller or underwriter, all publicly available, non-confidential financial and other

16

records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors and employees to supply all publicly available, non-confidential information reasonably requested by the seller, attorney, accountant or agent in connection with such registration statement; and

(h)     provide to the Sellers copies of the Registration Statement and amendments thereto three business days prior to the filing thereof with the Commission10.3.
Provision of Documents. In connection with each registration described in this Section 10, each Seller or holder of Registrable Securities will furnish to the Company in writing such information and representation letters with respect to itself and the proposed distribution by it as the Company shall reasonably deem necessary in order to assure compliance with federal and applicable state securities laws.

10.4.    Non-Registration Events. The Company and the Subscribers agree that the Sellers will suffer damages if the Registration Statement is not filed by the Filing Date and not declared effective by the Commission by the Effective Date, and any registration statement required under Section 10.1(i) or 10.1(ii) is not filed within 60 days after written request and declared effective by the Commission within 120 days after such request, and maintained in the manner and within the time periods contemplated by Section 10 hereof, if (A) the Company does not use its best efforts in causing the Registration Statement to become effective as early as reasonably possible with all material needed within a reasonable time frame, (B) the Registration Statement is not declared effective within five (5) business days after receipt by the Company or its attorneys of a written or oral communication from the Commission that the Registration Statement will not be reviewed or that the Commission has no further comments, (C) if the registration statement described in Sections 10.1(i) or 10.1(ii) is not filed within 60 days after such written request, or is not declared effective within 125 days after such written request, or (D) any registration statement described in Sections 10.1(i), 10.1(ii) or 10.1(iv) is filed and declared effective but shall thereafter cease to be effective for a period of time which shall exceed 45 days in the aggregate per year (defined as a period of 365 days commencing on the date the Registration Statement is declared effective) or more than 20 consecutive days (each such event referred to in clauses A through E of this Section 10.4 is referred to herein as a **"Non-Registration Event"**), then the Company shall pay to the holders of Registrable Securities included in the Registration Statement, as Liquidated Damages, an aggregate amount equal to one percent (1%) of the Purchase Price of the Shares owned of record by such holder which are subject to such Non-Registration Event for each thirty (30) days of the initial aggregate sixty (60) days of the pendency of Non-Registration Events and one and one-half percent (1.5%) thereafter for each thirty (30) days of the pendency of Non-Registration Events. A prorated portion shall be payable for any period of less than 30 days. The Company must pay the Liquidated Damages in cash. The Liquidated Damages must be paid within ten (10) days after the end of each thirty (30) day period or shorter part thereof for which Liquidated Damages are payable. In the event a Registration Statement is filed by the Filing Date but is withdrawn prior to being declared effective by the Commission, then such Registration Statement will be deemed to have not been filed. All oral or written comments received from the Commission relating to the Registration Statement must be responded to within twelve (12) business days after receipt of comments from the Commission. Notwithstanding the foregoing, the Company shall not be liable to the Subscriber under this Section 10.4 for any events or delays occurring as a consequence of the acts or omissions of the Subscribers contrary to the obligations undertaken by Subscribers in this Agreement. Liquidated Damages will not accrue nor be payable pursuant to this Section 10.4 nor will a Non-Registration Event be deemed to have occurred for times during which Registrable Securities are transferable by the holder of Registrable Securities pursuant to Rule 144(k) under the 1933 Act.

10.5.    Expenses. All expenses incurred by the Company in complying with Section 11, including, without limitation, all registration and filing fees, printing expenses (if required), fees and disbursements of counsel and independent public accountants for the Company, fees and expenses (including reasonable counsel fees) incurred in connection with complying with state securities or "blue

sky" laws, fees of the National Association of Securities Dealers, Inc., transfer taxes, and fees of transfer agents and registrars, are called "**Registration Expenses**." All underwriting discounts and selling commissions applicable to the sale of Registrable Securities are called "**Selling Expenses**." The Company will pay all Registration Expenses in connection with the registration statement under Section 11. Selling Expenses in connection with each registration statement under Section 11 shall be borne by the Seller and may be apportioned among the Sellers in proportion to the number of shares sold by the Seller relative to the number of shares sold under such registration statement or as all Sellers thereunder may agree.

      10.6.   Indemnification and Contribution.

      (a)      In the event of a registration of any Registrable Securities under the 1933 Act pursuant to Section 10, the Company will, to the extent permitted by law, indemnify and hold harmless the Seller, each officer of the Seller, each director of the Seller, each underwriter of such Registrable Securities thereunder and each other person, if any, who controls such Seller or underwriter within the meaning of the 1933 Act, against any losses, claims, damages or liabilities, joint or several, to which the Seller, or such underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such Registrable Securities was registered under the 1933 Act pursuant to Section 10, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made, and will, subject to the provisions of Section 10.6(c), reimburse the Seller, each such underwriter and each such controlling person for any reasonable legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable to the Seller to the extent that any such damages arise out of or are based upon an untrue statement or omission made in any preliminary prospectus if (i) the Seller failed to send or deliver a copy of the final prospectus delivered by the Company to the Seller with or prior to the delivery of written confirmation of the sale by the Seller to the person asserting the claim from which such damages arise, (ii) the final prospectus would have corrected such untrue statement or alleged untrue statement or such omission or alleged omission, (iii) to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission so made in conformity with information furnished by any such Seller, or any such controlling person, in writing specifically for use in such registration statement or prospectus, (iv) to the extent that any such loss, claim, damage or liability results from the settlement of any claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld, delayed or conditioned.

      (b)      In the event of a registration of any of the Registrable Securities under the 1933 Act pursuant to Section 10, each of the Sellers severally but not jointly will, to the extent permitted by law, indemnify and hold harmless the Company, and each person, if any, who controls the Company within the meaning of the 1933 Act, each officer of the Company who signs the registration statement, each director of the Company, each underwriter and each person who controls any underwriter within the meaning of the 1933 Act, against all losses, claims, damages or liabilities, joint or several, to which the Company or such officer, director, underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the registration statement under which such Registrable Securities were registered under the 1933 Act pursuant to Section 10, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to

state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and each such officer, director, underwriter and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action, provided, however, that the Seller will be liable hereunder in any such case if and only to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with information pertaining to such Seller, as such, furnished in writing to the Company by such Seller specifically for use in such registration statement or prospectus, and provided, further, however, that the liability of the Seller hereunder shall be limited to the net proceeds actually received by the Seller from the sale of Registrable Securities covered by such registration statement.  Seller shall not be liable under this Section 10.6(b) for any such loss, claim, damage or liability that results from the settlement of any claim if such settlement is effected without the prior written consent of the Seller, which consent shall not be unreasonably withheld, delayed or conditioned.

(c)     Promptly after receipt by an indemnified party hereunder of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party hereunder, notify the indemnifying party in writing thereof, but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to such indemnified party other than under this Section 10.6(c) and shall only relieve it from any liability which it may have to such indemnified party under this Section 10.6(c), except and only if and to the extent the indemnifying party is prejudiced by such omission. In case any such action shall be brought against an indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate in and, to the extent it shall wish, to assume and undertake the defense thereof with counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume and undertake the defense thereof, the indemnifying party shall not be liable to such indemnified party under this Section 10.6(c) for any legal expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation and of liaison with counsel so selected, provided, however, that, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be reasonable defenses available to it which are different from or additional to those available to the indemnifying party or if the interests of the indemnified party reasonably may be deemed to conflict with the interests of the indemnifying party, the indemnified parties, as a group, shall have the right to select one separate counsel and to assume such legal defenses and otherwise to participate in the defense of such action, with the reasonable expenses and fees of such separate counsel and other expenses related to such participation to be reimbursed by the indemnifying party as incurred.

(d)     In order to provide for just and equitable contribution in the event of joint liability under the 1933 Act in any case in which either (i) a Seller, or any controlling person of a Seller, makes a claim for indemnification pursuant to this Section 10.6 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 10.6 provides for indemnification in such case, or (ii) contribution under the 1933 Act may be required on the part of the Seller or controlling person of the Seller in circumstances for which indemnification is not provided under this Section 10.6; then, and in each such case, the Company and the Seller will contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that the Seller is responsible only for the portion represented by the percentage that the public offering price of its securities offered by the registration statement bears to the public offering price of all securities offered by such registration statement, provided, however, that, in any such case, (y) the Seller will not be required to

contribute any amount in excess of the public offering price of all such securities sold by it pursuant to such registration statement; and (z) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

10.7.    Delivery of Unlegended Shares.

(a)    Within five (5) business days (such fifth business day being the "**Unlegended Shares Delivery Date**") after the business day on which the Company has received (i) a notice that Shares or Warrant Shares or any other Common Stock held by a Subscriber have been sold pursuant to the Registration Statement or Rule 144 under the 1933 Act, (ii) a representation that the prospectus delivery requirements, or the requirements of Rule 144, as applicable and if required, have been satisfied, and (iii) the original share certificates representing the shares of Common Stock that have been sold, and (iv) in the case of sales under Rule 144, customary representation letters of the Subscriber and/or Subscriber's broker regarding compliance with the requirements of Rule 144, the Company at its expense, (y) shall deliver, and shall cause legal counsel selected by the Company to deliver to its transfer agent (with copies to Subscriber) an appropriate instruction and opinion of such counsel, directing the delivery of shares of Common Stock without any legends including the legend set forth in Section 4(e) above, reissuable pursuant to any effective and current Registration Statement described in Section 11 of this Agreement or pursuant to Rule 144 under the 1933 Act (the "**Unlegended Shares**"); and (z) cause the transmission of the certificates representing the Unlegended Shares together with a legended certificate representing the balance of the submitted Shares certificate, if any, to the Subscriber at the address specified in the notice of sale, via express courier, by electronic transfer or otherwise on or before the Unlegended Shares Delivery Date.

(b)    In lieu of delivering physical certificates representing the Unlegended Shares, if the Company's transfer agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer program, upon request of a Subscriber, so long as the certificates therefor do not bear a legend and the Subscriber is not obligated to return such certificate for the placement of a legend thereon, the Company shall cause its transfer agent to electronically transmit the Unlegended Shares by crediting the account of Subscriber's prime broker with DTC through its Deposit Withdrawal Agent Commission system.  Such delivery must be made on or before the Unlegended Shares Delivery Date.

(c)    The Company understands that a delay in the delivery of the Unlegended Shares pursuant to Section 10 hereof later than five (5) business days after the Unlegended Shares Delivery Date could result in economic loss to a Subscriber.  As compensation to a Subscriber for such loss, the Company agrees to pay late payment fees (as liquidated damages and not as a penalty) to the Subscriber for late delivery of Unlegended Shares in the amount of $100 per business day after the Delivery Date for each $10,000 of purchase price of the Unlegended Shares subject to the delivery default.  If during any 360 day period, the Company fails to deliver Unlegended Shares as required by this Section 10.7 for an aggregate of thirty (30) days, then each Subscriber or assignee holding Securities subject to such default may, at its option, require the Company to redeem all or any portion of the Shares and Warrant Shares subject to such default at a price per share equal to 120% of the Purchase Price of such Common Stock and Warrant Shares ("**Unlegended Redemption Amount**").  The amount of the aforedescribed liquidated damages that have accrued or have been paid for the twenty-day period prior to the receipt by the Subscriber of the Unlegended Redemption Amount shall be credited against the Unlegended Redemption Amount.  The Company shall pay any payments incurred under this Section in immediately available funds upon demand.

(d)    In addition to any other rights available to a Subscriber, if the Company

fails to deliver to a Subscriber Unlegended Shares as required pursuant to this Agreement, within five (5) business days after the Unlegended Shares Delivery Date and the Subscriber or a broker on the Subscriber's behalf, purchases (in an open market transaction or otherwise) shares of common stock to deliver in satisfaction of a sale by such Subscriber of the shares of Common Stock which the Subscriber was entitled to receive from the Company (a **"Buy-In"**), then the Company shall pay in cash to the Subscriber (in addition to any remedies available to or elected by the Subscriber) the amount by which (A) the Subscriber's total purchase price (including brokerage commissions, if any) for the shares of common stock so purchased exceeds (B) the aggregate purchase price of the shares of Common Stock delivered to the Company for reissuance as Unlegended Shares- together with interest thereon at a rate of 15% per annum, accruing until such amount and any accrued interest thereon is paid in full (which amount shall be paid as liquidated damages and not as a penalty).  For example, if a Subscriber purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to $10,000 of purchase price of shares of Common Stock delivered to the Company for reissuance as Unlegended Shares, the Company shall be required to pay the Subscriber $1,000, plus interest. The Subscriber shall provide the Company written notice indicating the amounts payable to the Subscriber in respect of the Buy-In

(e)    In the event a Subscriber shall request delivery of Unlegended Shares as described in Section 10.7 and the Company is required to deliver such Unlegended Shares pursuant to Section 10.7, the Company may not refuse to deliver Unlegended Shares based on any claim that such Subscriber or any one associated or affiliated with such Subscriber has been engaged in any violation of law, or for any other reason, unless, an injunction or temporary restraining order from a court, on notice, restraining and or enjoining delivery of such Unlegended Shares or exercise of all or part of said Warrant shall have been sought and obtained by the Company or at the Company's request or with the Company's assistance, and the Company has posted a surety bond for the benefit of such Subscriber in the amount of 120% of the amount of the aggregate purchase price of the Common Stock and Warrant Shares which are subject to the injunction or temporary restraining order, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Subscriber to the extent Subscriber obtains judgment in Subscriber's favor.

11.    (a)    <u>Right of First Refusal</u>.  Until 365 days after the Actual Effective Date, the Subscribers shall be given not less than five (5) business days prior written notice of any proposed sale by the Company of its Common Stock, other equity securities, obligations convertible or exercisable for equity securities or debt obligations, except in connection with (i) full or partial consideration in connection with a strategic merger, acquisition, consolidation or purchase of substantially all of the securities or assets of corporation or other entity which holders of such securities or debt are not at any time granted registration rights, (ii) the Company's issuance of securities in connection with strategic license agreements and other partnering arrangements so long as such issuances are not for the purpose of raising capital and which holders of such securities or debt are not at any time granted registration rights, and (iii) the Company's issuance of Common Stock or the issuances or grants of options to purchase Common Stock pursuant to stock option plans and employee stock purchase plans described on **Schedule 5(d)** hereto at prices equal to or higher than the closing price of the Common Stock on the issue date of any of the foregoing (collectively the foregoing are **"Excepted Issuances"**).  The Subscribers who exercise their rights pursuant to this Section 11(a) shall have the right during the five (5) business days following receipt of the notice to purchase such offered Common Stock, debt or other securities in accordance with the terms and conditions set forth in the notice of sale in the same proportion to each other as their purchase of Shares in the Offering.  In the event such terms and conditions are modified during the notice period, the Subscribers shall be given prompt notice of such modification and shall have the right during the five (5) business days following the notice of modification, whichever is longer, to exercise such right.

21

(b)      Favored Nations Provision.  Other than the Excepted Issuances, if at any time Shares or Warrant Shares are held by a Subscriber, the Company shall offer, issue or agree to issue any Common Stock or securities convertible into or exercisable for shares of Common Stock (or modify any of the foregoing which may be outstanding) to any person or entity ("**Third Party Purchaser**") at a price per share of Common Stock or exercise price per share of Common Stock which shall be less than the per share Purchase Price of the Shares, or less than the exercise price per Warrant Share, respectively, of the Subscribers holding Shares, Warrants, or Warrant Shares, then the Company shall issue, for each such occasion, additional shares of Common Stock to each Subscriber so that the average per share purchase price of the shares of Common Stock issued to the Subscriber (of only the Shares or Warrant Shares still owned by the Subscriber) is equal to such other lower price per share and the Warrant Exercise Price shall automatically be reduced to such other lower price per share.  The average Purchase Price of the Shares and average exercise price in relation to the Warrant Shares shall be calculated separately for the Shares and Warrant Shares.  The delivery to the Subscriber of the additional shares of Common Stock shall be not later than 15 business days from the closing date of the transaction giving rise to the requirement to issue additional shares of Common Stock.  If the Third Party Purchaser is offered registration rights with respect to the shares purchased by such Third Party Purchaser, the  Subscribers are granted, at their election, such other registration rights or the registration rights described in Section 10 hereof  in relation to such additional shares of Common Stock except that the Filing Date and Effective Date vis-à-vis such additional common shares shall be, respectively, the forty-fifth (45th) and ninetieth (90th) date after the closing date giving rise to the requirement to issue the additional shares of Common Stock.  For purposes of the issuance and adjustment described in this paragraph, the issuance of any security of the Company carrying the right to convert such security into shares of Common Stock or of any warrant, right or option to purchase Common Stock shall result in the issuance of the additional shares of Common Stock upon the actual issuance of such convertible security, warrant, right or option and again at any time upon any subsequent issuances of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the Conversion Price or Warrant exercise price in effect upon such issuance.  The Subscriber is also given the right to elect to substitute any term or terms of any other offering in connection with which the Subscriber has rights as described in Section 11(a), for any term or terms of the Offering in connection with Securities owned by Subscriber as of the date the notice described in Section 11(a) is required to be given to Subscriber..  The rights of the Subscriber set forth in this Section 11 are in addition to any other rights the Subscriber has pursuant to this Agreement, any Transaction Document, and any other agreement referred to or entered into in connection herewith.

(c)      Maximum Exercise of Rights.  In the event the exercise of the rights described in Sections 11(a) and 11(b) would result in the issuance of an amount of Common Stock of the Company that would exceed the maximum amount that may be issued to a Subscriber calculated in the manner described in Section 10 of the Warrant, then the issuance of such additional shares of Common Stock of the Company to such Subscriber will be deferred in whole or in part until such time as such Subscriber is able to beneficially own such Common Stock without exceeding the maximum amount set forth calculated in the manner described in Section 10 of the Warrant.  The determination of when such Common Stock may be issued shall be made by each Subscriber as to only such Subscriber.

(d)    From the date of this Agreement and until the earlier of (i) two (2) years after the Closing Date or (ii) until all the Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement, in the event the Company amends its certificate of incorporation to effect a reverse stock split of the Company's Common Stock, then the Company shall issue for each such occasion, additional shares of Common Stock to each Subscriber so that the average price of the Shares still held by the Subscriber shall be equal to 85% of the average of the closing price of the Common stock for the 20 trading days following the date of such reverse split.  This section shall apply only if the application shall result in the issuance of Common Stock to the Subscribers.

12.    <u>Miscellaneous</u>.

(a)    <u>Notices</u>.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be: (i) if to the Company, to: Silver Dragon Resources, Inc., 1121 Steeles Avenue West, Suite 803, Toronto, Ontario M2R 3W7, Attn: Marc M. Hazout, President and CEO, telecopier: (416) 661-9510, with a copy by telecopier only to: Garfin Zeidenberg LLP, Yonge-Norton Center, 5255 Yonge Street, Suite 800, Toronto, Ontario, Canada M2N 6P4, Attn: Stephen M. Cohen, B.A., LL.B., telecopier number: (416) 512-9992, and (ii) if to the Subscribers, to: the one or more addresses and telecopier numbers indicated on the signature pages hereto, with an additional copy by telecopier only to: Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, telecopier number: (212) 697-3575, and (iii) if to the Broker, to: the address and telecopier number set forth on **Schedule 7** hereto.

(b)    <u>Closing</u>.  The consummation of the transactions contemplated herein shall take place at the offices of Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, upon the satisfaction of all conditions to Closing set forth in this Agreement.  The "**Closing Date**" shall be the date that subscriber funds representing the net amount due to the Company from the Purchase Price of the Offering are received by the Company, provided such funds are received by the Company not later than the first business day after transmission of such funds, otherwise the Closing Date shall be the date such funds are actually received by the Company.

(c)    <u>Entire Agreement; Assignment</u>.  This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.  Neither the Company nor the Subscribers have relied on any representations not contained or referred to in this Agreement and the documents delivered herewith.  No right or obligation of either party shall be assigned by that party without prior notice to and the written consent of the other party.

(d)    <u>Counterparts/Execution</u>.  This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which,

23

when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument. This Agreement may be executed by facsimile signature and delivered by facsimile transmission.

(e)     <u>Law Governing this Agreement</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state of New York. **The parties and the individuals executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the jurisdiction of such courts and waive trial by jury.** The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

(f)     <u>Specific Enforcement, Consent to Jurisdiction</u>. The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity. Subject to Section 12(e) hereof, each of the Company, Subscriber and any signator hereto in his personal capacity hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in New York of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(g)     <u>Independent Nature of Subscribers</u>. The Company acknowledges that the obligations of each Subscriber under the Transaction Documents are several and not joint with the obligations of any other Subscriber, and no Subscriber shall be responsible in any way for the performance of the obligations of any other Subscriber under the Transaction Documents. The Company acknowledges that the decision of each Subscriber to purchase Securities has been made by such Subscriber independently of any other Subscriber and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company which may have been made or given by any other Subscriber or by any agent or employee of any other Subscriber, and no Subscriber or any of its agents or employees shall have any liability to any Subscriber (or any other person) relating to or arising from any such information, materials, statements or opinions. The Company acknowledges that nothing contained in any Transaction Document, and no action taken by any Subscriber pursuant hereto or thereto (including, but not limited to, the (i) inclusion of a Subscriber in the SB-2 Registration Statement and (ii) review by, and consent to, such Registration Statement by a Subscriber) shall be deemed to constitute the Subscribers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Subscribers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. The Company acknowledges that each Subscriber shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of the Transaction Documents, and it shall not be necessary for any other Subscriber to

be joined as an additional party in any proceeding for such purpose.  The Company acknowledges that it has elected to provide all Subscribers with the same terms and Transaction Documents for the convenience of the Company and not because Company was required or requested to do so by the Subscribers.  The Company acknowledges that such procedure with respect to the Transaction Documents in no way creates a presumption that the Subscribers are in any way acting in concert or as a group with respect to the Transaction Documents or the transactions contemplated thereby.

(h)    Consent.  As used in the Agreement, "consent of the Subscribers" or similar language means the consent of holders of not less than 70% of the total of the Shares and Warrant Shares owned by Subscribers on the date consent is requested.

(i)    Equitable Adjustment.  The Securities and the purchase prices of Securities shall be equitably adjusted to offset the effect of stock splits, stock dividends, and distributions of property or equity interests of the Company to its shareholders.

(j)    Currency.  All references to money, dollars and currency shall mean the currency of the United States.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

2/7/2008, 6:23 PM

## SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

SILVER DRAGON RESOURCES, INC.
a Delaware corporation

By:_____
      Name: Marc M. Hazout
      Title: President and CEO

Dated: as of November 2, 2006

| SUBSCRIBER | PURCHASE PRICE | SHARES | CLASS A WARRANTS | CLASS B WARRANTS | CLASS C WARRANTS |
|---|---|---|---|---|---|
| ALPHA CAPITAL ANSTALT<br>Pradafant 7<br>9490 Furstentums<br>Vaduz, Lichtenstein<br>Fax: 011-42-32323196<br><br><br>_____<br>(Signature)<br>By:<br>Title: | $500,000.00 | 500,000 | 250,000 | 250,000 | 1,000,000 |

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Forms of Class A and Class B and Class C Warrants |
| Exhibit B | Escrow Agreement |
| Exhibit C | Form of Legal Opinion |
| Exhibit D | Form 8-K or Public Announcement |
| Exhibit E | Form of Lock Up Agreement |
| Schedule 5(a) | Subsidiaries |
| Schedule 5(d) | Additional Issuances / Capitalization |
| Schedule 5(q) | Undisclosed Liabilities |
| Schedule 5(v) | Transfer Agent |
| Schedule 7 | Broker |
| Schedule 8(e) | Use of Proceeds |
| Schedule 8(r) | Negative Covenants |
| Schedule 10.1 | Other Securities to be Registered |

**EXHIBIT E**

**LOCK UP AGREEMENT**

This AGREEMENT (the "Agreement") is made as of the 2nd day of November, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Silver Dragon Resources, Inc., a Delaware corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

1.    Background.

    a.    Holder is the actual and/or beneficial owner of the amount of shares of the Common Stock, $0.0001 par value, of the Company ("Common Stock") and rights to purchase Common Stock designated on the signature page hereto.

    b.    Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's Common Stock and Warrants (the "Subscribers"), for the sale of Common Stock and Warrants to the Subscribers for an aggregate of up to $500,000 (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to obtain an agreement from the Holder to refrain from selling any securities of the Company at an effective price per share of Common Stock of less than $1.50 ("Minimum Price") from the date of the Subscription Agreement until six months after the Actual Effective Date (the "Restriction Period").

2.    Share Restriction.

    a.    Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof or acquires hereafter during the Restriction Period at less than the Minimum Price, except in connection with an offer made to all shareholders of the Company in connection with any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

    b.    Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

    c.    Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

3.    Miscellaneous.

    a.    At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the

intent and purposes of this Agreement.

b.    This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply.  Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

c.    This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

d.    This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

e.    This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

f.    The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement nor to amend or terminate this Agreement without the consent of the Subscribers.

g.    The Subscribers are third party beneficiaries of this Agreement, with right of enforcement.

h.    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Subscription Agreement.

i.    The Minimum Price shall be adjusted to equitably offset stock splits and similar events.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

HOLDER:

_____
(Signature of Holder)

_____
(Print Name of Holder)

_____
Number of Shares of Common Stock Owned

_____
Number of Shares of Common Stock
Beneficially Owned

_____
Number of shares of Common Stock issuable
upon exercise of Stock Options and Warrants
Beneficially Owned

COMPANY:
**SILVER DRAGON RESOURCES, INC.**

By:_____

## SCHEDULE 7

BROKER:    DRAGONFLY CAPITAL PARTNERS, LLC.
The Packard Building
1310 S. Tryon Street, Suite 109
Charlotte, NC 28203
Fax: (704) 342-9750

Cash Fee.   The Company agrees that it will pay the Broker, on the Closing Date a fee of seven percent (7%) of the Purchase Price ("**Broker's Cash Fee**").  The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the Offering except the Broker.

Broker's Warrants.  On the Closing Date, the Company will issue to the Broker, seven (7) Class A Warrants for each one hundred (100) Shares issued to the Subscribers and seven (7) Class B Warrants for each one hundred (100) Shares issued to the Subscribers on the Closing (collectively "**Broker's Warrants**") similar to and carrying the same rights as the Class A and Class B Warrants issuable to the Subscribers.

All the representations, covenants, warranties, undertakings, remedies, liquidated damages, indemnification, and other rights including but not limited to reservation requirements and registration rights made or granted to or for the benefit of the Subscribers are hereby also made and granted to and for the benefit of the Broker in respect of the Broker's Warrants.

## **SCHEDULE 5a**

**Company's Subsidiaries**

Silver Dragon Mining de Mexico S.A. de C.V.

## **SCHEDULE 5d**

**Additional Issuances**

1.    3,000,000 warrants exerciseable at $2.00 per share issued in conjunction with private placement of restricted stock, previously raised.

2.    3,000,000 warrants exerciseable at $5.00 per share issued in conjunction with private placement of restricted stock previously raised.

3.    200,000 warrants exerciseable at $0.80 per share issued to consultants.  Restricted.

4.    50,000 restricted common shares pursuant to consulting agreement.  Shares owed but not yet issued.

5.    From $12- $18 Million in common stock plus warrants as per engagement letter with Union Securities

6.    Any additional issuances of restricted common stock

**Capitalization**

57,010,533 (not including the 500,000 shares to be issued pursuant to this Subscription Agreement)

**SCHEDULE 5q**

**UNDISCLOSED LIABILITIES**

None.

**SCHEDULE 5v**

**Transfer Agent**

Signature Stock Transfer Inc.
2301 Ohio Drive
Suite 100
Plano, Texas, 75093
Tel: (972) 612-4120

Attention: Jason Bogutski

## SCHEDULE 8e

**Use of Proceeds**

The proceeds will be used to finance the Company's projects in Mexico and China, as well as for general corporate purposes.

<u>**SCHEDULE 8r**</u>

**Negative Covenants**

None.

## SCHEDULE 10.1

**Other Securities to be registered**

250,000 Units to Heller Capital Investments LLC at $1.00 per Unit. Each Unit consists of one share of Common Stock and 2 one half of one (1/2) Common Stock purchase warrants. The first half warrant is exercisable at $2.00 per share and the second half warrant is exercisable at $5.00 per share.

Subj:       **alpha capital v silver dragon resources**
Date:       1/2/2008
To:         smc@gzlegal.com
BCC:        ABrand@LHFIN.com

as a courtesy, I am forwarding to you copies of the documents (without exhibits) which were served upon Silver Dragon Resources on December 28. The preliminary injunction motion is returnable on January 9 before Judge McMahon

**Asher Brand**

| | |
|---|---|
| **From:** | Marc Hazout [hazout@rogers.com] |
| **Sent:** | Tuesday, January 08, 2008 3:32 PM |
| **To:** | Asher Brand |
| **Cc:** | smc@gzlegal.com; 'Colin Sutherland' |
| **Subject:** | Re: Alpha -LH Financial Proposal |

Asher,

As per our phone conversation we propose to offer 1,000,000 warrants at $.65 with the investor exercising half those warrants (500,000) by this Friday.
Also waiving the penalty amount outstanding ($37K).
Please present to investor and notify your counsel that we are in settlement negotiations .
Kindly respond before 5:00PM EST Today.

Thanking you in advance.


- - - - -



SILVER DRAGON®

Marc M. Hazout
President and CEO

Silver Dragon Resources Inc.

5160 Yonge Street, Suite 803
Toronto, Ontario, Canada, M2N 6L9

Email:
mhazout@silverdragonresources.com
Tel:    416.223.8500
Fax:    416.223.8507
Tol:    866.512.SDRG (7374)

NASDAQ:  SDRG.OB

Web:    www.silverdragonresources.com

1

United States District Court
Southern District of New York
--------------------------------------------------------x

Alpha Capital Anstalt,

                         Plaintiff,

         vs.

Silver Dragon Resources, Inc.,

                         Defendant.

--------------------------------------------------------x


<u>Affirmation In Support of Motion for Preliminary Injunction</u>

State of  Liechtenstein)
                                  :
City of Balzers)


        Konrad Ackermann hereby affirms under penalty of perjury under the laws of the United

States of America:


        I am a director of plaintiff Alpha Capital Anstalt ("Alpha Capital"). I submit this

affirmation in support of Alpha Capital's motion for a preliminary injunction:


        i) directing Defendant Silver Dragon Resources, Inc. ("SDRG") to deliver immediately

              333,333 shares of its common stock to Alpha Capital; and

        ii) declaring that the exercise price of the SDRG Class A and Class B Warrants purchased

              by Alpha Capital has been reduced to $0.60 per share.

SDRG, as hereafter set forth, has undisputedly failed in its obligation to deliver such shares of common stock to Alpha Capital and to acknowledge such reduction in the exercise price of the Warrants.

SDRG further agreed that Alpha Capital would suffer irreparable harm and would be entitled to injunctive relief in the event it failed to deliver the stock and reduce the exercise price of the Warrants. Alpha Capital will in fact suffer such irreparable harm unless this Court grants the requested injunctive relief. I have personal knowledge of the matters set forth herein.

Alpha Capital, is a Liechtenstein corporation with its principal place of business in Vaduz, Liechtenstein. Upon information and belief, SDRG is a Delaware corporation with its principal place of business in Toronto, Ontario, Canada. In the Subscription Agreement annexed hereto as Exhibit A the parties agreed, in section 12(e) thereof, to the exclusive jurisdiction of the federal and state courts in New York in which to bring any lawsuits and that New York law governs.

factual background

On or about November 8, 2006, Alpha Capital purchased from SDRG 500,000 units of its securities, each unit consisting of one share of common stock, and Class A, B and C Warrants (the "Warrants") to purchase shares of SDRG stock. Alpha Capital paid $500,000 for such units. For its investment, Alpha Capital received in total 500,000 shares of common stock, 250,000

2

Class A Warrants, 250,000 Class B Warrants and one million Class C Warrants. The purchase

was made upon the terms and conditions set forth in the Subscription Agreement, and the terms

of the Warrants annexed as an exhibit thereto. Among other terms, the Class A Warrants

contained an exercise price of $2.00 per share, the Class B Warrants contained an exercise price

of $5.00 per share and the Class C Warrants contained an exercise price of $1.00 per share.

Alpha Capital could exercise the Class A and B Warrants for five years after closing. Alpha

Capital could exercise the Class C Warrants for one year after closing. The Class C Warrants

have expired.[1] Because the Warrants had no value on the date of their issuance, all of the

$500,000 purchase price was attributable to the common stock at $1 per share.


In order to induce Alpha Capital to make the $500,000 investment, SDRG agreed to a

"Favored Nations Provision." Pursuant to that provision, if SDRG offered, issued, or agreed to

issue any common stock, or securities convertible or exercisable into common stock, at a price

per share of common stock, or at an exercise price per share of common stock, which was less

than the price per share of common stock or the exercise price of the Warrants held by Alpha

Capital, then SDRG was obligated, within fifteen business days of the event giving rise to such

obligation: i) to issue additional shares of stock to Alpha Capital such that Alpha Capital's

average price per share became equal to such other lower price per share; and ii) to adjust the

---

[1]Although the Class C Warrants expired on November 8, 2007, the event which required
SDRG to adjust downward the exercise price of all the Warrants occurred on November 2, 2007,
several days before those warrants expired. Alpha Capital has asserted in the Complaint a claim
for damages resulting from SDRG's failure timely to adjust downward the exercise price of the
Class C Warrants. Because, however, those warrants have already expired, Alpha Capital seeks
no injunctive relief regarding those warrants in this motion.

exercise price of the Warrants to such lower price per share. Thus ¶11(b) of the Subscription

Agreement provides as follows:

> (b)    <u>Favored Nations Provision</u>.    Other than the Excepted Issu-
> ances, if at any time Shares or Warrant Shares are held by a Sub-
> scriber, the Company shall offer, issue or agree to issue any Com-
> mon Stock or securities convertible into or exercisable for shares
> of Common Stock (or modify any of the foregoing which may be
> outstanding) to any person or entity ("Third Party Purchaser") at a
> price per share of Common Stock or exercise price per share of
> Common Stock which shall be less than the per share Purchase
> Price of the Shares, or less than the exercise price per Warrant
> Share, respectively, of the Subscribers holding Shares, Warrants, or
> Warrant Shares, then the Company shall issue, for each such
> occasion, additional shares of Common Stock to each Subscriber
> so that the average per share purchase price of the shares of the
> Common Stock issued to the Subscriber (of only the Shares or
> Warrant Shares still owned by the Subscriber) is equal to such
> other lower price per share and the Warrant Exercise Price shall
> automatically be reduced to such other lower price per share. The
> average Purchase Price of the Shares and average exercise price in
> relation to the Warrant Shares shall be calculated separately for the
> Shares and the Warrant Shares. The delivery to the Subscriber of
> the additional shares of Common Stock shall be not later than 15
> business days from the closing date of the transaction giving rise to
> the requirements to issue additional shares of Common Stock.

As reported in its form 10QSB filed by SDRG on November 14, 2007, SDRG on November 2,

2007 issued warrants to purchase its common stock at $0.60 per share. That form states that

"On November 2, 2007, the Company issued 500,000 warrants to a director, exercisable at a

price of $0.60 per share and expiring on November 2, 2012 for a fair value of $250,000." (See

Exhibit B). That warrant clearly constituted a security "exercisable into shares of common

stock" as provided in the Favored Nations Provision of the Subscription Agreement. That

warrant issuance, therefore, required SDRG to issue 333,333 shares to Alpha Capital so that the average price of the 500,000 shares which Alpha Capital then possessed would thereby be reduced to $0.60 per share.[2] Additionally, SDRG was required to reduce the warrant exercise prices on the Class A and Class B Warrants held by Alpha Capital to $0.60.

Alpha Capital demanded that SDRG issue such additional shares and reduce the warrant exercise price accordingly (see Exhibit C). SDRG responded by claiming that the issuance of the warrants on November 2, 2007 was an "Excepted Issuance" under the terms of ¶11(a) of the Subscription Agreement and, therefore, did not trigger the Favored Nations Provision (see Exhibit D). Alpha Capital thereafter informed SDRG that all of the Excepted Issuances were listed on Schedule 5(d) to the Subscription Agreement and the warrant issuance on November 2, 2007 was not one of the Excepted Issuances listed on Schedule 5(d) (see Exhibit 5(d) to Exhibit A annexed hereto and Exhibit C-1).[3] Alpha Capital, therefore,

---

[2] On November 2, 2007, the date when SDRG issued the warrants and thereby triggered the Favored Nations Provision, Alpha Capital held 500,000 shares of SDRG common stock. Shortly thereafter on November 8, 2007, Alpha Capital sold 9,400 shares and currently holds 490,600 shares of SDRG common stock. Alpha Capital still holds all of the Warrants.

[3] The only conceivably relevant "Excepted Issuance" is the provision of ¶11(a)(iii) which excepts "the Company's issuance of Common Stock or the issuances or grants of options to purchase Common Stock pursuant to stock option plans and employee stock purchase plans described on Schedule 5(d) hereto at prices equal to or higher than the closing price of the Common Stock on the issue date of any of the foregoing." Schedule 5(d) lists no such stock option plans. According to SDRG's public filings there were no such plans in 2005 or 2006. See Exhibit E, an excerpt from SDRG's form 10KSB/A filed on July 18, 2007. Further, only the issuance of certain common stock or the issuance of options pursuant to stock option plans were included in the definition of "Excepted Issuances." SDRG issued warrants, not options, on November 2, 2007. For that additional reason, the issuance of the warrants on November 2 was not an "Excepted Issuance."

demanded that SDRG immediately issue the additional shares and adjust the warrant exercise price. SDRG refused to do so.

There can be no serious question that the issuance of the warrants on November 2 was not an Excepted Issuance under the Subscription Agreement and, therefore, Alpha Capital has a clear right to the issuance of the additional shares and the adjustment of the exercise price of the Class A and Class B Warrants, as requested herein. Thus Alpha Capital has an overwhelming likelihood of success on the merits of its claim.

<u>Irreparable Harm</u>

Absent the award of immediate injunctive relief, Alpha Capital will suffer irreparable harm. First, SDRG agreed in writing that its failure to honor the terms of the Subscription Agreement would irreparably harm Alpha Capital and entitle it to injunctive relief. Thus ¶13(f) of the Subscription Agreement provides:

> "<u>Specific Enforcement, Consent to Jurisdiction</u>. The Company [SDRG] and the Subscriber [Alpha Capital] acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. **It is accordingly agreed that the parties shall be entitled to one or more preliminary and final injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof**, this being in addition to any other remedy to which any of them may be entitled by law or equity." (bold added)

6

Absent immediate injunctive relief, Alpha Capital will in fact suffer irreparable harm, as the parties specifically acknowledged in the Subscription Agreement. SDRG, according to its public filings, is a company which is engaged in the acquisition, exploration and development of silver and other mineral properties in China and Mexico. SDRG's primary focus is the exploration of nine properties located in Erbaohuo Silver District in Northern China, as well as the properties in Cerro Las Minitas located in Guadalupe, Durango, Mexico. SDRG is still in its exploration stage and has not generated any revenues from the mining properties in China and Mexico (Exhibits F and J).

SDRG's own accountants have expressed uncertainty as to its ability to continue as a going concern. The accountants noted that SDRG incurred losses in the first nine months of this year exceeding $8.5 million and has accumulated losses since inception of almost $20 million. They note that SDRG's ability to continue as a going concern is uncertain and dependant, among other things, on its ability to obtain additional sources of financing to sustain its operations. Thus the accountants stated (Exhibit G):

Going Concern and Exploration Stage Activities

The Company's unaudited condensed consolidated financial statements for the nine months ended September 30, 2007 have been prepared in accordance with accounting principles generally accepted in the United States of America with the assumption that the Company will be able to realize its assets and discharge its liabilities in the normal course of business. The Company has incurred a net loss of $8,551,143 for the nine months ended September 30, 2007 (2006 - $8,242,981), and has accumulated losses since inception of $19,916,756. The Company's continuation as a

7

going concern is uncertain and dependant on successfully bringing
its services to market, achieving future profitable operations and
obtaining additional sources of financing to sustain its operations. In
the event the Company cannot obtain the necessary funds, it will be
necessary to delay, curtail or cancel further acquisitions and explo-
ration and development activities. The Company is pursuing addi-
tional financing; however, there can be no assurance that the Com-
pany will be able to secure financing when needed or obtain such on
terms satisfactory to the Company, if at all.

Indeed, SDRG's current liabilities are more than double its current assets, making it impossible

for SDRG to pay its debts on a current basis, absent additional capital infusions (Exhibit H).[4]

Because SDRG's accountants have expressed uncertainty about its ability to continue as a

going concern, Alpha Capital should not be required to assume the risk that SDRG will not be

a viable entity which can respond to any ultimate judgment, particularly when Alpha Capital's

rights to the additional shares, and to the reduction in the exercise price of the Warrants, are so

clear. Alpha Capital should not be required to run the risk that SDRG, during the course of this

litigation, can continue to raise capital on acceptable terms so that it can stay in business, as to

which SDRG, as noted above, is unwilling and unable to give any assurances.

Further, as SDRG's public filings make clear, its main asset consists of mineral rights

in China and Mexico (Exhibit J) and prepaid expenses. It is highly questionable whether those

assets will be available to satisfy any ultimate judgment in this case. First, the mineral rights,

---

[4]When Alpha Capital made its investment in SDRG, the then most recent financials filed
by SDRG on November 14, 2006 showed that its current assets exceeded its current liabilities
(See Exhibit I, excerpts of its 10KSB/A filed on that date). The dramatic change in SDRG's
current ratio (the ratio of current assets to current liabilities) along with its substantial losses
since that time demonstrate a material deterioration in SDRG's financial condition since the time
of Alpha Capital's investment.

although they appear as assets on the SDRG consolidated balance sheet, are owned by a

Chinese and a Mexican subsidiary of SDRG, according to its public filings (Exhibits F and G).

Even if a subsidiary's assets were available to satisfy a judgment against its parent company,

which I am informed they are not, Alpha Capital would be compelled to enforce any judgment

in China and Mexico, a highly dubious, and clearly non-economical, undertaking. SDRG itself,

in its public filings, has acknowledged the difficulty, if not the impossibility, of enforcing any

judgment against it (Exhibit K):

> All of our assets are located outside of the United States, the
> individuals serving as officers and directors are nationals and/or
> residents of a country or countries other than the United States, and
> all or a substantial portion of their assets are located outside the
> United States. As a result, it may be difficult for an investor to
> effect service of process or enforce within the United States any
> judgments obtained against us or our officers and directors,
> including judgments predicated upon the civil liability provisions
> of the securities laws of the United States or any state thereof.

The admitted unavailability of assets in the United States against which to enforce any

judgment renders the requested injunctive relief against SDRG imperative.

Even if SDRG had assets which were available to satisfy any judgment and even if it

were possible and economical to enforce any judgment in China and Mexico, SDRG's

accountants are unwilling to assign any value to those mineral rights in the event SDRG ceases

as a going concern. Thus the mineral rights, in the event SDRG ceases business, may in fact

have no value. Thus the accountants state (Exhibit G):

> The unaudited condensed consolidated financial statements
> do not include any adjustments to reflect the possible future effects
> on the recoverability and classification of assets or the amounts and
> classification of liabilities that may result from the possible inabil-
> ity of the Company to continue as a going concern.

If SDRG's accountants question the value of its assets in the event SDRG is no longer a going

concern, Alpha Capital should not be required to assume the risk that those assets will in fact

have any value at the end of this case.

Grants of mineral rights, I am informed, generally require the grantee to make certain

investments in the property and to continue mining operations. In the event the grantee ceases

to make such investments, it is not unusual, I am informed, for the rights granted to the grantee

to lapse. All of the terms of the mineral rights which SDRG's subsidiaries may possess are not

available online and apparently have not been filed so that Alpha Capital could examine all of

the terms thereof. If SDRG has insufficient funds to meet its subsidiaries' obligations under the

grant of mineral rights, those rights, as a matter of contract, may disappear and become

valueless.

Without the mineral rights and without the prepaid expenses which are listed as an asset

on the most recent SDRG balance sheet (Exhibit H), which prepaid expenses clearly are not

available to satisfy any judgment, SDRG has a negative net worth of approximately $2 million.

As is set forth in the memorandum of law served herewith, the inability of a defendant to satisfy any ultimate judgment at the end of the case, either because the defendant no longer exists, because the main assets on its consolidated balance sheet are owned by subsidiaries, because its assets are located outside of the United States in remote locations, or because SDRG states that the assets may well prove valueless in the event it ceases operations, all should compel this Court to award the requested preliminary injunctive relief.

It will also be extremely difficult, if not impossible, to calculate with any certainty the damages resulting from SDRG's failure to deliver the stock. The dates upon which Alpha Capital would have sold the stock it did not receive, and the amounts Alpha Capital would have realized from any such sales, will be difficult to establish with any degree of certainty. Such inability to calculate damages with any degree of precision, I am informed, also constitutes irreparable harm supporting an award of preliminary injunctive relief. It is for all the above reasons that the parties in the Subscription Agreement agreed to an award of preliminary injunctive relief to remedy SDRG's wrongs set forth herein.

There is no reason why the Court should not hold SDRG to the terms of its agreement and enter the requested injunction. SDRG agreed to those terms to obtain Alpha Capital's $500,000 investment. Alpha Capital has in fact suffered irreparable harm. SDRG should not be permitted to evade its agreement when Alpha Capital seeks to obtain the very relief which the parties, at the inception of the investment, agreed Alpha Capital could obtain to remedy SDRG's defaults.

There has been no previous application for the relief requested herein.

Wherefore, Alpha Capital respectfully requests that the Court issue an order: i) directing SDRG to deliver immediately 333,333 shares of its common stock to Alpha Capital; and ii) declaring that the exercise price of the SDRG Class A and Class B Warrants purchased by Alpha Capital is now $0.60 per share.

Dated: December 3 2007

_____
Konrad Ackermann

12

Yahoo! | My Yahoo! | Mail | More        **Make Y! your home page**        New User? Sign Up  **Sign In** | Help

**YAHOO!** FINANCE        Search: [                    ] [Web Search]

---

sdrg    [GET QUOTES]  Finance Search        Wednesday, February 20, 2008, 1:09PM ET - U.S. Markets close in 2 hours and 51 minutes.

      

## Get Quotes Results for "sdrg"

All (1)   Stocks (1)   Mutual Funds (0)   ETFs (0)   Indices (0)   Futures (0)        All Markets ▼

| Symbol | Name | Last Trade | Type | Industry/Category | Exchange |
|--------|------|-----------|------|-------------------|----------|
| SDRG.OB | SILVER DRAGON RES | 0.48 | Stock | | OBB |

SPONSORED LINKS

SDRG Is Forecast Upward
Automated Software picks
OTCBB stocks that are likely
to double soon.
www.autopilottraders.net

Buy Sdrg Stock - $4 Fee
No Account or Investment
Minimums. No Inactivity Fees.
Start Today.
www.ShareBuilder.com

OTC BB - Penny Stocks Daily
Un-biased BB stock picks and
anaylsis. Profits of 5000% or
more.
www.pennystocksdaily.com

SPONSORED LINKS

SDRG Is Forecast Upward
Automated Software picks OTCBB stocks that are likely to double soon.
www.autopilottraders.net

Buy Sdrg Stock - $4 Fee
No Account or Investment Minimums. No Inactivity Fees. Start Today.
www.ShareBuilder.com

OTC BB - Penny Stocks Daily
Un-biased BB stock picks and anaylsis. Profits of 5000% or more.
www.pennystocksdaily.com

## YAHOO! FINANCE

| YAHOO! FINANCE | ALSO ON YAHOO! | | THINGS TO DO |
|----------------|----------------|---|--------------|
| Banking & Budgeting | Insurance | 360 | Hot Jobs | News | Send Feedback |
| Currency | Market Stats | Autos | Mail | Shopping | Check Stock Quotes |
| Calculators | Message Boards | Finance | Maps | Sports | Search Homes for Sale |
| ETFs | Mutual Funds | Games | Movies | Tech | Check Home Values |
| Experts | Personal Finance | Groups | Music | Travel | Find a New Car |
| Investing | What's New | Health | My Yahoo! | TV | Search Jobs Across the Web |

» All Y! Services

## YAHOO! FINANCE WORLDWIDE

Argentina  Australia & NZ  Brazil  Canada  China  Chinese  France  French Canada  Germany
Hong Kong  India  Italy  Japan  Korea  Mexico  Singapore  Spain  Spanish  Taiwan  UK & Ireland

Copyright © 2008 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy - Send Feedback
Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quote data delayed 15 minutes for Nasdaq, 20 minutes for NYSE and Amex. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Yahoo! is not an investment adviser and does not provide, endorse or review any information or data contained herein. Collective Intellect, Inc., a third party provider, collects and disseminates data comprising Community Sentiment based upon voluntary postings to Yahoo! message boards. The postings may or may not be from reliable sources. The Community Sentiment information is not intended as investment advice and does not constitute recommendations or endorsements of any issuer, security or action. Neither Yahoo! nor any of its independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. You are solely responsible for the investment decisions made by you and the consequences resulting therefrom. By accessing the Yahoo! site, you agree not to redistribute the information found herein.



| Enter Symbol(s) or Keyword(s) | GO | Advanced Search > |

Learn more about the next step beyond mutual funds

FRONT PAGE     TOOLS & RESEARCH     QUOTES     SDRG

Profile    News    Chart    Analyst Info.    Insiders    Financials    Historical Quotes    SEC    Options    Industry

## Silver Dragon Res Inc SDRG (OTC BB)     Change: +0.01 +1.96%    Volume: 71,066    delayed quote data    11:52am 2/19/2008    | Change Symbol | Go

Overview    Profile    News    Chart    Analyst Info.    Insider Actions    Financials    Historical Quotes    Message Board    SEC    Industry

Enter Date: december 26, 2007    →

**Historical Quote For: SDRG**

Wednesday, December 26, 2007

| Closing Price: | **0.67** |
| Open: | **0.67** |
| High: | **0.67** |
| Low: | **0.65** |
| Volume: | **71,700** |



RELATED LINKS
• Featured Products
• ETF Center
• My Portfolios



There has never been a better time to roll over your retirement funds to Vanguard.

Learn more »    Vanguard

Vanguard Marketing Corp., Distributor. © 2008 The Vanguard Group, Inc.

Sponsored Links

**16 Hot Dividend Stocks**
Discover 16 sizzling stock picks earning annual yields up to 45%/yr.
MoneyAndMarkets.com

**AARP Auto Insurance**
Save $385 On Auto Insurance In Minutes If You're Over 49. Free Quote!
Hartford.com/AARP

**Stocks Ready To Soar**
Hot News Alert, Huge Profits, Stock Near Explosive Breakout Point
www.otcstockexchange.com

MOST POPULAR

READ     E-MAILED     EDITOR'S PICK

1. Retest of January lows may fail
2. U.S. stock futures point to strong opening on Wall Street
3. Writing a 'get rich' book is the path to wealth, not reading one
4. Fidel Castro stepping down as president of Cuba after 49 years
5. Microsoft won't raise bid for Yahoo: report
6. Credit Suisse writes down $2.85 bln after pricing errors
7. Tuesday's biggest gaining and declining stocks
8. Shanghai shrugs off inflation data to post gains
9. U.S. stocks advance for first session in three
10. Gold surges in broad metals rally; platinum hits new record

Get the Latest MarketWatch News >>

TRADING CENTER

 Take our free online seminars. Charles Schwab

  Trade with E*TRADE Securities

 OptionsHouse: Flat Rate Prices, Any Size.

  Trade free for 30 days at TD AMERITRADE.

Switch to Scottrade, get up to $100 back

 Plan for the retirement you deserve

Silver Dragon Resources Inc.: Form 10-Q - Prepared by TNT Filings Inc.

Page 1 of 2

Case 1:07-cv-11430-CM-THK   Document 15-18   Filed 02/20/2008   Page 1 of 2

**SILVER DRAGON RESOURCES INC. AND SUBSIDIARIES**
**(AN EXPLORATION STAGE COMPANY)**
**Condensed Consolidated Balance Sheet**
**(Unaudited)**

|  | September 30, 2007 |
|---|---|
| **ASSETS** |  |
| **Current Assets** |  |
| Cash and cash equivalents | $ 22,084 |
| Other receivables | 200,214 |
| Current portion of deferred expenses | 1,094,557 |
| **Total Current Assets** | 1,316,855 |
|  |  |
| **Deferred Expenses** | 567,291 |
| **Plant and Equipment, net** (note 4) | 536,488 |
| **Mineral Rights** (note 5) | 9,076,897 |
|  |  |
| **Total Assets** | $ 11,497,531 |
|  |  |
| **LIABILITIES** |  |
| **Current Liabilities** |  |
| Accounts payable (note 9) | $ 873,708 |
| Accrued liabilities | 1,196,342 |
| Loan payable (note 6) | 250,000 |
| Related party loans payable (note 8) | 578,109 |
| **Total Current Liabilities** | 2,898,159 |
|  |  |
| **Total Liabilities** | 2,898,159 |
|  |  |
| **Commitments and Contingencies** (note 13) |  |
|  |  |
| **STOCKHOLDERS' EQUITY** |  |
| **Capital Stock** (note 7) |  |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized, none issued and outstanding |  |
| Common stock, $0.0001 par value, 150,000,000 shares authorized 66,321,488 shares issued and outstanding | 6,632 |
|  |  |
| **Additional Paid-in Capital** (note 7) | 28,511,527 |
| **Deficit Accumulated During the Exploration Stage** | (19,916,756) |
| **Accumulated Comprehensive Loss** | (2,031) |
| **Stockholders' Equity** | 8,599,372 |
|  |  |
| **Total Liabilities and Stockholders' Equity** | $ 11,497,531 |

United States District Court
Southern District of New York
--------------------------------------------------------x

Alpha Capital Anstalt,

                Plaintiff,

        vs.

Silver Dragon Resources, Inc.,

                Defendant.

--------------------------------------------------------x

07 CV 11430 (CM)

        Affirmation of Barbara Mittman In Opposition To Defendant's
        Motion To Set Aside The Preliminary Injunction Granted By Default

      I am an attorney at law duly admitted to this Court. I hereby affirm under penalties of

perjury as follows:

      I have reviewed the affirmation of Asher Brand dated February 20, 2008 and I adopt the

factual statements set forth therein.

Dated: New York, New York
       February 20, 2008

                               Barbara Mittman